UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

UNITED STATES OF AMERICA,

           -against-

MYRON GUSHLAK,

              Defendant.

**MEMORANDUM & ORDER**

**03-CR-833 (NGG)**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ FEB 2 4 2011 ★
BROOKLYN OFFICE

------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

      Following Defendant Myron Gushlak's ("Gushlak") sentencing for his conviction on

charges that he conspired to commit securities fraud and money laundering, the Government has,

pursuant to 18 U.S.C. §§ 3663A and 3664, proffered evidence of securities trades it claims show

the actual losses suffered by the victims of Gushlak's crimes. Gushlak opposes the

Government's use of trading records to calculate victim losses and asks the court to order

restitution in reliance on loss affidavits submitted by some of the victims. For the reasons set

forth below, the court orders the Government to submit additional evidence relevant to

identifying Gushlak's victims and determining the losses they sustained because of Gushlak's

offense conduct.

## I.    BACKGROUND

      On July 22, 2003, Gushlak pleaded guilty to an Information charging him in Count One

with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b)

and 78ff, and in Count Two with conspiracy to commit money laundering in violation of 18

U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i), and 1956(h). (Information (Docket Entry # 3).) In

pleading guilty to Count One, Gushlak admitted to conspiring with others to "devise[],

implement[] and overs[ee] a fraudulent scheme to manipulate the price of Global Net common stock, as well as the stock of other publicly traded companies" during the period "[i]n or about and between January 1999 and December 2000." (Information ¶ 3.) In furtherance of this scheme, Gushlak admitted to conspiring with others to purchase and sell large blocks of the common stock of GlobalNet, Inc. ("GlobalNet") "in a manner designed to inflate artificially the price of the stock," and paying secret kickbacks to brokers "in exchange for the brokers causing their clients to purchase blocks of Global Net common stock from Gushlak and others at artificially inflated prices." (Id. ¶¶ 3-4.) On November 18, 2010, the court imposed on Gushlak a sentence of seventy-two months in the custody of the Attorney General and a $25 million fine, and stated that it would enter an order of restitution within ninety days of sentencing pursuant to 18 U.S.C. § 3664(d)(5). (Sentencing Tr. (Docket Entry # 32) at 116.)

## II.   DISCUSSION

### A.   Applicable Law

Under the Mandatory Victim Restitution Act ("MVRA"), codified at 18 U.S.C. § 3663A, the court is required to order a defendant convicted of "an offense against property . . . including any offense committed by fraud or deceit" to make restitution to any "identifiable victim or victims [who have] suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(A)(ii)-(c)(1)(B). This provision of the MVRA requires the court to order restitution in cases involving pump-and-dump schemes similar to the one at issue in this case. See United States v. Reifler, 446 F.3d 65, 121 (2d Cir. 2006) (citing United States v. Catoggio, 326 F.3d 323, 327-28 (2d Cir. 2003)). Orders of restitution issued under § 3663A must conform to the requirements of 18 U.S.C. § 3664. 18 U.S.C. § 3663A(d).

2

The court must identify the victims of a defendant's crimes, Catoggio, 326 F.3d at 328, and determine the amounts of each victim's actual losses caused by the defendant's criminal conduct, United States v. Carboni, 204 F.3d 39, 47 (2d Cir. 2000); Reifler, 446 F.3d at 121. In offenses "resulting in damage to or loss or destruction of property of a victim of the offense," the amount of loss is "the greater of the value of the property on the date of the damage, loss, or destruction; or the value of the property on the date of sentencing, less the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B).

"The government bears the burden of proving the amount of loss sustained by the victim by a preponderance of the evidence." United States v. Donaghy, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008) (Amon, J.) (citing 18 U.S.C. § 3664(e); Reifler, 446 F.3d at 122). Nonetheless, "the loss need not be determined with precision and [] the court need only make a reasonable estimate of the loss, given the available information." United States v. Germosen, 139 F.3d 120, 129, 130 (2d Cir. 1998) (quotation omitted) (holding "quantity and quality of evidence the district court may rely upon to determine the amount of loss is the same" in calculating both offense level under the Sentencing Guidelines and restitution); see also United States v. Boccagna, 450 F.3d 107, 114 (2d Cir. 2006) (noting that in the context of determining the value of lost property the MVRA tells a court "*what* to value" and "*when* to value it" but not "*how* the referenced property is to be valued"). The court may consider such "additional documentation or [] testimony" as it requires to identify victims and determine the amounts of their losses. 18 U.S.C. § 3664(d)(4); see also United States v. Duverge Perez, 295 F.3d 249, 254 (2d Cir. 2002) ("The discretion of a sentencing court is similarly broad either as to the kind of information it may consider, or the source from which it may come.") (quotation omitted).

