FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.
★ JUL 26 2011 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

UNITED STATES OF AMERICA,

        -against-

MYRON GUSHLAK,

        Defendant.

------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**03-CR-833 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

In this Order—the court's third attempt to determine the amount Defendant must pay to his victims in restitution—the court finds that the Government has once again failed to prove that the victim losses it identified were caused by Defendant's offense of conviction, and orders the Government to try one last time to carry its burden.

**I.  BACKGROUND**

On July 22, 2003, Defendant Myron Gushlak ("Gushlak") pleaded guilty to an Information charging him in Count One with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b) and 78ff, and in Count Two with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i), and (h). (Information (Docket Entry # 3).) In pleading guilty to Count One, Gushlak admitted to conspiring with others to "devise[], implement[] and overs[ee] a fraudulent scheme to manipulate the price of Global Net common stock, as well as the stock of other publicly traded companies" during the period "[i]n or about and between January 1999 and December 2000." (Information ¶ 3.) In furtherance of this scheme, Gushlak admitted, he conspired with others to

1

purchase and sell large blocks of the common stock of GlobalNet, Inc.[1] ("GlobalNet") "in a manner designed to inflate artificially the price of the stock," and paid secret kickbacks to brokers "in exchange for the brokers causing their clients to purchase blocks of Global Net common stock from Gushlak and others at artificially inflated prices." (Id. ¶¶ 3-4.) On November 18, 2010, the court imposed on Gushlak a sentence of 72 months in the custody of the Attorney General and a $25 million fine, and stated that it would enter an order of restitution within 90 days of sentencing pursuant to 18 U.S.C. § 3664(d)(5). (Sentencing Tr. (Docket Entry # 32) at 116.)

In its first attempt to prove the losses suffered by the victims of Gushlak's offense, the Government submitted a letter to the court on December 20, 2010, in which it indicated that, based on its review of records of trading activity in the shares of GlobalNet, the victims of Gushlak's offense lost approximately $20,468,876.29. (Gov't First Restitution Br. (Docket Entry # 21) at 1.) The Government, however, did not provide those trading records to the court, describe its methodology in calculating losses, or include a list of the victims of Gushlak's offense. (First Restitution Order (Docket Entry # 26) at 4.)[2] Consequently, the court found that the Government had yet to prove any victim losses and ordered the Government to explain its methodology, and to provide to the court, for in camera review, the trading records on which it relied, as well as a list of victims and the amounts of their losses. (Id. at 4-5.)

The Government made its second attempt to prove victim losses on January 27, 2011. (See Gov't Second Restitution Br. (Docket Entry # 29).) The Government provided a

---

[1] As explained in the Information, GlobalNet used a back-door listing procedure to become a public company. (Information ¶ 2.) GlobalNet became a publicly-traded company through a reverse merger into Rich Earth, Inc. ("Rich Earth"), a shell company trading on the Over-the-Counter Bulletin Board under the ticker symbol RCER. (Id.) Following the acquisition, GlobalNet changed its ticker symbol to GBNE on May 31, 2000. (Id.) The court refers to them both as GlobalNet in this Order.

[2] The court's First Restitution Order is available at United States v. Gushlak, No. 03-CR-833, 2011 WL 128359, at *1 (E.D.N.Y. Jan. 14, 2011).

2

declaration from Peter Melley, an analyst with the Financial Industry Regulatory Authority, in which he described how he used the trading records to calculate victim losses. (See First Melley Decl. (Docket Entry # 29-1).) The Government also submitted spreadsheets of securities trading data ("Blue Sheets")[3] to the court for in camera review. (See Gov't Trading Data Cover Letter (Docket Entry # 30).) The court summarized the Government's methodology in its Second Restitution Order:

> Using these records, the Government calculated the total dollar value of each customer's purchases of GlobalNet shares and subtracted the proceeds each customer obtained from selling shares of GlobalNet to determine whether the customer obtained a net positive return or suffered a net loss on their investment in GlobalNet. For the purpose of these calculations the Government values GlobalNet shares unsold as of the end of the relevant trading period at zero dollars per share, and calculates the victim's loss as the full purchase price of the unsold shares. The Government excludes from its list of victims any customer who realized a net positive return through trading in GlobalNet shares.

(Second Restitution Order (Docket Entry # 35) at 4 (internal citations omitted).)