## B.    The Government's Victim Loss Calculations

The Government has calculated that the victims of the securities fraud conspiracy

suffered, in aggregate, $20,468,876.29 in losses as a result of the fraudulent scheme. (See

Melley Decl. (Docket Entry # 29-1) ¶ 9; Melley Decl. Ex. 1 ("GlobalNet Victim List") (Docket

Entry # 29-2) at 10.) The Government bases its calculation of victim losses on its review of

detailed records maintained by market makers of trading activity, called "Blue Sheets," in shares

of GlobalNet and its predecessor-in-interest Rich Earth, Inc. ("Rich Earth"),[1] during the period

from March 1, 2000 through November 1, 2000 (the "relevant trading period"). (Gov't

Restitution Methodology Mem. ("Methodology Mem.") (Docket Entry # 29) at 2.) The Blue

Sheet data consist of details of all trades in GlobalNet shares executed by the two brokerages

involved in the fraudulent scheme, LCP Capital ("LCP") and Montrose Capital ("Montrose"),

including information identifying the customers for whom the trades were executed. (Id. at 2-3;

Melley Decl. ¶¶ 3-6.) Using these records, the Government calculated the total dollar value of

each customer's purchases of GlobalNet shares and subtracted the proceeds each customer

obtained from selling shares of GlobalNet to determine whether the customer obtained a net

positive return or suffered a net loss on their investment in GlobalNet. (Methodology Mem. at 3;

Melley Decl. ¶ 7.) For the purpose of these calculations the Government values GlobalNet

shares unsold as of the end of the relevant trading period at zero dollars per share, and calculates

the victim's loss as the full purchase price of the unsold shares. The Government excludes from

its list of victims any customer who realized a net positive return through trading in GlobalNet

shares. (Melley Decl. ¶ 8.) The Government acknowledges that the Blue Sheet data on which it

---

[1]    As explained in the Information, GlobalNet used a back door listing procedure to become a public
company. (Information ¶ 2.) GlobalNet became a publicly-traded company through a reverse merger into Rich
Earth, Inc., a shell company trading on the Over-the-Counter Bulletin Board under the ticker symbol RCER. (Id.)
Following the acquisition, GlobalNet changed its ticker symbol to GBNE on May 31, 2000. (Id.) The court refers
to them both as GlobalNet in this opinion.

4

relies do not include trades by the putative victims through other brokers or outside of the relevant trading period. (Id. ¶ 9.)

C.    Montrose Customers as Victims

Gushlak contests the Government's inclusion of Montrose customer accounts in its calculation of victim losses. (Def.'s Opp'n (Docket Entry # 31) at 2.) Gushlak states that to his knowledge, "Montrose Capital has nothing to do with the Global Net fraud." Gushlak states that in his allocution, and "in many of the forty-plus meetings he had with law enforcement," he indicated that "the Global Net fraud was committed with coconspirators Salvatore Romano and Joseph Quattrochi, principals of LCP Capital – not Montrose Capital." (Id. at 2-3.) Gushlak further states that "Montrose Capital, whose principal was Jonathan Winston, had nothing to do with Global Net." (Id. at 3.) Gushlak's argument is without merit.

The relevant question is whether the Montrose customers are victims of the securities fraud conspiracy in which Gushlak participated. Under the MVRA a victim is any

> person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2). The Second Circuit has read this provision to "provide for restitution payable by all convicted co-conspirators in respect of damage suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions." United States v. Boyd, 222 F.3d 47, 50 (2d Cir. 2000). Thus, a court may order a participant in a conspiracy to pay restitution for the reasonably foreseeable acts of his coconspirators. Id. at 51; see also Donaghy, 570 F. Supp. 2d at 426-27.