These materials, however, revealed certain assumptions in the Government's calculations that were not supported by the evidence it presented. (See id. at 9-10.) In the court's Second Restitution Order,[4] the court held that

> [w]hile the Government's methodology in calculating victim losses is generally sound, the Government has erred in three important respects: (1) the Government does not explain its basis for valuing GlobalNet stock unsold during the relevant trading period at zero dollars; (2) the Government does not explain its basis for limiting the relevant trading period to the time period of March 1 to November 1, 2000; and (3) the Government has failed to proffer evidence sufficient to establish that the full amount of losses suffered by the victims were caused by and are attributable to [] Gushlak's offense of conviction.

---

[3] "Blue Sheets" are detailed records of trading activity maintained by market makers. The Blue Sheets submitted by the Government to the court reflect trading activity in shares of GlobalNet and its predecessor-in-interest Rich Earth, during the period from March 1, 2000 through November 1, 2000 (the "relevant trading period"). The Blue Sheet data consist of details of all trades in GlobalNet shares executed by the two brokerages involved in the fraudulent scheme, LCP Capital and Montrose Capital, including information identifying the customers for whom the trades were executed.

[4] The court's Second Restitution Order is available at United States v. Gushlak, No. 03-CR-833, 2011 WL 782295, at *1 (E.D.N.Y. Feb. 24, 2011).

(Id. at 9.) The court observed that the Government's calculations of loss "assume[d] that GlobalNet had literally no intrinsic value" and implicitly attributed the entire price of the stock on any given day to the manipulative activities of the members of the conspiracy. (Id. at 11.) The court noted that United States v. Rutkoske, 506 F.3d 170, 178 (2d Cir. 2007), required the court to reject the assumption that GlobalNet's stock was worthless and to demand that the Government prove the stock's actual value in the absence of manipulation. (Id. at 13.) To carry this burden the court stated that the Government could provide "a detailed presentation of the facts of the GlobalNet stock manipulation conspiracy, additional trading records, and other information relevant to assessing the effect exogenous market factors might have had on GlobalNet's stock price." (Id. at 14.)

On April 15, 2011, the Government filed its third attempt to prove victim losses. (Gov't Third Restitution Br. (Docket Entry # 42).) That submission is the subject of this Order.

## II. DISCUSSION

### A. Legal Standard for Determining Victim Losses

The Mandatory Victim Restitution Act ("MVRA"), codified at 18 U.S.C. §§ 3663A and 3664, requires the court to identify the victims of a defendant's crimes, United States v. Catoggio, 326 F.3d 323, 328 (2d Cir. 2003), and determine the amounts of each victim's actual losses caused by the defendant's offense of conviction, United States v. Carboni, 204 F.3d 39, 47 (2d Cir. 2000); United States v. Reifler, 446 F.3d 65, 121 (2d Cir. 2006). For the purposes of the MVRA, "victims" are those persons "directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2). For offenses "resulting in damage to or loss or destruction of property of a victim of the offense," the amount of loss is "the greater of the value of the property on the date of the damage, loss, or destruction; or the value of the

4

property on the date of sentencing, less the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B). "In determining the proper amount of restitution, a court must keep in mind that '[t]he loss must be the result of the fraud.'" United States v. Paul, 634 F.3d 668, 676 (2d Cir. 2011) (quoting Rutkoske, 506 F.3d at 179).

The MVRA tells a court "*what* to value" and "*when* to value it" but not "*how* the referenced property is to be valued." United States v. Boccagna, 450 F.3d 107, 114 (2d Cir. 2006). Second Circuit case law, however, requires sentencing courts to apply principles "relevant to loss causation in a civil fraud case" to identify the victims of a criminal securities fraud conspiracy and to determine the amounts of their losses caused by the conspiracy. Rutkoske, 506 F.3d at 178-79; see also United States v. Leonard, 529 F.3d 83, 92 n.11 (2d Cir. 2008).

Causation in securities fraud cases has two aspects: transaction causation and loss causation. Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 196-97 (2d Cir. 2003).

> [T]ransaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities. It is established simply by showing that, but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.
>
> Loss causation, by contrast, is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff. We have often compared loss causation to the tort law concept of proximate cause, meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission.