5

The Information charged Gushlak with conspiring with others to "manipulate the price of Global Net common stock," and with paying "secret kickbacks to brokers . . . in exchange for the brokers causing their clients to purchase blocks of Global Net common stock from Gushlak and others at artificially inflated prices." (Information ¶¶ 3, 5.) The Information did not identify those brokers.

Gushlak's coconspirator, Howard Appel ("Appel"), pleaded guilty, however, to an information which specifically charged him with bribing LCP and Montrose brokers in furtherance of the GlobalNet conspiracy. (See Appel Information, (Docket Entry # 9) ¶¶ 2-10, United States v. Appel, 04-CR-505 (JG) (E.D.N.Y. Sept. 21, 2004).) Gushlak has candidly and repeatedly admitted that Appel was his coconspirator in the GlobalNet stock manipulation conspiracy. (See Def.'s Letter of Jan. 7, 2011 at 1 ("[R]estitution should be imposed in an amount no greater than $1,457,555.55, the amount of restitution already imposed upon Howard Appel, jointly and severally with Appel's co-conspirators including Mr. Gushlak for the GlobalNet offense.").) Under Boyd, a participant in a conspiracy may be ordered to pay restitution for harm caused by the acts of his coconspirators done in furtherance of the conspiracy, even though he was not charged with engaging in the specific conduct causing the harm. 222 F.3d at 51. Even if the court were to credit Gushlak's statement that he was unaware that Montrose was involved in the scheme,[2] Appel's bribery of Montrose brokers was clearly within the scope of the securities fraud conspiracy to which Gushlak pleaded guilty because Gushlak was "aware of his part in a larger organization where others performed similar roles."

---

[2]    Gushlak's apparent surprise at the inclusion of Montrose customers in the loss calculations is also unwarranted based on the record in his own case. On November 10, 2003, just months after Gushlak pleaded guilty, the Government represented to the court that in furtherance of the GlobalNet stock manipulation conspiracy "Gushlak [] entered into secret agreements with the principals of two corrupt broker-dealers, Montrose Capital Management Ltd. . . . and LCP Capital Corp.," and "paid brokers at Montrose and LCP Capital bribes in exchange for soliciting their clients to purchase Global Net stock from Gushlak." (Gov't Opp'n to Def.'s Bail Application (Docket Entry # 10) at 3.)

Donaghy, 570 F. Supp. 2d at 427 (quotation omitted); see also United States v. Geibel, 369 F.3d 682, 689 (2d Cir. 2004) ("The co-conspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan.") (quotation omitted). Appel's admission to bribing Montrose brokers in furtherance of the GlobalNet stock manipulation conspiracy is sufficient evidence to conclude that Montrose customers who purchased GlobalNet stock were victims of the conspiracy in which Gushlak was a participant. Montrose customers who purchased GlobalNet stock and lost money because of the conspiracy are victims of Gushlak's offense of conviction within the meaning of the MVRA.

## D.     Preferability of Victim Loss Affidavits

Gushlak argues that the court should use victim loss affidavits submitted in connection with the Government's prosecution of his coconspirator, Appel, instead of trading records to determine the amounts of victims' losses.[3] (Def.'s Opp'n at 2; see Def.'s Letter of Jan. 3, 2011; Def.'s Letter of Jan.7, 2011.) Gushlak contends that the "statutory scheme and case law clearly favors victim loss affidavits in lieu of trading records in all but the most complicated cases," and attacks the reliability of the Blue Sheet data relative to the loss affidavits. (Def.'s Opp'n at 1.)

Under 18 U.S.C. § 3664(a), the probation officer must prepare a report that includes "a complete accounting of the losses to each victim." To assist the probation officer in preparing this report, § 3664(d)(1) requires the Government to consult, "to the extent practicable, with all identified victims," and "provide the probation officer with a listing of the amounts subject to