Id. at 197 (internal quotation marks and citations omitted).[5] In Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 340, 342 (2005), the Supreme Court cited Emergent with approval in

---

[5] Emergent, conincidentally, arose out of allegations of fraud involving Gushlak's infamous coconspirator, Howard Appel. See Emergent, 343 F.3d at 193-94.

5

holding that a person is not harmed simply by purchasing a security at a price that is artificially inflated because of a fraudulent representation or omission.

> [In Dursa Pharmaceuticals] the Court observed that although an artificially inflated price might cause an investor's loss when the investor sells his shares "after the truth makes its way into the marketplace," id. at 342, other factors, such as changed economic conditions, might also contribute to a stock's decline in price, see id. at 343, and a plaintiff must prove that the misrepresentation proximately caused the economic loss, see id. at 346.

Rutkoske, 506 F.3d at 179. Thus, "'there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines.'" Id. (quoting United States v. Olis, 429 F.3d 540, 546 (5th Cir. 2005)). "[M]any factors may cause a decline in share price between the time of the fraud and the revelation of the fraud. In such cases, '[l]osses from causes other than the fraud must be excluded from the loss calculation.'" Rutkoske, 506 F.3d at 179 (internal citation omitted, quoting United States v. Ebbers, 458 F.3d 110, 128 (2d Cir. 2006)).[6]

---

[6] The court notes an apparent inconsistency in Second Circuit case law on the question of loss causation where the defendant fraudulently induces the victim to purchase securities at an artificially inflated price by failing to disclose to the investor that the broker or sales agent is being paid commissions to sell the security. In Leonard, 529 F.3d at 85-86, the sales agent defendants fraudulently failed to disclose to investors the commissions they received to market interests in motion picture investment vehicles. To determine the appropriate sentencing enhancement for victim losses under the 2000 Sentencing Guidelines, the Court of Appeals instructed the district court to apply application note 8(a) of § 2F1.1 of the 2000 Guidelines, which stated that "'[w]here, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock was overvalued (i.e., $30,000).'" Id. at 92-93 (quoting U.S.S.G. § 2F1.1 app. n.8(a) (2000)). By its terms, application note 8(a), since deleted with the rest of § 2F1.1, did not require the Government to prove loss causation and apparently endorsed the inflated purchase price theory rejected by the Supreme Court five years later in Dura Pharmaceuticals. As additional support for this approach, Leonard cited Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1173 (2d Cir. 1970), for the proposition that courts could "employ[] a recissional measure of damages, rather than equating damages to purchase price, where 'the evil is not the price at which Chasins bought but the fact of being induced to buy and invest.'" Id. at 93.

In Rutkoske, however, the Second Circuit considered a securities fraud scheme much like the one Gushlak is charged with, in which "[b]rokers selling NetBet stock received large commissions, which Rutkoske personally authorized. The commissions were not disclosed to clients; in fact, brokers often told their clients that they received no commission, and trade confirmations stated that there was no commission." Rutkoske, 506 F.3d at 173. There, the Second Circuit also applied § 2F1.1 of the 2000 Sentencing Guidelines, but held that Dura Pharmaceuticals required the sentencing court to find the amount of loss actually caused by the defendant's fraud. Id. at 178-80. In Rutkoske it was not enough that the defendants had fraudulently induced investors to purchase artificially inflated securities; the Court of Appeals also required the district court to determine how much of the decline in the stock's price was attributable to the defendant's scheme to defraud.

6

"The government bears the burden of proving the amount of loss sustained by the victim by a preponderance of the evidence." United States v. Donaghy, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008) (Amon, J.) (citing 18 U.S.C. § 3664(e); Reifler, 446 F.3d at 122). Nonetheless, "the loss need not be determined with precision and [] the court need only make a reasonable estimate of the loss, given the available information." United States v. Germosen, 139 F.3d 120, 129, 130 (2d Cir. 1998) (internal quotation marks omitted) (holding "quantity and quality of evidence the district court may rely upon to determine the amount of loss is the same" in calculating both offense level under the Sentencing Guidelines and restitution). The court may consider such "additional documentation or [] testimony" as it requires to identify victims and determine the amounts of their losses. 18 U.S.C. § 3664(d)(4); see also United States v. Duverge Perez, 295 F.3d 249, 254 (2d Cir. 2002) ("The discretion of a sentencing court is similarly broad either as to the kind of information it may consider, or the source from which it may come.") (internal quotation marks omitted).