---

[3]     Pursuant to the court's January 14, 2011 Order, (Docket Entry # 26), the Government submitted on January 20, 2011, *ex parte* and under seal, copies of all documents relating to the imposition of restitution in United States v. Appel. The court requested copies of the restitution briefing in Appel, which remains under seal, in order to review the legal arguments on which Judge Gleeson might have based his rejection of the Government's arguments regarding the calculation of restitution in that case. See Order, United States v. Appel, 04-CR-505 (JG) (E.D.N.Y. May 20, 2008) (Gleeson, J.). The court reviewed the Appel restitution briefing and has determined that it will not rely on any of the sealed documents in the record in Appel in order to determine the amount of restitution Gushlak must pay in this case. Furthermore, the court is not persuaded by the arguments advanced by Appel against using trading records to prove the amount of a victim's losses.

restitution." Additionally, before submitting the report, the probation officer must "to the extent practicable, provide notice to all identified victims of . . . the opportunity of the victim to file with the probation officer a separate affidavit relating to the amount of the victim's losses subject to restitution." 18 U.S.C. § 3664(d)(2)(A)(vi). "After reviewing the report of the probation officer, the court may require additional documentation or hear testimony." Id. § 3664(d)(4).

No provision of § 3664 requires that a victim submit a loss affidavit, or that the court rely on one in determining the amount of a victim's losses. Rather, this provision demonstrates that the purpose of soliciting loss affidavits is, like the purpose of the MVRA, "to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." See Boccagna, 450 F.3d 107, 115 (quotation omitted). Soliciting loss affidavits serves the MVRA's compensatory purpose by allowing victims to supplement the information provided to the probation officer by the Government, thereby increasing the likelihood that they will be fully compensated for their losses. In some cases, such as where a defendant's conduct has caused the victim bodily harm, a loss affidavit may be the only practicable way of placing a value on the harm caused to the victim. See 18 U.S.C. § 3663A(b)(2) (requiring defendant guilty of an offense resulting in bodily harm to reimburse the victim for, among other things, "necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care"). But where there are a large number of potential victims who have suffered quantifiable pecuniary losses differentiated only in their magnitude, and where the losses sustained by all potential victims are disclosed in the same business records, reliance on incomplete loss affidavits from only some of the potential victims, instead of those business records, would poorly serve the compensatory purpose of the MVRA.

In this case there are strong reasons to not rely on the loss affidavits. First, the number of identifiable victims is much larger than the number of loss affidavits that have been submitted to the court. Based on the Government's analysis of the Blue Sheets, there are 452 customer accounts which traded in GlobalNet shares through Montrose and LCP during the relevant trading period that lost money. (See GlobalNet Victim List.) This large number of potential victims contrasts sharply with the seventy-one individuals who submitted loss affidavits in connection with the Government's prosecution of Appel. (See Amended Judgment (Docket Entry # 17) at 6, United States v. Appel, 04-CR-505 (JG) (E.D.N.Y. Jun. 11, 2008).) Second, the trading records submitted by the Government are far more likely to reliably state a victim's actual losses than a victim's years-old recollection of the stocks he or she owned and traded within the relevant trading period. Indeed, the most reliable loss affidavits are likely to be those based on trading records retained by the victim similar to those submitted by the Government.

While Gushlak speculates that there may be errors in the Blue Sheets, or other relevant information not included in them, (see Def.'s Opp'n, Lowry Decl. at 1-4), it is certain that if the court were to rely on the victim loss affidavits the court would fail to award full restitution to numerous identifiable victims of Gushlak's crime, and in so doing, would violate 18 U.S.C. § 3663A(a)(1) and § 3664(f)(1)(A). Consequently, the court finds that reliance on the loss affidavits is inappropriate here, where trading records are far more likely to serve the MVRA's purpose of fully compensating all victims for the losses caused by Gushlak's crime. See Boccagna, 450 F.3d at 115.

E.    Errors in the Government's Methodology

While the Government's methodology in calculating victim losses is generally sound, the Government has erred in three important respects: (1) the Government does not explain its basis

for valuing GlobalNet stock unsold during the relevant trading period at zero dollars; (2) the

Government does not explain its basis for limiting the relevant trading period to the time period

of March 1 to November 1, 2000; and (3) the Government has failed to proffer evidence

sufficient to establish that the full amount of losses suffered by the victims were caused by and

are attributable to the Gushlak's offense of conviction. Because these errors are related, the

court addresses them together.