## B. The Government's Revised Method of Determining Victim Losses and Defendant's Objections

The Government's revised method is essentially the same as the one it used before, except that it now attempts to account for the role played by exogenous market forces in the

---

While the Second Circuit's more recent opinion in Leonard is inconsistent with the approach taken in Rutkoske, the scheme to defraud proven in Rutkoske is more similar to the one in this case than the scheme proven in Leonard, and Rutkoske is, therefore, more directly applicable here. Moreover, the court agrees with the Ninth Circuit's observation that there are stronger reasons for applying Dura Pharmaceuticals' approach in the context of criminal restitution, "which, unlike the sentencing enhancement scheme, focuses on harm to the victims as opposed to loss caused by the defendant." See United States v. Berger, 587 F.3d 1038, 1044 n.7 (9th Cir. 2009).

decline in GlobalNet's share price during the relevant trading period.[7] At the request of the Government, Melley performed an analysis of the S&P 500, Nasdaq Composite, and Russell 2000 market indices. (Second Melley Decl. (Docket Entry # 42-1) ¶¶ 13-16.) He determined that during the relevant trading period these market indices declined 20%, on average, while the share price of GlobalNet declined 72% during the same period. (Id. ¶ 17.) Melley attempted to factor this decline into the victim loss calculations by discounting victim losses by 20%, apparently to reflect the degree to which the stock price decline and victims' losses were caused by market forces and not the securities fraud conspiracy of which Gushlak was a member. (Id. ¶ 19.) Based on this analysis, the Government contends that $8,950,032.54 is a reasonable estimate of the losses suffered by the victims of Gushlak's offense of conviction. (Gov't Third Restitution Br. at 3.)

Gushlak's principal objection to the Government's revised methodology is that the Government has failed to prove that any of the losses suffered by holders of GlobalNet shares were actually caused by the securities fraud conspiracy. (Def. Mem. (Docket Entry # 52) at 10.) He argues that GlobalNet was just like any other internet startup that suffered massive declines in its stock price during the same period. (Id.) Gushlak identifies two companies in the telecommunications sector that competed with GlobalNet—Level 3 Communications, Inc. ("Level 3") and 8x8, Inc. ("8x8")—and which he contends are directly comparable to GlobalNet

---

[7] The Government has also changed how it values shares unsold as of November 1, 2000. The Government explains that it is unable to provide records of trades in GlobalNet shares executed after November 1, 2000 because such records are maintained for only three years, and the Government did not request those data before they were destroyed. (Gov't Third Restitution Br. at 1-2.) Accordingly, the Government's revised methodology assumes that each shareholder who held shares of GlobalNet as of November 1, 2000, was able to sell those shares at the last sale price reflected in the Blue Sheets—$7.34 per share. (Id. at 2; Second Melley Decl. (Docket Entry # 42-1) ¶ 11.) The Government admits that this is an "imperfect" measure of victim loss, but observes that historical share price data indicate that after November 1, 2000, GlobalNet shares never sold for an amount greater than $7.34 per share. (Id. at 2; Second Melley Decl. ¶¶ 10; Historical Price Charts (Docket Entry # 42-3).) Therefore, a valuation of unsold shares at $7.34 is more likely than not to inure to Gushlak's benefit. Indeed, Gushlak's opposition does not object to this assumption.

8

during the relevant trading period. (Reinbeau Decl. (Docket Entry # 54) ¶¶ 5, 9, 11-12.) Gushlak argues that historical financial data indicate that GlobalNet, like Level 3 and 8x8, was following a strategy of "Get Big Fast" in which it pursued aggressive revenue growth while sustaining mounting operating losses. (Id. ¶¶ 16-17.) He contends that GlobalNet's stock price, like Level 3's and 8x8's, reflected market speculation "that telecommunications companies, particularly those with internet skills, were the stocks of the future, whose current valuations would be validated by increasing revenues." (Id. ¶ 18.) Gushlak observes that his securities fraud conspiracy was not publicly revealed until after GlobalNet stock ceased to be publicly traded, and argues that there was no public revelation of fraud relating to GlobalNet prior to or during GlobalNet's decline that would permit the inference that the decline was caused by the conspiracy. (Def. Mem. at 10.) Thus, Gushlak reasons that the entire decline in GlobalNet's stock price is attributable to the same market factors that led to comparable declines in Level 3's and 8x8's share prices, and therefore was not caused by his fraud. (Reinbeau Decl. ¶¶ 20-28.)