In calculating victim losses, the Government assumes that GlobalNet shares retained by

purchasers at the end of the relevant trading period were literally worthless. For example, as

disclosed in the GlobalNet Victim List,[4] the Government calculates that James Manzi, Jr. lost

$242,450.00. (See GlobalNet Victim List at 5.) According to the Microsoft Excel spreadsheets

of Blue Sheet data provided to the court by the Government, Mr. Manzi did not sell any of his

GlobalNet shares during the relevant trading period. The Government calculated that Mr. Manzi

lost $242,450.00 simply by totaling the amounts of money that he paid to purchase shares of

GlobalNet in two transactions on August 28, 2000 and October 3, 2000. This calculation could

only be an accurate statement of Mr. Manzi's losses if: (1) the GlobalNet shares he purchased

were actually worthless, either at the time they were purchased or on the date of sentencing, see

18 U.S.C. § 3663A(b)(1)(B)(i); and (2) Mr. Manzi did not sell them to recoup any part of his

investment, see 18 U.S.C. § 3663A(b)(1)(B)(ii) (requiring court to reduce the amount of a

victim's loss by "the value (as of the date the property is returned) of any part of the property

that is returned"). The Blue Sheet data provided by the Government do not support this

conclusion. According to the Government's data, one putative victim sold 875 GlobalNet shares

---

[4]     The GlobalNet Victim List also includes some facial inconsistencies which may or may not be related to
the errors identified here. For example, Dr. Howard Chang is listed twice on the list, once with a loss of $49,465.00
and once with a profit of $19,389.54, and David Landis is listed as having made a profit of $1,549.43. (GlobalNet
Victim List at 2.) While defense counsel make much of hypothetical errors that may infect the Blue Sheet data,
these facial inconsistencies in the GlobalNet Victim List apparently eluded them.

for $6.375 per share on October 30, 2000, and other victims purchased 1,000 and 500 GlobalNet shares for $7.50 and $7.5625 respectively on November 1, 2000. These transactions, the last transactions included in the Government's Blue Sheet data, tend to show that a market for GlobalNet shares continued to exist at the end of the relevant trading period, and that the market placed a relatively significant value on those shares.

These data beg the question why the March 1 to November 1, 2000 trading period is the "relevant" trading period for determining the amount of victim losses. In the Information, the Government charged that the GlobalNet stock manipulation conspiracy was in existence from "[i]n or about and between January 1999 and December 2000." (Information ¶ 3.) If the stock price manipulation and high-pressure sales tactics used by the members of the conspiracy continued through December 2000, additional trading data may establish that there are other victims of Gushlak's crimes, or show that some of the victims currently listed by the Government were able to recoup at least some of their losses through sales of the GlobalNet stock. Trading data for periods of time preceding and following the conspiracy's manipulation of the stock could also be useful in showing what the market price of GlobalNet stock was in the absence of the manipulation.

The Government's analysis assumes that GlobalNet had literally no intrinsic value, that the price of the stock on any given day—and therefore the entire amount of the losses suffered by the victims who purchased it—was the result of manipulation by the members of the conspiracy. In recent securities fraud cases, the Second Circuit has rejected similar assumptions implicit in a sentencing court's determination of the amount of loss caused by a stock fraud conspiracy. In United States v. Rutkoske, 506 F.3d 170, 178 (2d Cir. 2007), a case presenting facts very similar to those here, the Court of Appeals reversed a sentence imposed in a criminal

11

stock fraud case in which the district court calculated the amount of loss caused by the defendant's offense of conviction, using a method[5] which "implicitly attributed the total amount of the decline in the value of NetBet shares to Rutkoske's offense conduct."

Citing Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), United States v. Ebbers, 458 F.3d 110 (2d Cir. 2006), and United States v. Olis, 429 F.3d 540 (5th Cir. 2005), Rutkoske held that principles governing recovery of damages in civil securities fraud cases should guide a sentencing court's determination of the amount of loss caused by a criminal stock fraud. 506 F.3d at 179. Relying on Olis's holding that "there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines," 429 F.3d at 546, Rutkoske stated that "many factors may cause a decline in share price between the time of the fraud and the revelation of the fraud. In such cases, losses from causes other than the fraud must be excluded from the loss calculation." 506 F.3d at 179 (quotations and citations omitted).