C.  **The Government's Failure to Prove Loss Causation**

The Government has failed to prove that *any* of the people who purchased GlobalNet stock lost money *because of* Gushlak's securities fraud conspiracy. The Information to which Gushlak pleaded guilty charged him with conspiring with others to "manipulate the price of Global Net common stock." (Information ¶ 3.) "As a part of this scheme, [Gushlak] and others obtained several large blocks of Global Net common stock for little or no consideration. Subsequently, Gushlak purchased and sold shares of Global Net common stock in a manner designed to artificially inflate the price of the stock." (Id. ¶ 4.) "As a further part of this scheme, Gushlak paid secret kickbacks to brokers . . . in exchange for the brokers causing their clients to

9

purchase blocks of Global Net common stock from Gushlak and others at artificially inflated prices." (Id. ¶ 5.)

Even though Gushlak has admitted that the price of GlobalNet shares was inflated, the Government has offered no basis for inferring that the decline in GlobalNet's share price—and the resulting loss suffered by GlobalNet shareholders—was caused by the fraud. Gushlak's guilty plea establishes only transaction causation—the causal link between the fraud and the GlobalNet stock purchasers' decisions to purchase GlobalNet stock. The plea does not establish loss causation—a causal link between the fraud and the decline in GlobalNet's share price. See Emergent, 343 F.3d at 197.

The GlobalNet securities fraud conspiracy is different from similar "pump-and-dump" prosecutions in that the conspiracy's bribes to brokers were not publicly disclosed before the stock stopped trading on March 21, 2002. (Gov't Third Restitution Br. at 2-3.) There is no causal link between the revelation of fraud and the decline in the price of GlobalNet stock because the revelation of fraud occurred long *after* the price declined. The court cannot infer that any part of the decline in GlobalNet's market price was attributable to a fraud of which the market remained entirely unaware. See Rutkoske, 506 F.3d at 179 (quoting Olis, 429 F.3d at 546 ("[T]here is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines.")).

This is also why the Government's analysis of declines in market indices during the relevant trading period is irrelevant. In a case where fraudulent representations and omissions relating to a particular stock are publicly revealed and the stock's price subsequently declines, it may be helpful to compare the decline to relevant market trends during the same period to determine to what extent the decline is caused by fraud. Declines in the stock prices of

10

comparable companies or relevant market indices during the same period may indicate that some portion of the decline reflects the market's assessment of industry or market sector information unrelated to the fraud. See Rutkoske, 506 F.3d at 179-80 ("Normally, expert opinion and some consideration of the market in general and relevant segments in particular will enable a sentencing judge to approximate the extent of loss caused by a defendant's fraud."). But where the market remains entirely unaware of fraud that is inflating a stock's price, a comparison of the decline in the stock price and the decline of the price of comparable companies and relevant market indices does not say anything about what portion of the decline in the stock's price was caused by the fraud.

Gushlak's expert points to similar stock price declines suffered by comparable public companies as evidence that GlobalNet's decline was not caused by the fraud. Gushlak's expert identified two publicly-traded telecommunications companies, Level 3 and 8x8, in the same market sector as GlobalNet, that offered the same type of telecommunications products and services purportedly sold by GlobalNet, and which experienced declines similar to those sustained by GlobalNet. (Reinbeau Decl. ¶ 5.) While there are reasons to doubt that Level 3 and 8x8 are truly comparable to GlobalNet (e.g., their more extensive trading histories and record of past financial results, and greater market capitalizations), it is reasonable to infer that major market events like the dot-com collapse of 2000-01 would have had a similar effect on the stock prices of high-tech companies in roughly the same line of business.