The Rutkoske court rejected the Government's argument that the Government satisfied its burden of proving loss causation "by showing that NetBet shares traded in a thin market and that the scheme unraveled, and the price of NetBet stock plummeted." Id. at 180 (quotation omitted). The court stated that

> a "thin" market does not preclude the effect of market forces, although it may minimize them, and the Government's expert linked the low share price of his calculation to an arbitrary date representing the end of available blue sheet data, rather than the date of disclosure of the fraud. The Government provides no record citation to any particular date to support its generalized claim that the scheme "unraveled."

---

[5]    That method "was to take the losses sustained by Lloyd Wade customers in NetBet stock as a result of their purchases and sales between January 1997 and July 29, 1999, and, as to unsold shares, use the difference between purchase price and value on July 29, 1999. That date was the last date for which the parties had 'blue sheets,' reporting forms for market makers. That date had no particular relevance to the offense conduct, and in fact was three months after the end of the charged conspiracy." Rutkoske, 506 F.3d at 178.

Id. The Court of Appeals reversed the district court's determination of the amount of loss

attributable to the defendant because of its "basic failure at least to approximate the amount of

the loss caused by the fraud without even considering other factors relevant to a decline in

NetBet share price." Id. The Court of Appeals remanded the case to the district court "to

redetermine the amount of the loss, both for purposes of the sentence and restitution." Id.

The Rutkoske court noted, however, that the record before the Court of Appeals was

bereft of evidence showing that the defendant had "'promoted worthless stock in worthless

companies,' which would justify attributing the entire loss amount to Rutkoske's fraud." Id. at

n.4 (quoting Olis, 429 F.3d at 546). This dictum in Rutkoske refers to a distinction drawn by the

Fifth Circuit in Olis between securities fraud conspiracies "where defendants promoted worthless

stock in worthless companies" and those "fraudulent transactions that 'cook the books' and prop

up a company's stock but do not . . . render the company worthless." Olis, 429 F.3d at 546. In

the former situation the Fifth Circuit stated that "measuring the loss as the entire amount raised

by the schemes is neither surprising nor complex, and is fully consistent with civil loss

causation." Id. Here, the Government has not proffered evidence that would be sufficient for the

court to conclude either that GlobalNet was a worthless company with worthless stock, or that

Gushlak's offense conduct was entirely responsible for rendering GlobalNet stock worthless.

### F.    Violation of 18 U.S.C. § 3664(d)(5)

The shortcomings the court has identified in the Government's methodology prevent the

court from determining the amounts of loss caused by Gushlak's offense of conviction within the

ninety-day period required by statute. See 18 U.S.C. § 3664(d)(5). This does not mean,

however, that the court should order Gushlak to pay no restitution at all, or order Gushlak to pay

restitution based on loss affidavits that are comparatively unreliable and certain to understate the

victims' amounts of loss. The purpose of the ninety-day window is to help victims enforce judgments of restitution by preventing defendants from dissipating assets subject to restitution. See United States v. Catoggio, 326 F.3d 323, 330 (2d Cir. 2006). Here, the Government's submissions demonstrate that there were a large number of victims of Gushlak's offense conduct, and that, despite errors in its methodology, the Government has the ability to identify the victims who suffered losses and prove the amounts of loss caused by Gushlak's offense. The court concludes that the Government will be able to carry its burden of proving loss causation through additional evidentiary submissions to the court. For example, the Government might submit a detailed presentation of the facts of the GlobalNet stock manipulation conspiracy, additional trading records, and other information relevant to assessing the effect exogenous market factors might have had on GlobalNet's stock price. Therefore, the court finds that although the ninety-day window for entering an order of restitution has passed, the interests of the victims and the compensatory purposes of the MVRA are best served by requiring the Government to submit additional evidentiary material sufficient to prove the identities of the victims and their losses by a preponderance of the evidence.

## III. CONCLUSION

Consequently, the Government shall review Rutkoske and other relevant case law and submit a letter to the court by March 4, 2011, proposing a schedule for its submission of additional material which it believes will be sufficient to carry its burden of identifying the victims of Gushlak's offense and proving their amounts of loss.

SO ORDERED.

s/Nicholas Garaufis

Dated: Brooklyn, New York
    February 23 2011

NICHOLAS G. GARAUFIS
United States District Judge

14