The Government's expert, by contrast, compares GlobalNet's stock price decline to much smaller declines in the S&P 500 (an index of 500 large cap companies in a variety of industries), the Nasdaq Composite index (an index of all companies trading on the Nasdaq exchange), and the Russell 2000 (an index of 2000 small cap companies in a variety of industries). (Second

11

Melley Decl. ¶¶ 13-17.) These market indices include numerous companies that are unlikely to have been affected by the dot-com collapse and other market factors in the same way that a high-tech company would have been. Indeed, the fact that the indices include a large number of companies in diversified industries likely explains why they suffered smaller declines than the high-tech companies identified by Gushlak.[8]

The Government's only attempt at establishing a causal link between the fraud and the decline in GlobalNet's stock price is the naked assertion that "[w]hen the scheme unraveled, the stock price plummeted, resulting in massive losses to investors." (Gov't Third Restitution Br. at 1.) The Government does not provide any indication of *when* the scheme unraveled, *how* it unraveled, or *why* the unraveling of the scheme caused any part of the decline in GlobalNet's share price. As the Second Circuit made clear in Rutkoske, the bare statement "that the scheme unraveled, and the price of [the] stock plummeted," is insufficient to prove loss causation. Rutkoske, 506 F.3d at 180. Here, as in Rutkoske, "[t]he Government provides no record citation to any particular date to support its generalized claim that the scheme 'unraveled.'" Id.

### D. Evidence that May Be Relevant to Proving Loss Causation

In the court's Second Restitution order the court noted that "the Government has not proffered evidence that would be sufficient for the court to conclude either that GlobalNet was a worthless company with worthless stock, or that Gushlak's offense conduct was entirely

---

[8] The Government's expert explains that he analyzed these market indices "to gauge the overall performance of the stock market in general." (Second Melley Decl. ¶ 13.) It is apparent from this explanation, however, that the Government's expert misunderstands the logic of comparing the decline in GlobalNet's stock price to market indices. One may reasonably assume that the stock prices of substantially similar companies, or indices comprised of substantially similar companies, will, all things being equal, respond similarly to the same economic factors. If fraud in relation to a stock is publicly revealed and the stock suffers a much greater decline in share price than comparable companies during the same period, it may be reasonable to infer that the stock's decline in excess of that suffered by comparable companies is a result of the fraud. But this inference is only reasonable if the comparable companies are actually *comparable*. This much, at least, is clear from Rutkoske. See Rutkoske, 506 F.3d at 179-180 (stating that the court should consider "coincidentally precipitous decline in shares of comparable companies," explaining that "a fraud disclosed just as the dot-com bubble burst might cause most, but not necessarily all, of the decline in previously high-flying technology stocks").

12

responsible for rendering GlobalNet stock worthless." (Second Restitution Order at 13.) The court stated that the Government could carry its burden of proving victim losses by providing "a detailed presentation of the facts of the GlobalNet stock manipulation conspiracy, additional trading records, and other information relevant to assessing the effect exogenous market factors might have had on GlobalNet's stock price." (Id. at 14.) The Government's third restitution submission, however, attaches a few historical price graphs for major stock market indices, explains that it has no more trading records, and says nothing about how Gushlak and his coconspirators carried out the fraud. The pre-sentence investigation report is similarly unhelpful. To date, the only factual information the court has obtained regarding how Gushlak and his coconspirators carried out the GlobalNet fraud is contained in the Information and in a few sentences from Gushlak's plea colloquy.

Gushlak's guilty plea provides some indication of one way the Government might prove that the GlobalNet securities fraud conspiracy to which Gushlak pleaded guilty caused the losses suffered by the customers of the two brokerages to which Gushlak and his coconspirators paid bribes—LCP Capital ("LCP") and Montrose Capital ("Montrose"). (See Second Restitution Order at 4-7.) Gushlak has admitted that he and his coconspirators (1) engaged in manipulative trading to artificially inflate the price of the stock, and (2) bribed LCP and Montrose brokers to cause their clients to buy the stock at these artificially inflated prices. The LCP and Montrose customers who were duped into buying GlobalNet shares by members of the conspiracy lost money when GlobalNet's stock price declined and they were unable to recoup the money they paid to purchase GlobalNet shares.

The Government's theory of loss causation appears to be that GlobalNet's purchase price remained inflated as long as Gushlak and his coconspirators traded in the stock and fraudulently

13

induced others to trade in the stock. When Gushlak and his coconspirators ceased their manipulative trading and ceased bribing LCP and Montrose brokers to cause their customers to trade in the stock in the manner the conspirators desired, the artificial demand for GlobalNet shares that had inflated the price of the stock disappeared. As demand for GlobalNet shares evaporated, the market for GlobalNet stock became illiquid and the price for GlobalNet stock began falling to reflect the greater risk to shareholders. Thus, even though the fraud was never explicitly revealed to the public while GlobalNet was publicly traded, the decline in GlobalNet's market price, according to this theory, reflected the effect of the end of the fraud, and was a foreseeable consequence of the fraud itself.

Assuming that this is what the Government meant when it stated that "[w]hen the scheme unraveled, the stock price plummeted, resulting in massive losses to investors," (Gov't Third Restitution Br. at 1), there are several pieces of evidence within the Government's control that may be relevant to this theory of loss causation. First, the Government could provide evidence showing what percentage of the daily market for GlobalNet shares during the relevant trading period was comprised of trading activity attributable to the GlobalNet conspiracy—i.e., those trades executed or induced by Gushlak and his coconspirators. The Government could do this by creating a spreadsheet listing the trading volume of GlobalNet shares for each day during the relevant trading period in one column, in a second column listing the percentage of the trading volume each day that was comprised of trades attributable to the GlobalNet conspiracy, and in a third column listing the daily closing price for GlobalNet shares.[9] Second, the Government could provide a detailed factual explanation of how the GlobalNet conspiracy was carried out and ended, including relevant dates. Gushlak, Howard Appel, and others may have given some

---

[9] A visual chart of these data may also be helpful.

14

of this information to the Government over the course of their cooperation. This information would be relevant to determining when, why, and how the conspiracy "unraveled," and could help to explain the information provided in the spreadsheet. Third, the Government would need to offer evidence relevant to measuring investor losses, including establishing the value of GlobalNet shares in the absence of manipulation. Numerous pieces of information may be relevant to this determination. The price Gushlak and his coconspirators paid to initially acquire GlobalNet shares is relevant to determining the actual value of the stock, because they acquired the stock before its price had been artificially inflated. It may be reasonable to infer that the purchase price at which the conspirators acquired the stock is a more reasonable approximation of its value in the absence of manipulation. Finally, the Government's expert could make another attempt at identifying comparable companies and comparing GlobalNet's operating metrics and valuation multiples to the operating metrics and valuation multiples of the comparable companies. To the extent that GlobalNet's valuation multiples reflect significant inflation over the valuation multiples of comparable companies during the same time period, the Government's expert may be able to use the valuation multiples of comparable companies to estimate GlobalNet's value in the absence of manipulation.

The court includes these suggestions to facilitate the swift resolution of the determination of restitution and pursuant to its authority under 18 U.S.C. § 3664(d)(4) to "require additional documentation or hear testimony." Although the court believes this information may be relevant to determining victim losses, whether this information actually is relevant and whether it will be sufficient to establish loss causation and the amounts of victim losses are questions that cannot be resolved until the court reviews the Government's submissions. To the extent that the Government intends to pursue a different theory of loss causation, or believes that different

evidence is relevant to proving loss causation, the Government should submit the evidence it believes will allow it to carry its burden to prove loss causation and the amount of victim losses.

## III. CONCLUSION

This is the last time the court will order the Government to submit additional evidence to carry its burden under 18 U.S.C. §§ 3663A and 3664. If the Government again fails to prove loss causation and the amounts of each victim's loss, the court will be forced to deny the Government's request to order Gushlak to make restitution. This would be unfortunate. Gushlak has admitted to stealing from a large number of people what likely amounted to a significant portion of their personal wealth. While determining the value of securities in the absence of fraud is "extremely difficult," Leonard, 529 F.3d at 93, and "cannot be an exact science," Rutkoske, 506 F.3d at 179, the Government should review the case law that instructs how it must be done, and strive diligently to carry its burden under 18 U.S.C. § 3664(e) to prove victim losses.

The Government shall submit the additional evidence requested by the court by August 22, 2011. The court will hold a Fatico hearing to consider the evidence on September 6, 2011. The Government shall make its expert available for cross-examination at that time. Should Gushlak wish to introduce testimony from an expert as to the value of GlobalNet shares in the absence of manipulation, or any other question, he shall file the expert's report by August 22, 2011, and shall make the expert available for cross-examination at the Fatico hearing.

SO ORDERED.

Dated: Brooklyn, New York
July 25, 2011

s/Nicholas G. Garaufis
_____
NICHOLAS G. GARAUFIS
United States District Judge

16