# EXHIBIT
# 1

1

```
 1                     UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF NEW YORK
 2      - - - - - - - - - - - - - - - X

 3     UNITED STATES OF AMERICA,           03cr833

 4                   v.                    U.S. Courthouse
                                           Brooklyn, New York
 5     MYRON GUSHLAK,
                                           November 17, 2010
 6
                           Defendant.      11:15 p.m.
 7
        - - - - - - - - - - - - - - - X
 8

 9                   TRANSCRIPT OF PROCEEDINGS
                     BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
10                   UNITED STATES DISTRICT JUDGE

11
       APPEARANCES:
12
       For the Government:      LORETTA E. LYNCH, ESQ.
13                              United States Attorney
                                By:  DANIEL SPECTOR
14                              Assistant U.S. Attorney
                                271 Cadman Plaza East
15                              Brooklyn, New York 11201

16     For the Defendant:       ALAN FUTERFAS, ESQ.

17     Also Present;
       Charles Linehan,
18     Assistant District
       Attorney, NY County
19

20     Court Reporter:          Burton H. Sulzer
                                 225 Cadman Plaza East
21                               Brooklyn, New York 11201
                                 (718) 613-2481
22                               Fax # (718) 613-2505

23

24
       Proceedings recorded by mechanical stenography, transcript
25     produced by CAT.
```

2

1            (Open court-case called-appearances noted.)

2            THE COURT:  Sorry for the delay.

3            This is a sentencing proceeding for Myron L.

4    Gushlak.  Mr. Gushlak, are you satisfied with the assistance

5    that your attorney has given you thus far in this matter?

6            THE DEFENDANT:  Yes, sir.

7            THE COURT:  We are slowly going to go through the

8    materials that I have reviewed for this sentencing so that we

9    don't miss anything.  There's a presentence investigation

10   report dated March 16, 2009, and then there's an addendum to

11   the presentence report dated December 1, 2009.  Has everyone

12   reviewed these two documents?

13           MR. SPECTOR:  I don't know that I've seen the

14   addendum.

15           MR. FUTERFAS:  Neither have I.

16           THE COURT:  Let me make sure it's the right case.

17   It is for Mr. Gushlak's case.  Let me show you the addendum.

18           Why don't the two lawyers come on up.  Mr. Gushlak

19   may remain seated while we do this.

20           Take a look and then we'll make copies for both

21   counsel.

22           MR. SPECTOR:  Thank you, Judge.

23           (Pause.)

24           MR. FUTERFAS:  All right, thank you, your Honor.  We

25   have had a chance to review it.

Burton H. Sulzer - OCR, CM, CRR

1          THE COURT:  Do you need that now?

2          MR. SPECTOR:  No.

3          MR. FUTERFAS:  No.

4          THE COURT:  Very good.

5          Let me go through the materials that we have.

6  There's a sentencing memorandum that the government seeks to

7  have filed under seal.  It doesn't have a date on it.

8          MR. SPECTOR:  It was filed I believe on Monday --

9  sorry -- I believe approximately ten days ago, Monday the 8th.

10         THE COURT:  All right.  I also have the

11  August 20th -- have you seen the sentencing memorandum?

12         MR. FUTERFAS:  From the government?

13         THE COURT:  Yes.

14         MR. FUTERFAS:  Yes, your Honor.

15         THE COURT:  Have you shared that with your client?

16         MR. FUTERFAS:  Yes, your Honor.

17         THE COURT:  Has your client reviewed the presentence

18  report?

19         MR. FUTERFAS:  He has, your Honor.

20         THE COURT:  Have you answered all his questions

21  about it?

22         MR. FUTERFAS:  I have.

23         THE COURT:  Do you believe he understands its

24  contents?

25         MR. FUTERFAS:  Yes.

4

1    THE COURT:    Did you want to talk to him about the

2 addendum?

3    MR. FUTERFAS:  I just did.

4    THE COURT:    So he understands what is here as well?

5    MR. FUTERFAS:  Yes.

6    THE COURT:    Okay.

7    I have the defense sentencing memorandum on behalf

8 of Mr. Gushlak, which was forwarded to the court on August 20,

9 2010, and also the exhibit binder which was provided.

10    I would note that some of the exhibits are in

11 German, are they not.

12    MR. FUTERFAS:  Your Honor, the sentencing memorandum

13 that we submitted on August 20th had the exhibits attached to

14 them, to the memo, and after receiving the government's brief

15 about a week ago, we filed a reply memo, which is the 24 page

16 memorandum of law and a separate exhibit binder.  I think that

17 was filed Monday at about 1:00 o'clock with chambers.

18    THE COURT:    Let me take a look at your copy of

19 that.

20    (Pause.)

21    THE COURT:  I've got it.  I have the reply

22 memorandum with a cover letter November 15th and then I have

23 an exhibit binder.

24    Have you seen that?

25    MR. SPECTOR:  Yes, your Honor.

5

1          THE COURT:   I've reviewed it.

2          I also have a submission from the government ex

3  parte and under seal, which provides the sealed unredacted

4  version of the government's application for a downward

5  departure pursuant to 5K1.1 of the sentencing guidelines in

6  United States v. Howard Appel, right.

7          MR. SPECTOR:  That's correct.

8          THE COURT:   You haven't seen it because it was

9  filed ex parte.

10         MR. FUTERFAS:  On my consent, your Honor, as well.

11 I agreed with that procedure.

12         THE COURT:   Thank you.

13         There have been previous filings in connection with

14 certain proceedings, but I think -- and you can correct me if

15 I'm wrong -- that those are the filings that pertain

16 specifically to the sentencing proceeding; is that right?

17         Is there something else you should tell me?

18         MR. FUTERFAS:  Your Honor, I'm not exactly sure what

19 documents your Honor might be referring to.

20         MR. SPECTOR:  I believe everything that has been

21 filed specifically for the sentencing proceeding you've just

22 listed.

23         THE COURT:   That's what I'm saying to you, I'm

24 saying that those documents which the court has received in

25 connection with the sentencing proceeding have been identified

6

1    by me and that I have reviewed them and you reviewed them with

2    your client?

3           MR. FUTERFAS:  Yes, your Honor.  There is no

4    other -- nothing else, to my knowledge, that has been

5    submitted to the court certainly by the government or myself

6    to your Honor in connection with sentencing.

7           THE COURT:   I just wanted to make sure of that.

8    There is so much here that I didn't want anything to be

9    overlooked.  Obviously I've also reviewed the cooperation

10   agreement.

11          Is any objection to the court unsealing the

12   information in this case at this time?

13          MR. SPECTOR:  No, your Honor.

14          MR. FUTERFAS:  Your Honor, we don't have an

15   objection either.

16          I think what I would ask your Honor to consider is a

17   process similar to what was done in the Appel matter in which

18   maybe the government and I could have an opportunity to

19   confer.  There is a fair amount of materials that we would

20   want to remain under seal.

21          THE COURT:   I'm just talking about the information.

22          MR. FUTERFAS:  We have no objection at this time.

23          THE COURT:   We'll deal with everything else in good

24   time.

25          MR. FUTERFAS:  Very well.

7

1          THE COURT:  We may not deal with it all today but
2     let's see how far we get.
3          MR. FUTERFAS:  Thank you, your Honor.
4          THE COURT:  Now, there seems to be a substantial
5     difference of opinion as to the computation of the guideline.
6          Is that a fair statement?
7          MR. SPECTOR:  Yes, your Honor.
8          THE COURT:  Let me hear from the government and
9     then I'll hear from the defense and then you all will hear
10    from me on the subject because it's my belief that we may not
11    be able to resolve all of this today.
12         MR. SPECTOR:  Certainly, your Honor.
13         THE COURT:  Go ahead.
14         MR. SPECTOR:  I guess we can start with, from our
15    perspective, what is sort of the easier issue, and that is
16    money laundering.
17         THE COURT:  I don't know that's so easy.  You tell
18    me why it is.
19         MR. SPECTOR:  Certainly, your Honor.  The PSR failed
20    to provide -- if I can have one moment, the 8 point
21    enhancement under 2S1.1D2K for a value of funds exceeding 10
22    million dollars.
23         In our view, based solely on the defendant's plea
24    allocution, in the allocution clearly the defendant himself
25    admitted that he laundered funds, obviously, and that the

1   amount of funds laundered exceeded 10 million dollars, which

2   set forth the portions, the relevant portions of the colloquy

3   in our sentencing memorandum and, therefore, in our view, an 8

4   point enhancement should apply.

5           The defense has raised a concern about whether this

6   is consistent with Judge Gleeson's approach in Appel.  I can

7   represent to the court that that is the approach taken Judge

8   Gleeson.  I have a copy of the PSR in the Appel case, which,

9   if the court would like, I'm happy to provide is ex parte for

10  your review, but I think both under a strict reading of the

11  application of the guideline, as well as a consistent

12  application across different defendants in the scheme, the 8

13  point enhancement is appropriate.

14          THE COURT:   So you think the base offense level is

15  a 20 plus an 8 point enhancement?

16          MR. SPECTOR:  Correct, your Honor.

17          THE COURT:   I see.  Let me just hear from the

18  defense on that.

19          MR. FUTERFAS:  Your Honor, as we noted in our

20  papers, the Probation Department obviously did not include it,

21  did not make that finding.

22          We do, and had a concern, which we expressed in our

23  papers, that the government take consistent positions

24  across-the-board.  I haven't seen any of the Appel documents.

25  Appel was part of the same conduct to which Mr. Gushlak pled

1   guilty and if there's a way to see the probation officer's

2   position in that case -- we object to the enhancement and

3   that's our position.

4        MR. SPECTOR:  To correct the record.  As I'm looking

5   at the PSR, the PSR in Appel actually applied a 10 point

6   enhancement.  Here we were just basing it on the defendant's

7   plea colloquy which gives us an 8 point enhancement, which is

8   exceeding ten million.  The PSR in Appel had it exceeding 20

9   million.

10       THE COURT:   Did Judge Gleeson accept the 10 point

11  enhancement?

12       MR. SPECTOR:  I believe he did.  I don't have any

13  recollection of any guidelines dispute in that case, your

14  Honor, and my understanding is that -- to be honest, I don't

15  have a specific recollection, but there was no guidelines

16  issue that I can recall in the case.

17       THE COURT:   Let me see that PSR.

18       MR. SPECTOR:  Certainly, your Honor.  As you can see

19  from the --

20       THE COURT:   I'd also want to know that he accepted

21  it, although it's obviously not dispositive with respect to

22  this case.

23       (Pause.)

24       MR. SPECTOR:  One other point.  The reason I'm

25  fairly confident that that was the guideline in the Appel

1  case, even though I don't have a specific recollection, is in

2  the 5K letter there is no mention of any guideline issue and

3  if the issue had been raised, I am confident I would have

4  addressed it in my letter.

5         THE COURT:   But in Appel the court granted a 5K

6  departure.

7         MR. SPECTOR:   Correct.

8         THE COURT:   So it wouldn't have been as critical,

9  if you will, that that issue be raised by defense counsel in

10  Appel as it is here where you're not seeking a departure.

11         MR. SPECTOR:   That is certainly correct, your Honor,

12  but I think maybe the answer is while it wasn't litigated

13  because it wasn't necessary --

14         THE COURT:   Right, I understand.

15         MR. SPECTOR:   Again, if you look at what I think is

16  just clear from the defendant's own plea allocution, there is

17  no question that the enhancement should apply.

18         MR. FUTERFAS:   Your Honor, also in Appel, Mr. Appel,

19  to our knowledge, pled to four different fraud schemes and I'm

20  not sure if the enhancement that is reflected in the PSR is an

21  enhancement for money laundering based on all four of those or

22  if it's just GlobalNet, which is what Mr. Gushlak pled to.

23         MR. SPECTOR:   I can address that if you had like.

24         THE COURT:   Go ahead.

25         MR. SPECTOR:   The PSR, if you look at paragraph 35,

1  lists the losses from each of the stocks involved.  GlobalNet

2  dwarfs by a large margin the losses from any of the others.

3          Clearly, the GlobalNet loss amount is what was

4  driving the loss allocation in that case and the money

5  laundering calculation.

6          THE COURT:  The GlobalNet loss, according to the

7  Appel PSR, was approximately 80 percent of the total loss,

8  right, and the total loss was over 25 million dollars.

9          So you're talking about 20 of the $25 million

10 being -- more than 20 million being the product of the

11 GlobalNet fraud.  That is what is in the presentence report.

12 I take it that wasn't changed at any point?

13         MR. SPECTOR:  Not to my knowledge -- not that I can

14 recall I should say.

15         THE COURT:   All right.

16         MR. FUTERFAS:  Fine, your Honor.

17         THE COURT:   That having been said, what is your

18 position on the 8 points?

19         MR. FUTERFAS:  Your Honor, we're objecting to the 8

20 points.  I'm objecting to the 8 points, I'm not agreeing to

21 the 8 points.

22         THE COURT:   That's fine.

23         Now, while we're still on the subject, I'm wondering

24 whether the calculation, the base offense level on money

25 laundering is correct because according to the year 2000

1  guidelines that existed -- and we have taken a look at this --

2  apparently the Section 2S1.1A and 1B1.3, Application Note 6,

3  appears to impose a base offense level of 23 for conspiracy to

4  commit a violation of 18 United States Code,

5  Section 1956(a)(1)(a)(1), which means -- and the information

6  charges an (a)(1)(a)(1) violation, right?

7          MR. SPECTOR:  That's correct, your Honor.

8          THE COURT:  So you all and the Probation Department

9  appear to be in error as to what the base offense level is.

10 Have you looked into that?  I take it you haven't.

11         MR. FUTERFAS:  I have not, your Honor, I apologize.

12         The probation report, as your Honor correctly notes,

13 on page 11, paragraph 34, provides a base level of 20.  I

14 haven't looked at whether that was erroneous.

15         THE COURT:  Make a note.  You can comment on that.

16 My point is that it's important to whatever I do to get the

17 computation right and we'll -- we go from there.

18         MR. SPECTOR:  Yes, your Honor.  I have to confess, I

19 missed that as well.

20         THE COURT:  You may have missed it because in the

21 cooperation agreement it misstates the section that he's

22 pleading to.  But in the information it's correct that he is

23 pleading to that section, isn't he?

24         MR. SPECTOR:  I don't have the information in front

25 of me.

1    THE COURT:  That's something to look at all right.

2    I wish you would.  One of the issues then becomes, should I

3    apply the offense level indicated in the guideline or should I

4    apply the offense level of 20 in making the computation?

5    But I think my guess is that I'm going to apply --

6    since we're applying the 2000 guidelines, I will apply the

7    offense level that is in the guideline, but I want to hear

8    from you first, if you have anything to say.

9    What other issues do we have here?

10    MR. SPECTOR:  The other guidelines issue, and I

11    think probably the more heavily contested one is as to the

12    application of the instruction enhancement.

13    THE COURT:  The which?

14    MR. SPECTOR:  The obstruction of justice

15    enhancement.  And there are several bases for that.  They all

16    really come down to the defendant concealing and failing to

17    disclose certain assets.

18    There are a number of ways in which in our view he

19    did that.  First of all, there is his ownership of the Cofolo

20    entity, which, as you will recall, Judge, this was an entity

21    in which the defendant transferred shares of the German stocks

22    to Markus Frick -- and we provided documentation showing that.

23    I don't think there is any dispute that the transfer

24    occurred, that is the transfer from Cofolo to SI Finanz, which

25    was the company from which the shares ultimately flowed to

1    Frick.

2            The defendant never disclosed his ownership of

3    Cofolo in any financial disclosure.  He made a financial

4    disclosure in 2003, in 2005 and in 2009.

5            THE COURT:  He didn't disclose it when the

6    preliminary order of forfeiture was amended; is that right?

7            MR. SPECTOR:  Absolutely correct, your Honor.  That

8    was in 2006.  If you recall the preliminary order of

9    forfeiture, there is a provision --

10           THE COURT:   We went from 5 million to 500,000?

11           MR. SPECTOR:  Exactly.  There is a provision, I

12   believe it's paragraph 8, in that order, which provides that

13   the defendant will forfeit any assets he has not heretofore

14   disclosed.

15           That certainly strongly suggests that the

16   understanding was everything he had disclosed in 2005

17   represented all of his assets.  There was no disclosure of

18   Cofolo.

19           The defendant's provided several reasons for this

20   lack of disclosure, which appear from our perspective to be

21   both nonsensical and contradictory.  On the one hand, he

22   claims that the Cofolo, along with several other entities,

23   were subsidiaries of this entity known as EH&P, and he claims

24   he only learned about the other entities from documents

25   obtained from the German investigation.

1          It appears from the defendant's claims that he's had

2   documents from the investigation for two years.  Frankly, it

3   appears that he actually has more documents than we do because

4   I think the German practice is to give the defense everything.

5          His claim is, well, I disclosed three other

6   subsidiaries of EH&P because I learned about them from

7   documents from the Germans.  Well, if you learned about those

8   entities he would have had to have learned about Cofolo

9   because Cofolo was the entity involved in the stock transfer.

10         If we received documents from the Germans on Cofolo

11  so the defendant must have received those as well.  The

12  explanation contrasting the treatment of Cofolo with those

13  other entities doesn't make any sense.

14         On the other hand, he claims, well, the reason I

15  didn't disclose it in the 2009 affidavit is because at that

16  time I didn't own anything in Cofolo anymore.

17         I find that to be, frankly, a little bit suspicious.

18  Even assuming that's true -- there really is no evidence of

19  that -- but assuming that that's true, first of all, his

20  financial disclosure in 2009 seems to be quite overinclusive.

21         In fact, I remember a conversation with Mr. Futerfas

22  where he told me that he made a tremendous effort to be

23  overinclusive so there wouldn't be anything left off, and

24  there are several footnotes talking about the treatment of

25  various of these disclosed entities going back several years.

1    So it would seem if that is the approach they are

2    taking there is no reason they wouldn't have included Cofolo.

3    In addition, there is a portion of the financial disclosure, I

4    believe it's Section K, where there is specifically a three

5    year lookback provision for all business holdings.  So, even

6    just under the plain language of the disclosure, and even

7    assuming he has no more interest in 2009, he clearly had an

8    opportunity going back to 2006.  So however you slice it --

9    THE COURT:  Is this the money that went into the

10   beneficial trust?

11   MR. SPECTOR:  I believe so, because the defendant

12   has claimed that all of his earnings from the German fraud

13   went into these trusts --

14   THE COURT:  From the German transactions.

15   MR. SPECTOR:  The German transactions.

16   THE COURT:   Let's call them transactions for now.

17   MR. SPECTOR:  Thank you.

18   THE COURT:  You can ascribe fraud to them -- and

19   that is about $86 million?

20   MR. SPECTOR:  Correct, your Honor.  That's what he's

21   told us, that they all -- and I believe told the court -- that

22   they all went into these now unreachable trusts with the

23   exception, I suppose, of the stocks he transferred to Frick.

24   So that is the Cofolo issue which, by itself, in our

25   view, is ample basis for an obstruction enhancement but that

1   is actually not the only basis.

2          There is also what happened with respect to the

3   preliminary order in 2006 when, as you know, we went from 5

4   million to $500,000, and what we find troubling is just a

5   couple of months after that order is entered, he's investing a

6   million dollars in Star Energy, by his own admission.

7          It's still not really clear to me what his position

8   is if his position is that at the time of the preliminary

9   order he had no money, or if his position is he had the money

10  but we didn't ask about it.

11         There is a note in his brief on page 13 where he

12  says, well, look, at the time of the preliminary order the

13  government didn't ask me to do an updated financial and if

14  they had asked me, you know, they would have gotten more

15  information.

16         That's troubling on a number of levels.  First of

17  all, because, as we talked about, the language of the

18  preliminary order certainly implies that he disclose

19  everything.  It's also troubling because it's really not

20  appropriate a position for someone who wants cooperation

21  credit to be taking that, well, I got one over on the

22  government because they didn't ask me about it in 2006 but, on

23  the other hand, you should give me credit for cooperating.

24         Even assuming his position is that he was honest in

25  2005 through 2006 and that the position was the same and he

1    had no money at the time of the preliminary order, it's just a

2    little bit shocking how he has a million dollars a few months

3    later.  He now claims it's a loan.  To us that seems like he's

4    shifting his position based on our brief.

5         In his initial brief, he doesn't mention anything

6    about a loan.  He says, I invested a million dollars in Star

7    Energy then when we come back with our evidence showing that

8    it suggests he lied to the court and to the government, now

9    he's claiming it's a loan.  By the way, there is no evidence

10   for that, he provides no documentation for the loan, he

11   doesn't even mention who gave him the money.  It's an

12   undisclosed personal friend.

13        So, from our perspective, the clear conclusion from

14   all of these facts is that he lied to the government and to

15   the court in 2006.  So for all of those reasons we believe

16   there is ample evidence to find the obstruction enhancement.

17        MR. FUTERFAS:  Your Honor, I don't know if you have

18   had a chance to read my reply brief and look at the exhibits.

19        THE COURT:  Yes.

20        MR. FUTERFAS:  We rebut every one of those

21   allegations absolutely conclusively.

22        The first thing is, and what gives the government

23   away is they say he owned Cofolo.  He can't Cofolo.  Cofolo is

24   an account that is created by EH&P, it is an omnibus account

25   created by that bank that holds assets of numerous clients of

1   the bank.  There is the letter that we submitted to your Honor

2   from EH&P, which is Exhibit J to our exhibits, which is to the

3   reply brief.

4           THE COURT:  Got it.

5           MR. FUTERFAS:  That's a letter directly from EH&P.

6   It says that Mr. Gushlak has never owned neither the company

7   nor the bank account of Cofolo.  It is owned 100 percent by

8   EH&P and that says that EH&P was holding assets for

9   Mr. Gushlak in the account a few years ago.

10         Since January 1, 2008, no assets held by Cofolo

11   belong to Mr. Gushlak or anyone associated with him, nor he

12   has since been a beneficial owner of the assets in the

13   account.

14         The government has two bases of their argument.  The

15   first argument is that the October financial statement, which

16   is October 2005, is incorrect.  There is not scintilla of

17   proof that that 2005, October 15, 2005, financial statement is

18   incorrect.

19         Mr. Gushlak in October 2005 had never heard of these

20   Russian energy stocks, he had no possession of any of the

21   Russian energy stocks, he had not invested in the Russian

22   energy stocks.

23         Their argument is that Mr. Gushlak owns a Cofolo

24   account; he must have owned it during the time of the

25   October 2005 financial statement, therefore that statement is

1  false.

2        The syllogism is wrong, it is false, it doesn't

3  work.  Mr. Gushlak never owned Cofolo, he did not hold any of

4  the Russian stocks, he never had heard of those companies in

5  October 2005.  There is not scintilla of evidence, a piece

6  paper before your Honor, saying that the October 2005

7  financial statement is false -- none, none.

8        There is not a piece of paper on the planet that

9  says that Mr. Gushlak owned the Cofolo account because he

10  can't.  The Cofolo account doesn't belong to him just like

11  some other of those accounts do not belong to him.

12        In June of 2006, when we go to the amended

13  forfeiture, there was no financial statement between October

14  2005 and August 2009.  In October -- I'm sorry,

15  October 2005 -- I think that's right -- what happens is, the

16  financial statement in October 2005 is filed.  There is no

17  evidence that it's wrong in any way, none.

18        Now you're into June of 2006.  The dealings with the

19  hurricane and all that went on for about eight months.  At the

20  time it was filed, the only statement in that forfeiture order

21  was that the only representation made, it was a true

22  representation, was he does not have the money, which is

23  $5 million, to pay the forfeiture.  He did not have

24  $5 million.

25        By the way, in the October 2005 financial statement

1    he disclosed not like he was penniless, he had liabilities,

2    but he had 5 or $6 million; he had a million in cash, he had

3    other money disclosed in the October 2005 financial statement.

4           There was no illusion, there was no hiding, there

5    was no account there that was not put on the 2005 financial

6    statement.  The government has no evidence to show there was.

7           THE COURT:  All right.

8           Anything else on that or do you think we he need to

9    have an evidentiary hearing on the subject because there is

10   still a dispute as to the Cofolo account and whether there was

11   disclosure of the assets?

12          MR. SPECTOR:  Judge, I think the evidence before the

13   court is sufficient to make a finding.

14          If I can just clarify one point, if I may?  The sort

15   of issue of whether Gushlak was legal owner of Cofolo is

16   simply a red herring.

17          On Exhibit 16 of our submission, we show he's listed

18   as a beneficiary and in footnote two, if you see Exhibit 16,

19   your Honor, there is a number three beneficiary; the last one

20   listed is Myron Gushlak.

21          THE COURT:   I see it.

22          MR. SPECTOR:  If you turn to Exhibit 20, which is

23   the defendant's financial disclosure, you turn towards the

24   back --

25          THE COURT:   I'm looking for the date on this

1  exhibit, frankly.

2           MR. SPECTOR:  Exhibit 20?

3           THE COURT:   No. 16.  When was this?

4           MR. SPECTOR:  Your Honor, I don't know.  I don't

5  have the date.

6           THE COURT:   That's sort of relevant, I guess.  I

7  need to know.

8           Exhibit 20?  Go ahead.

9           MR. SPECTOR:  Exhibit 20, if you look towards the

10  back, there are no page numbers, but there is a heading

11  "notes," which explains the defendant's footnotes.

12           THE COURT:   I see them.

13           MR. SPECTOR:  Number two.  He describes corporations

14  owned by EH&P in which there is -- they're essentially

15  subsidiaries of EH&P in same way as Cofolo.

16           He says here they are not -- Myron and Deborah

17  Gushlak are not beneficial owners.  Whatever the specific

18  legal relationship is between Gushlak and these entities, he

19  views them as worthy of disclosure on the form as to the other

20  entities and he has yet significantly left off Cofolo.

21           MR. FUTERFAS:  Your Honor --

22           THE COURT:  I'm interested in obviously the dates of

23  these.

24           MR. FUTERFAS:  The date is totally relevant.

25           THE COURT:  That's why I asked.

1          MR. FUTERFAS:  I know.

2          Your Honor, Cofolo -- the government has no idea of

3     what the system of holding these accounts was.  A bank like

4     EH&P has many omnibus accounts that it owns, EH&P, like it

5     says in its letter.  There is proof in the record, and it's

6     Exhibit P.  EH&P says in its letter that we own Cofolo.

7          What Exhibit 16 is, is if -- I'll give your Honor an

8     example.  If your Honor banks at EH&P and your Honor buys

9     shares in Ford Motor Company, those shares will be held by the

10    plaintiff bank in one of a number of different accounts.  It

11    could be a Cofolo account, it could be one of the other

12    accounts that are identified in his Lakki -- that's one of the

13    accounts, L-A-K-K-I, or Parone Real Estate.

14         A bank like EH&P has dozens of these omnibus

15    accounts.  So your Ford stock would be held in that account,

16    and if your friend owned General Motors and it was also banked

17    at EH&P, their stock would be held in the Cofolo account of

18    EH&P.

19         So you will clearly beneficially own Ford stock;

20    that stock is held in the omnibus account at Cofolo which is

21    owned by EH&P.  Of course that is how the bank knows you own

22    that Ford stock.

23         When you get a statement from EH&P it will not say

24    your stock is in account called Cofolo, it will say you own X

25    shares of Ford stock and we are holding that on your behalf.

1          So what happens in Cofolo is, when Mr. Gushlak

2     starts trading these Russian energy stocks, some of those

3     shares are held in Cofolo, some of them are also held in

4     Lakki, some of them are held in Parone, and he makes trades in

5     those shares in each of those omnibus accounts.

6          Now he doesn't know at that time the names of those

7     omnibus accounts, he learns it later from the German

8     investigation when records are disclosed and he sees the names

9     of EH&P's omnibus accounts.  But the point is, is that by

10    January of 2008 -- before, a year and eight months before the

11    2009 financial statement, he no longer has any shares in

12    Cofolo; they don't reside there anymore.

13         THE COURT:   Where are they?

14         MR. FUTERFAS:  Well, there is clearly some in Lakki,

15    which he disclosed; there were some in this Parone, which he

16    disclosed, and that's why eight months later when he filled

17    out the financial statement, he disclosed -- because he now

18    knew the names -- he disclosed not only the omnibus name, but

19    he also disclosed what is in that omnibus account.  Some of it

20    was shares, some of it was cash, some of it was gold ETFs --

21    looks like gold ETFs that are in those accounts.

22         So the government says, Look at that time this, he

23    didn't disclose Cofolo in 2009.  Nothing was held, there were

24    no Ford Motor stock in Cofolo in 2009.  There was none left

25    after January of 2008.  That's what EH&P says in its letter.

1          THE COURT:  All right.  I hear you.

2          MR. SPECTOR:  Can I be heard?

3          THE COURT:  Yes.

4          MR. SPECTOR:  First of all, again, the specific date

5 for Exhibit 16, now that I have had a chance think about it, I

6 don't see how that is really a relevant dispute.  I don't

7 think there is any question that it had to be during the time

8 period of the transfers, from '06 to '07, which are listed in

9 I believe it's Exhibit 15; that must be where it comes from.

10 I don't hear the defense to be disputing that.

11          THE COURT:  So it's within that range when he was

12 one of the beneficial owners?

13          MR. SPECTOR:  Exactly.

14          The point here is, Judge, is whether or not he had

15 any stock still in Cofolo in 2009 isn't the point, the point

16 is that 2006 to 2007 is within the three year lookback that is

17 required for business holdings under the affidavit.  That is

18 all we need here.

19          MR. FUTERFAS:  Your Honor, that is a total change of

20 argument.  They first say he deliberately misled the court in

21 an October 2005 application and a 2009 application and now

22 they're turning around and saying, Hold on, I'm, conceding

23 government, that the 2005 statement of finances is accurate.

24          THE COURT:  I don't think he said that.

25          MR. FUTERFAS:  It is, your Honor.

1        MR. SPECTOR:  I'm not conceding that.  We have

2    another argument.

3        MR. FUTERFAS:  He has not put any evidence before

4    your Honor that it is inaccurate.  Now he's going to the 2009

5    application --

6        THE COURT:  And using the lookback.  I understand.

7        MR. FUTERFAS:  He's saying in 2009, that statement

8    when it was filed, we can't say that it's not accurate.

9        He just disclosed $86 million worth of assets in

10   those accounts at the time they held them and now he's saying,

11   Hold on a second -- if he was under obligation to file a daily

12   financial statement, those accounts would have changed every

13   month, every two months.

14       He would have had to file financial statements every

15   three weeks as stocks were traded and were held in one account

16   versus another.  The question is, in October 2005, on the day

17   that was signed, was the statement correct?

18       The other question is on August 2009 was that an

19   accurate statement of his financial wherewithal?  And that is

20   correct.

21       THE COURT:  I have your arguments.  I understand.

22   That's fine.

23       MR. SPECTOR:  Thank you, Judge.

24       THE COURT:  Now, with regard to acceptance of

25   responsibility, which is another issue in contention -- is

1    that correct?

2              MR. SPECTOR:  Yes, your Honor.

3              THE COURT:   The government offers three grounds for

4    concluding that the defendant has not accepted.  One is that

5    it's not warranted because of the obstructive conduct, which

6    we have already discussed, and the second is that the Kealy

7    e-mail in which he stated that he has no criminal record and

8    has never had a run-in with the SEC constitutes a basis for

9    denying him acceptance of responsibility, and the third is his

10   involvement in the alleged German stock fraud.

11             So on the Kealy e-mail, could you just briefly speak

12   to that.

13             MR. SPECTOR:  Certainly, your Honor.

14             THE COURT:   Then I'll hear briefly from the other

15   side -- briefly and briefly.

16             MR. SPECTOR:  There are a number of disturbing

17   aspects to the Kealy e-mail.

18             First of all, the context in which it's made in

19   which he not only says I have no criminal record but attaches

20   the dismissal order from the complaint in this case is clearly

21   intended to convey the false impression that the charges in

22   the case were dismissed.

23             In addition to that, he goes on to then make

24   statements about his relationship with the SEC.  He says, I've

25   had no contact with the SEC ever.  That is particularly

1    galling because it seems to be totally gratuitous.

2           THE COURT:  What about the argument that pursuant to

3    his cooperation agreement he was not to disclose the

4    circumstances of his cooperation?

5           MR. SPECTOR:  He should have contacted his attorney

6    and brought that to our attention and we could have dealt with

7    it appropriately.

8           That doesn't give him a license to lie and, again,

9    even if we are assuming that that is the reason the defendant

10   essentially lied to Kealy about his criminal record, it

11   certainly doesn't explain him going on to make the statement

12   about the SEC, which is particularly galling because at the

13   same time he's now devoted ten pages of his brief to talking

14   about how he cooperated extensively with the SEC as well as

15   the government and the state, had all these meetings with the

16   SEC about his own conduct as well as other criminal conduct.

17          Lastly, the timing of this e-mail is disturbing

18   because it was the same -- I think it was the same week in

19   which he was meeting with prosecutors in another case to

20   testify in that case and his attorney certainly said Gushlak

21   was available to testify but implored them to try to avoid

22   using him.

23          Certainly, I can understand no one wants to be a

24   witness in any case, particularly an organized crime case, but

25   at the same time, the timing of this e-mail suggests that his

1   real motive, or at least a major component of his real motive,

2   was to avoid public disclosure of the truth, that is his

3   criminal conduct, because if people who deal with him in his

4   business know the truth about him, they are obviously going to

5   be less likely to deal with him.

6           MR. FUTERFAS:  Your Honor, this is being one of the

7   few times you'll hear this, but I actually agree with some of

8   what Mr. Spector said.

9           This raises an issue that I think people who are

10  cooperating in these kinds of cases face, and I think that

11  there certainly could have been a better way to handle this

12  and that's why I agree with Mr. Spector that the appropriate

13  way to handle this, I think, would have been to contact

14  counsel and say, Look, I'm in this situation -- as it turns

15  out, Kealy knew, I mean Kealy knew that Mr. Gushlak had

16  criminal problems, so as a practical matter he knew that

17  Mr. Gushlak had criminal issues and there is a report to that

18  effect.  But aside from that, there was some -- certainly it

19  could have been handled in a better way.

20          I think the question for your Honor, most

21  respectfully, is, was it a relatively rational approach to

22  take when, A, he's meeting with federal authorities during

23  that very same time; 2, and the time line of cooperation we

24  provided to your Honor, he was actively meeting not only with

25  federal authorities but the state authorities, and the last

1   thing that anyone wanted in the public marketplace was

2   disclosure when there were potentially active investigations

3   or he might be a witness in a case.

4          So I think it's one of those situations where we

5   could say and all agree that there might have been a better

6   way to handle it.  Does that mean that for that we assess and

7   say this was an intentional obstruction and throw all kinds of

8   penalties or conclusions on top of that?  I don't think so.  I

9   don't think that is appropriate.

10         I think that we say that he had a good-faith basis

11  for making these claims; he was actively cooperating at the

12  time.  In truth, and according to law, he wasn't convicted of

13  anything.  He had taken a plea, but he wasn't convicted of

14  anything.

15         With respect to the SEC, yes, he was talking about

16  the SEC, but the SEC never interviewed Mr. Gushlak about his

17  own behavior or his own case, he was consulting with the SEC

18  about cases it was making with others.

19              THE COURT:  Was this after he pleaded?

20              MR. SPECTOR:  I have to correct a couple of things.

21              MR. FUTERFAS:  Yes.

22              THE COURT:  Are you finished?  I think I got it.

23              MR. FUTERFAS:  Thank you.

24              MR. SPECTOR:  First of all, I wasn't the assistant

25  at the time, but my understanding from the assistant assigned

1  to the case in 2003 --

2          THE COURT:  Who was that.

3          MR. SPECTOR:  Michael Asaro -- is that at the time

4  Mr. Gushlak was proffered in 2003 and beyond, he had meetings

5  with the SEC about his own criminal conduct as well as that of

6  others.

7          MR. FUTERFAS:  Your Honor, I was there at every

8  meeting.  That is not the case.

9          THE COURT:  All right.

10         MR. FUTERFAS:  What I gave your Honor in my memo was

11 directly from all my handwritten notes of every single

12 meeting.  So he few contacts with the SEC --

13         THE COURT:  Let's set that aside since it's in

14 dispute.  Move on to the next argument.

15         MR. SPECTOR:  Mr. Futerfas said that Kealy knows

16 about the defendant's criminal case.  Myself and Mr. Linehan

17 know that is false because we spoke to Mr. Kealy ourselves,

18 and Mr. Kealy is today under the impression that the case was

19 dismissed.

20         Moreover, the report that is referred to in the

21 e-mail is a Nixon-Peabody internal investigation report that

22 was conducted after the Star Energy stock crashed.  What

23 Mr. Gushlak is doing in this e-mail, he says keep my name off

24 the report.  He wants his name kept out of the Nixon-Peabody

25 report.

1          The report doesn't talk about Mr. Gushlak's

2    convictions.  The report also talks about that there was a

3    dismissal.  So that is just factually incorrect.  I don't know

4    that it makes a difference, but I have an obligation to

5    correct that.

6          MR. FUTERFAS:  Mr. Gushlak's name is all over that

7    report.  I don't know how much more we have to beat this

8    horse, but Mr. Gushlak may have said keep his name out of the

9    report, but he voluntarily interviewed and was interviewed at

10   length with respect to that inquiry and his name is all over

11   the report.

12         THE COURT:  The third basis for denying acceptance

13   that you've identified is the defendant's involvement in the

14   German stock fraud.

15         Is that an appropriate consideration with respect to

16   determining acceptance here even if he was?

17         MR. SPECTOR:  You know, I don't remember actually

18   framing it as an acceptance issue, to be candid, Judge.  I

19   actually think -- I haven't thought about that, but I think

20   it's probably cleaner, first of all, really, as more of an

21   explanation for why he shouldn't get any cooperation credit

22   and then as a factor for you to consider in sentencing to what

23   we are asking for, which is the top of the guideline range.

24         THE COURT:  So in what way should I be considering

25   the German stock issue in sentencing?

1        MR. SPECTOR:  I think there are two frameworks of

2    analogy.  The first is, if you sort of think of it almost as

3    scale in terms of cooperation credit, we provide first and

4    foremost an explanation for why he's not getting a 5K letter

5    and why he shouldn't therefore receive any credit for the

6    cooperation.

7        I don't think there is a factual dispute that he did

8    give us useful information and but/for all of the other things

9    that happened with the German fraud and all the other issues

10   we brought to the court's attention, if he had behaved, so to

11   speak, we would have filed a 5K letter.

12       But the issue is, because of these issues, primarily

13   the German fraud, he shouldn't receive any of cooperation

14   credit.  The standard for that is just a good-faith basis.

15   It's not even a preponderance.

16       To the extent you would consider it as a factor in

17   the guidelines or --

18       THE COURT:  I'm not thinking of doing that.

19       MR. SPECTOR:  Okay.

20       THE COURT:  That's out.

21       MR. SPECTOR:  Really, just on a good-faith basis

22   standard, and under that, you know, the most glaring sort of

23   piece of this I think just to start out with is his refusal to

24   meet with us.

25       THE COURT:  To meet with you regarding the German

1   situation?

2          MR. SPECTOR:  Correct, your Honor, because if we

3   have it so wrong, and the defense reply brief in very strong

4   language talks again and again about how we don't understand

5   this, how we misunderstood this, that we don't know the truth

6   about what happened.  Given the stakes involved here, he's

7   facing ten years in jail, you would think he would jump at the

8   chance to come in and sit down with us and tell us why we're

9   wrong.

10          Just so you understand, Judge, this isn't something

11  we asked him to do at the last minute, this is an issue I

12  raised with Mr. Futerfas going back to last year when I

13  explained to him our process for reaching cooperators and how

14  we give them an opportunity to come in and be confronted with

15  our concerns before we make a final decision.

16          We were trying to schedule a meeting with the

17  defendant.  I remember having conversations with Mr. Futerfas

18  going back to the summer -- and I don't think I need to do

19  this, but I have e-mails here that I can provide from late

20  September trying to schedule a meeting.

21          The fact that he refused to meet with us, I think

22  there is really only one explanation for that.  It's not

23  because he was too busy with his divorce proceedings, because

24  that has been going on for months, he's been able to find time

25  to fly to Europe repeatedly while this is going on, not

1   because we were mean to him, it's because he doesn't want to

2   subject himself to close scrutiny, the scrutiny of in-person

3   close questioning about his conduct.

4         There is a good reason he doesn't want to expose

5   himself that and that is because he committed the conduct and

6   he knows if we have that meeting what would likely happen is

7   we'll just obtain more evidence that he's guilty of the

8   conduct and so, from our perspective, the fact that he refused

9   to meet with us is devastating and that by itself is really

10   all you need to know to sort of exclude any cooperation

11   credit.

12         THE COURT:  All right.

13         MR. SPECTOR:  Going back to the German fraud itself.

14   If you sort of strip away --

15         THE COURT:  What is the dollar number that you have

16   identified in the German fraud, at least preliminarily?  Do

17   you have one?

18         MR. SPECTOR:  I don't know.  Frankly, all I know is

19   the defendant by his own admission obtained $86 million from

20   the fraud.

21         THE COURT:  I'm not sure where that 86 million

22   dollar number comes from, but I'm sure I'll hear from

23   Mr. Futerfas.

24         Go ahead.

25         MR. SPECTOR:  It's true that it's -- let me address

1  that point directly.  It's true it's not in the 302.  He

2  clearly said that at the meeting.  Whatever the number is, I

3  don't think there is any question it's in the tens of millions

4  of dollars of profit the defendant made from the fraud, from

5  what we consider to be a fraud, the German transaction.

6       So it's a lot of money.  I don't know if even the

7  specific dollar figure matters.

8       THE COURT:  It might matter in terms of fine.  It

9  might matter in terms of restitution, whether funds were

10  available for restitution for the fraud committed here.

11       MR. SPECTOR:  Those are fair points, Judge.

12       THE COURT:  And so I'd want to know more about that

13  before I made any final decision.

14       MR. SPECTOR:  I understand that.  Those are

15  excellent points.

16       From our perspective, the purpose of the analysis of

17  the breach in the conduct, whether it was a fraud for a few

18  million or 80 million or 200 million, the analysis is the same

19  in that he's committed a crime.

20       I take your point that it is relevant for other

21  considerations.  Having said all that, I think when you strip

22  away --

23       THE COURT:  Even if the conduct was lawful it would

24  be relevant because it was money in his possession.

25       MR. SPECTOR:  Certainly, yes, that's correct.

1      THE COURT:   Assuming he received it.

2      MR. SPECTOR:   When you strip away what in our view

3   is almost an entirely irrelevant distraction from the defense,

4   you have undisputed, really all, virtually all of the elements

5   of a pump and dump securities fraud scheme.

6      This is straight from the 302.  The defendant admits

7   that he purchased these German stocks when they were at low

8   value; he admits that they rose in value; he admits that they

9   rose in value because of the information disseminated to

10  investors by Markus Frick.

11     He also admits that the information Frick provided

12  was false, was inaccurate.  He admits that after it rose, he

13  sold the stock and then it crashed afterwards.  That's a pump

14  and dump.  The only factor that he disputes is he denies

15  transferring shares to Frick, that is what he denies, that is

16  the piece of it really that he denies.

17     There is, in our view, ample evidence to show those

18  transfers.  There's the records we have provided, and the

19  arguments that the defense has raised, in our view, when you

20  unpack them a little bit, go nowhere.

21     If I can just for a minute talk about the evidence

22  that they purport to provide.  We provided witness statements

23  and bank records.  They claim correctly, I presume, that there

24  are hundreds and hundreds more pages of these witness

25  statements.

1         When I first read the brief I assumed that that's

2    what they were going to file but when I saw their exhibits

3    they don't file a single page of witness statements.

4         If there were statements from Radke or Frick or

5    Leiduck -- those are the three German witnesses --

6    contradicting what we're relying upon -- the defense appears

7    to have everything -- I'm sure they would have filed it with

8    the court.  They don't do that.  What they file are letters

9    from lawyers representing other targets in the German

10   investigation.

11        Certainly there's a lower evidentiary threshold here

12   in a sentencing hearing, but that is worth nothing.  That is

13   not something that the court can look to to make any kind of a

14   factual finding.  That is just sort of a preliminary concern.

15        Even if we take it as face value, their argument, as

16   I understand it, is that they concede Gushlak transferred

17   shares but claim that he transferred them to this SI Finanz

18   entity and that Gushlak understood a person named Neumann to

19   be the one who would be controlling the shares.

20        The proof of that, they cite to these e-mails

21   between Gushlak and Radke and their theory, as I understand

22   it, is Neumann was getting shares because he was going to do a

23   private placement for Star Gold and then that didn't happen

24   and so as a result there were never any Russ Oil shares

25   transferred.

1          Just unpacking that, the e-mails that they submit,

2    which are really the only things that could even be considered

3    evidence at all, the are e-mails from Gushlak to Radke, this

4    don't mention Neumann at all.

5          It's unclear to me why Gushlak would be e-mailing

6    Rake if he wants to communicate with Neumann because, as I

7    understand the defense position, Gushlak has already had

8    numerous direct communications with Neumann.

9          So there is no evidence at all that he's speaking to

10   Neumann or that Neumann's doing anything having to do with

11   this proposed private placement.

12         Second, they argue that, Well, Neumann wouldn't

13   serve as a nominee.  They say that is an absurd position to

14   take because Neumann is wealthy and successful.

15         We don't actually have to look any further than this

16   case, the case that the defendant's pled guilty to.  One of

17   the three frauds that we outlined in our papers, there is no

18   dispute the defendant committed, was this because Bauer

19   partnership scheme where --

20         THE COURT:   Which one?

21         MR. SPECTOR:  B-A-U-E-R.  The defendant himself

22   acted as a nominee, the defendant was wealthy and successful

23   in running these pump and dump scams.  He acted as a nominee

24   for Bauer for less money than he made on the other scheme.

25         It's perfectly reasonable to think Neumann acted as

1  a nominee because that's how pump and dump fraudsters behave,

2  they act as nominees for each other.

3          As to the claim that, well, there weren't any

4  transfers to Russ Oil and that somehow corroborates the

5  defendant's theory, I don't know that that shows anything.

6  Probably the explanation for why there were no transfers is by

7  the time they got to Russ Oil it was the summer of 2007 and

8  the scheme had already collapsed because there has been press

9  articles and so Frick ended up changing his recommendations,

10  but it really doesn't matter, it's yet another red herring.

11          The issue isn't why didn't Gushlak transfer shares

12  of Russ Oil, the issue is why did he transfer shares of Star

13  Energy and Star Gold; that is the question.

14          The defendant is really ignoring the most important

15  piece of evidence here, and that is that there are three

16  independent witnesses who all say the same thing, which is

17  Gushlak transferred the shares as a payoff to Frick.

18          Radke says that, and I haven't seen anything where

19  they even attempt to undermine Radke's credibility.  He's a

20  banker who observed the transactions.

21          Then there's Frick's statement -- look, we certainly

22  concede that Frick has not told the whole truth, which is not

23  surprising given that he's a target of the investigation, but

24  what Frick does do is he inculpates himself, he admits Gushlak

25  offered him shares and he took shares, and there is no reason

1  in the world Frick would make an inculpatory statement like

2  that if it wasn't true.

3          If we were operating under the Rules of Evidence,

4  that would be admissible as statement against penal interest.

5  The reason is because it's reliable when somebody says

6  something that inculpates themself.

7          Then there is Lakki's statement, and you know we

8  concede that there appears to be this issue with Lakki

9  committing a fraud, but if the standard is, well, if you're a

10 con man you can't be believed, well, Myron Gushlak pled guilty

11 to fraud here, which is more than what happened with Lakki.

12 So by that standard we shouldn't believe anything Gushlak

13 says.

14         The reason Lakki's significant is because it's a

15 third witness.  Now three people are all saying the same thing

16 and essentially, you know, he's got to be the unluckiest guy

17 in the world, an argument we commonly make during jury trials

18 that applies here too, these three people are all conspiring

19 against poor Myron Gushlak to frame him for something he

20 didn't do and it just so happens these shares of these stocks

21 that he thought were going to Neumann somehow end up in

22 Frick's possession.  It's ridiculous, Judge.

23         THE COURT:  All right.

24         MR. FUTERFAS:  I guess, based upon what I just heard

25 I can say anything in this courtroom; I can say it's a

1  hurricane outside, I can say the earth is really the moon,

2  just say it. It's just absolutely preposterous.

3       THE COURT: Do you think we ought to have a Fatico

4  hearing on to issue so I can guest it straight?

5       MR. FUTERFAS: Your Honor, I'll start with --

6       THE COURT: Whether you're saying it or Mr. Spector

7  is saying it, its still lawyers saying it and I'm not going to

8  credit what some lawyer in Germany is sending on to me because

9  I have no way of knowing anything about the underlying facts

10 to those claims; it's just the way it is.

11      The participants in transactions, they may be lying,

12 too, or they may be telling the truth, but at least they were

13 the participants and I can assess, perhaps, whether I'm going

14 to give credit to what they say.

15      So, you know, what about the argument that's been

16 made that you have coconspirators or -- if you want to call

17 them business acquaintances -- who have made statements that

18 were not in their interests or in Mr. Gushlak's interest?

19      MR. FUTERFAS: I have an easy answer to that

20 question, your Honor. The answer is as follows: The German

21 authorities, who I have personally met with, have interviewed

22 Markus Frick five or six times.

23      The government here provided two or three pages out

24 of 86 pages of interviews. On one day Markus Frick says, I

25 never received any shares, I never got anything. It's a lie,

1   who's ever saying this is lying.  On another day he says

2   something else.

3           The German authorities -- let's take a step back and

4   look at where we are.  Your Honor is getting .001 percent of a

5   file that is thousands of pages long, that the German

6   authorities have been dealing with for three years.

7           Your Honor, don't you think that if the German

8   authorities credited Frick that Frick would have been on trial

9   this September 2010 when he was supposed to?

10          Don't you think, your Honor, that if the authorities

11  credited this Mr. Radke, that Frick would have been on trial

12  or that Mr. Gushlak would have been charged by now?

13          This investigation started in early 2007.  Markus

14  Frick was charged in a case in 2007.  He was supposed to go to

15  trial in 2010, just two months ago.  His trial was taken off

16  the calendar, and what the German lawyers for Mr. Gushlak

17  wrote to your Honor in our Exhibits A and B -- or Exhibit A,

18  was there is no new date for that trial to go forward.

19          Mr. Frick is out there, as I said to your Honor -- I

20  sent your Honor his Website link -- Mr. Frick is out there, he

21  is by far today as we stand in this courtroom the busiest,

22  most prolific -- he's like the Kramer of Germany.  He's giving

23  seminars every two weeks in Germany where he publicly stands

24  up in front of hundreds of people and recommends stocks and

25  promotes companies and that's what he's doing.

1          He has been under charges in Germany since the

2     summer of 2007, his trial was supposed to begin.  It's off the

3     calendar.  What I'm trying to express to your Honor is this,

4     and we refuted and rebutted what the government's arguments

5     were point-by-point in our reply with documents, with

6     documents, not just hearsay or lawyer talk but with documents.

7          The government came in here December of 2009 and

8     their big witness was Leiduck.  Leiduck made claims, I don't

9     recall, I haven't looked at his statement in a while, but I

10    don't recall Leiduck saying anything about Mr. Gushlak

11    returning shares to Mr. Frick, but I can tell you this, that

12    Leiduck never disclosed to the German authorities that he was

13    a fraudster and that he had stolen money and that he had to be

14    pursued through the Middle East, and so what happened was the

15    government came before your Honor and the government said,

16    Your Honor, remand Mr. Gushlak because witness Leiduck makes

17    these claims.

18         Then we wrote a memorandum to your Honor back in

19    August of this year and we devote about a page and a half to

20    Leiduck and it turns out Leiduck created this entire scheme, a

21    scheme where he was telling the company that he had

22    $20 million to invest, he got the company to give him 250

23    thousand dollars and he took that money, he claimed there were

24    diamonds -- it was a whole scam -- and then he ran, and he had

25    to go to Abu Da bu where Star Gold and Star Energy lawyers

1    chased him with subpoenas and everything else and there was a

2    criminal investigation begun against him.

3         So you want to know why the German authorities have

4    not charged Mr. Gushlak yet, have not even proceeded against

5    Frick?  They couldn't try this case in ten minutes in this

6    courtroom.  Leiduck would be destroyed; Frick has given 15

7    different versions of the events; Radke took Frick's money

8    that was deposited into an account, $7 million, hasn't

9    returned that money to Frick.  Now he says he doesn't want

10   anything to do with it.

11        It's outrageous.  The government is here saying

12   Judge, I want you to do a complete investigation while you're

13   on the bench, interview these the witnesses, assess their

14   credibility, indict Mr. Gushlak, try him in this courtroom and

15   sentence him.  It's outrageous.

16        The German authorities who have met with these

17   witnesses, who have looked at all the trading records, who

18   have examined their statements, who have sat across the table

19   from them, who know these documents inside and out that I've

20   presented to your Honor, and understand what really happened

21   here.

22        Let's not get bogged down in the details.  I mean,

23   you know, it's interesting, when we met with the government

24   back in December of 2009 and the government says, Oh, we

25   didn't meet, we didn't want to meet.  Well, I presented a

1  letter to your Honor from Mr. Frankel, who it sitting here at

2  counsel table and who was at that meeting in December of 2009.

3          What he writes to your Honor as an officer of the

4  court is this.  That was the meeting:  Mr. Gushlak attempted

5  to explain in detail the operation of the lawfully established

6  trust, the nature of omnibus accounts at Swiss private banks,

7  the context for the three companies that are subject of the

8  German government's investigation --

9          THE COURT:  Read more slowly.

10          MR. FUTERFAS:  Sorry, your Honor.

11          Mr. Gushlak attempted to explain in detail the

12  operation of the lawfully established trusts, the nature of

13  the omnibus accounts at Swiss private banks, the context for

14  the three companies that are the subject of the German

15  government's investigation and respond to the questions

16  proposed about his financial statements.

17          When Mr. Spector did not appear to like the answers

18  that Mr. Gushlak was providing, Mr. Spector's response is with

19  specificity were variously, quote, I want to stay away from

20  the minutiae, close quote, open quote, let's move on, close

21  quote, open quote, I want to understand simplistically, close

22  quote, and, open quote, I'm not interested in the details,

23  close quote.  All of this information I noted

24  contemporaneously when I too took notes of the meeting.

25          I mean, to stand up here and say your Honor is to

1   make findings on the credibility of witnesses that they've

2   never seen, that your Honor has never seen, that have provided

3   inconsistent statements and the German government doesn't even

4   think at this point it has enough to go forward with

5   Mr. Gushlak and will not have enough, and it won't make a

6   decision at least until sometime in 2011, if ever -- if

7   ever -- is just outrageous.  How can they do that?

8              MR. SPECTOR:  May I respond briefly?

9              THE COURT:  Very briefly and then I want to move

10  on.

11             MR. SPECTOR:  The issue of the German investigation

12  is completely irrelevant in terms of what the Germans have

13  done in charging, it is a different standard, a different

14  system.  Frankly, it's a little dangerous to try to read tea

15  leaves from a docket sheet, which is what Mr. Gushlak tried to

16  do with Mr. Kealy.

17             So the issue isn't what the Germans are doing, what

18  their prosecution is, the issue is, the evidence before this

19  court, in the much lower standard that we're operating under,

20  which is, is there a good-faith basis based on what is before

21  the court, to deny the defendant any credit for cooperation?

22  That is the issue.  Under that standard, the witnesses that

23  were provided are more than sufficient.

24             THE COURT:  With regard to the cooperation motion,

25  are you challenging the government's decision not to give him

1    a 5K letter?

2           It is unclear from, I would say, thousands of pages

3    of materials that you've submitted in aggregate where you

4    stand on that.  I know where they stand on it, where the

5    government stands on it, but where you stand on it is not at

6    all clear.

7           MR. FUTERFAS:  Your Honor, I don't think it was

8    appropriate for them, and I don't think they had the right to

9    rip up the 5K.1.

10          I say that recognizing that the standard for the

11   government's decision making with respect to its ability to

12   decide when or not to give a 5K1 is broad; they have broad

13   discretion.  I'm not agreeing with it, but I understand the

14   nature of their discretion in that regard.

15          THE COURT:  Okay.  I understand your position.  But

16   I wanted to get that on the record.

17          MR. SPECTOR:  Thank you, Judge.

18          So really it just comes down to, from our view, from

19   our perspective, weighing this, and this evidence should

20   discount any credit under 3553, or however you would frame it,

21   that the defendant should get for his cooperation, that is the

22   issue.

23          THE COURT:  I hear your.

24          MR. SPECTOR:  If I can just correct the record, just

25   so the record is clear, because the defense suggested that

1   Leiduck didn't make any statements about transferring shares

2   to Gushlak.  This is page three of the Leiduck statement which

3   was attached as Exhibit 1 to our bail revocation motion.

4              THE COURT:   That was back in --

5              MR. SPECTOR:  December of 2009.

6              THE COURT:   I have that.

7              MR. SPECTOR:  I don't have to read it aloud, it's

8   clear.  Just so the record is clear, Leiduck specifically said

9   Gushlak told him that he transferred shares to Frick.

10             MR. FUTERFAS:  Your Honor, I want to address two

11  things.  I know your Honor has been very patient, but when the

12  government keeps talking about the record, I want to make

13  clear what the record is.

14             Mr. Gushlak -- and there were three lawyers at the

15  meeting in December of '09 -- never said, he never said that

16  he knew or that he was part of Frick making false statements

17  with his press releases.

18             In fact, one of the issues that is a major issue in

19  the German investigation and why, in fact, every cornerstone

20  of what the government says is a pump and dump is actually

21  refuted, is the following:

22             Number one, the Germans were concerned and had an

23  initial belief that these companies were not legitimate.  They

24  have been provided with hundreds of pages of materials showing

25  they were legitimate, they had real resources and they had

1   real geological surveys.

2           Number two, those companies -- in any pump and dump

3   the stock goes up, the stock crashes and everyone goes home.

4   Your Honor has seen this numerous times, in the Jonathan

5   Winston case --

6           THE COURT:  I'm well aware of it.  Let's not go back

7   to 2000.

8           MR. FUTERFAS:  What happened here was after the

9   stock collapsed in the June of 2007, Mr. Gushlak continued to

10  put money into those companies; the officers and directors

11  continued to work in those companies and in 2008 Star Gold

12  acquired an energy -- acquired -- made an acquisition, and

13  Russ Oil made an acquisition.  So the Germans are aware of

14  that.

15          So the first question, the Germans were very

16  vigorous about this, they wanted to know what -- are these

17  companies real or not?  Now they understand they are real,

18  they understand they had real resources, and so that is number

19  one with respect to a, quote, pump and dump.

20          The second thing you need in a pump and dump is you

21  need false statements.  Now, Mr. Spector went up and said

22  Frick's false statements, Frick's false statements.  In their

23  30 something page submission they don't identify a single

24  Frick false statement or false newsletter to the public.

25          It's very, very interesting, because I sent your

1   Honor in the first submission pages of Frick's newsletters, I

2   sent a half inch of material.  You can get on his e-mail and

3   get them every day.

4           THE COURT:   No thank you.

5           MR. FUTERFAS:  A good idea not to.  But

6   interestingly, it is, the second thing that is bothering the

7   Germans one of the reasons they haven't gone forward with that

8   case much less even charged Mr. Gushlak, is when you look at

9   Frick's newsletters very carefully, they largely report

10  government -- not government, excuse me -- they largely report

11  the corporate statements, the statements issued by the company

12  and then there's a lot of fluff and forward looking

13  statements.

14          So it's very hard to tease out.  It's like Jim

15  Kramer or anyone else, it's very hard to tease out from those

16  statements, and the Germans have had a tough time with this

17  too, saying where is the false statement by Frick, a false

18  statement of fact, and if there is one, was it material?

19          And the government -- it's interesting, we know the

20  answer to that, we talked to the Germans about that -- but it

21  is interesting that in their materials they say Frick made

22  these false statements in his newsletters.

23          They never cite the false statement, okay, and that

24  is a problem that the Germans have and will continue to have

25  because Frick it turns out was, for the most part, very, very

1    careful in how he crafted those newsletters.  That's why he's

2    still in business is today.

3           The transfers of the shares to Frick, I have to

4    address so much about that.  That is documented by the

5    government's own papers.  I don't have to rely on my papers, I

6    don't have to rely on lawyers, I don't have to rely on

7    anything.  In the government's memorandum, in their exhibits

8    the share transfers go to a company called SI Finanz; that's

9    where they go.

10          The evidence is wholly uncontradicted and

11   uncontradictable that SI Finanz belongs to this person named

12   Neumann.  That is where they go, there is no question that's

13   where they go and there is not a piece of paper shown to your

14   Honor that suggests that they went anywhere to Mr. Frick or

15   that they left SI Finanz and went to Mr. Frick.

16          That's where they went and that's what Mr. Gushlak

17   understood and the government says, Well, we don't like the

18   Russ Oil, you know, we don't like the fact that Mr. Gushlak

19   didn't transfer his shares on the Russ Oil deal because you

20   know what, maybe the scheme was over by then.  Your Honor may

21   have heard the government say that?

22          THE COURT:  Go ahead.

23          MR. FUTERFAS:  The government can only say that if

24   they had no idea what they were talking about, because the

25   Russ Oil transaction made more money than the Star Energy

1   transaction and made more money than the Star Gold

2   transaction.  More money was made on Russ Oil on the trading

3   of the stock in Russ Oil than it was on the prior two

4   transactions and the government stands up here and says, Well,

5   maybe Mr. Gushlak didn't send the shares on Russ Oil because

6   the scheme was over already.

7           The fact is that -- we don't hide from it -- the

8   fact is that because the records in the European's possessions

9   shows it, they have it for years, Russ Oil's transaction was

10  more profitable than the other two.  So why didn't Frick or

11  Neumann get shares on that transaction?  It's very clear,

12  because the --

13          THE COURT:  You don't want me to conduct a separate

14  inquiry into what happened in Germany, do you?

15          The extent to which this court has an interest in

16  Mr. Gushlak's activities in Germany is somewhat narrow, isn't

17  that right?

18          MR. FUTERFAS:  I agree with your Honor.

19          THE COURT:  So we don't have to go into all the

20  details.  The government's making certain points about

21  Mr. Gushlak's business associates in terms of the German

22  investigation and how much I credit that is really something

23  for me to consider.

24          MR. FUTERFAS:  That's why I'm talking to your Honor,

25  because the question is, if a witness says that -- a witness

54

1    who has no knowledge, for example, Leiduck -- Leiduck is a
2    liar, he's being chased for $250,000; he's interviewed by the
3    police, he says whatever he says.  He doesn't tell them that
4    he stole $250,000, and he says X, but the documents are a
5    proof, absolutely prove why.

6            I think your Honor is entitled to look at what do
7    the documents show.  They show unquestionably that the shares
8    went to Neumann, they went to SI Finanz, they are the
9    Government Exhibits, the proofs show that SI Finanz belongs to
10   Neumann, Mr. Gushlak understood without question that Neumann
11   was to buy significant blocks of shares in the marketplace,
12   which he apparently did.

13           Neumann also promised to buy a private placement in
14   Star Gold and when he didn't do that -- and the e-mails
15   reflect this -- Mr. Gushlak said, I'm not -- and then he calls
16   and says, I want shares on Russ Oil, which is the deal that
17   made more than the other two, Mr. Gushlak said, no, because
18   you promised to put a private placement in.

19           He didn't need a private placement on Star Energy
20   because a New York investment banking firm put 7.5 million.
21   And that raises the other question which is, if this is a pump
22   and dump with companies that don't exist, a New York hedge
23   fund would send three people to do due diligence to Moscow and
24   Siberia and invest $7.5 million on a company that doesn't
25   exist?

1          THE COURT:   It makes you wonder about hedge funds.

2          MR. FUTERFAS:  So I think your Honor can take that

3     into account in determining, do I credit that anything -- that

4     a crime happened there?  That is the key; do I credit that a

5     crime happened there when the German authorities that have

6     been dealing with this, and in interviewing the witnesses,

7     know all this, they have not come to the conclusion that one

8     that is,but they are asking to you make that conclusion on a

9     scintilla of information not at all accurate.

10          THE COURT:  Let's talk about the preliminary

11     forfeiture order.  The order of forfeiture was amended back in

12     2006, June 2006.

13          MR. SPECTOR:  Correct, your Honor.

14          THE COURT:   And is the government satisfied to

15     stand by that preliminary order of forfeiture?

16          MR. SPECTOR:  No, Judge.

17          We're asking that the original order be reinstated

18     because the amended preliminary order of 2006 was induced by

19     fraud, and that is the defendant's failure to disclose the

20     full scope of his assets.

21          The basis for that argument is the fact that just a

22     couple of months later he invested a million dollars in Star

23     Energy.

24          THE COURT:   He says it was a loan, isn't that what

25     he says?

1          MR. FUTERFAS:  Your Honor, it was a loan.  It was a

2    loan, and I obviously know the name of the individual who

3    loaned him the money.  He got a loan.

4          We tried to get the documents showing the money

5    coming in.  We provided to your Honor the money going from

6    Blue Water to the company, is no question a million dollars

7    went to the company as we said.

8          That money went to the company in late 2000 --

9    December 10, or something like that, 2006, but at that very

10   time they were negotiating with the investment bank and the

11   investment bank put in $7.5 million two months later and that

12   million dollars was repaid when the 7.5 came in.

13         THE COURT:  Even assuming that it was Mr. Gushlak's

14   money, that would only increase the amount that he had

15   available for forfeiture from his crimes by a million dollars;

16   isn't that right?

17         MR. SPECTOR:  Respectfully, Judge, I don't believe

18   that is the appropriate analysis.

19         THE COURT:   I'm just asking.

20         MR. SPECTOR:  Once there is a fraud in the

21   inducement, the entire contract is rescinded and we go back to

22   the $5 million order.  The amount of actual money he had at

23   his disposal is sort of irrelevant.  We don't craft a new

24   third preliminary order.

25         THE COURT:  I see.

1       MR. SPECTOR:  Again, the fact that he lied to us

2  suggests in our view that there's a lot more money out there.

3  That's why we want the $5 million order in place so that if at

4  one point --

5       THE COURT:  How do you respond to the defense's

6  claim that this really was borrowed money and that he was just

7  engaging in business so that he could make a living and he

8  borrowed the money because he's a clever investor and that he

9  could make money from somebody else's money, which is what a

10  lot of people do?

11       MR. SPECTOR:  A couple of thoughts on that.  First

12  of all, even assuming if it was in fact a loan, let's assume

13  that for the purposes of this discussion, that fact suggests

14  there's something else he's not telling us that's going on

15  here, otherwise why would some person loan him a million

16  dollars totally unsecured when Gushlak apparently has no

17  assets of his own and is essentially under water?

18       It also suggests that there may in fact have been

19  either more security to secure the loan he didn't tell us

20  about or that the loan, that million dollar loan, was a part

21  of some other fraudulent scheme.

22       Frankly, the suspicion probably is that to the

23  extent there was a loan, the person who loaned the money was a

24  coconspirator in the German fraud.

25       THE COURT:  Then there is also the issue of the

1   amount of assets that's available to pay a fine and for

2   restitution.  Have you figured out whether restitution can be

3   ascertained as to the charges to which the defendant pleaded

4   guilty?

5          MR. SPECTOR:  I believe it can.

6          Just so the court understands, there was litigation

7   about that in Appel.  Our view then and now is that Judge

8   Gleeson incorrectly calculated restitution.

9          We're prepared to address that issue, but our view

10  was, it wasn't the best procedure, it sort of bogs down what

11  is a fairly bogged down proceeding by adding that today when

12  we can deal with it within 90 days permitted by the statute.

13  So that's our application.

14         THE COURT:  All right.

15         MR. FUTERFAS:  Your Honor, I just want to go back.

16  They go back to this whole fraud in the inducement theory.

17  It's like we started where we started an hour and a half ago.

18         There was a financial statement filed October 2005.

19  There is no evidence to suggest that statement in any way was

20  wrong.  The whole theory of the fraud is that this Cofolo

21  account, this mysterious account had all kinds of money in it

22  and he never disclosed the account.

23         I think we have conclusively shown he had no money

24  in Cofolo in 2005.  The bank has written the court a letter

25  saying it's not his account and there were no funds in that

Case 1:03-cr-00333-NGG Document 1431 Filed 02/11/19 Page 60 of 118 PageID #: 25478

1    account after 2008.

2           And by the way, he wasn't under water in 2005, the

3    October 2005 financial statement shows significant assets;

4    there is no question about it, it shows significant assets.

5    In fact, his financial statement said -- I mean the

6    government, the bottom line is the government doesn't like the

7    deal they made, that's the bottom line and I'm sorry about

8    that.

9           There was a hurricane, the house was destroyed, the

10   house had a value -- in his 2003 financial statement, he

11   valued the house at $12 million.  The house was destroyed in

12   the hurricane.  Everyone evacuated the island.  We showed the

13   government pictures, we showed the government videotape of the

14   house.

15          The government could have chosen to say, No, we're

16   keeping it at 5 million or not.  The original $5 million

17   figure was set upon the value of the house.  The government

18   agreed to reduce it -- that was in 2005 -- and all the papers

19   were signed in June of 2006.  He wasn't destitute in 2006.

20   Did he have 5 million in cash in 2006?  No, but he certainly

21   wasn't destitute.  The October 2005 financial statement shows

22   he has assets and, in fact, more than that, your Honor, this

23   is what is amazing, in the 2005 financial statement,

24   Mr. Gushlak said on that statement, he put a value on the

25   house and he said, open parens, the house is 90 percent

1    complete if you look at that financial statement.

2          So he's telling the government -- the hurricane was

3    in September of '04 -- in October of '05, a year later, he's

4    telling the government this house is worth whatever, 5

5    million, something like that, the house is worth 5 million and

6    it's 90 percent complete.

7          The government decided to make the deal and reduce

8    the forfeiture, they made it and it was signed and now the

9    government is coming in and saying you hid what from us in a

10   Cofolo account, like it was a stock or something that he held,

11   that he withheld the fact that the house was almost done, the

12   house was complete.

13         The government knew all the facts.  They don't have

14   to say, your Honor -- you know what, I think it would be more

15   appropriate for the government to come in and say, you know

16   what, your Honor, we cut him a break on the financial

17   statement.  You know what, he's made money since then, or the

18   trust has money since then and, your Honor, rather than saying

19   he induced it in fraud, why not just be straightforward and

20   come in and say, you know, we made a deal, went from 5 million

21   to 500,000, he paid it.  We thought we were doing the right

22   things but, you know what, he's made money since then -- we

23   think it was improperly, he says it was properly -- he's made

24   money, there is money in trust or whatever it is, and, your

25   Honor, you should really say that the deal that he cut for

1   those circumstances, you should change that deal, if you are

2   inclined to put some more forfeiture on there you should do it

3   because circumstances have changed.

4        That would be something, but you don't have to say

5   and create this argument, this whole syllogism that there was

6   this account, that it had this and the financial statements,

7   when there is no evidence of just to say maybe the government

8   was too generous in redoing the financial statement.

9        THE COURT:  Let's talk about the assets that are

10  currently available to pay a fine.

11       Let me understand what happened to whatever money it

12  was that the defendant made between the time he pleaded guilty

13  and today.  Let's take the German transactions for a moment.

14  What are his current assets?

15       MR. FUTERFAS:  Your Honor, in the August 2009

16  financial statement he listed total assets -- that includes

17  trusts and everything else -- that is a separate discussion --

18  but since he put it all in the financial statement, let's deal

19  with it that way, as $86 million.

20       That wasn't the amount gained from the German

21  transactions, that was the total assets, that included the

22  value of his home, that included cars, that included

23  everything else.  He never said, and there is no -- the

24  financial statement makes clear the 86 million dollar figure

25  is not from the German transactions.

1          THE COURT:  These are the funds that are delineated

2    in the addendum to the presentence report, right?

3          MR. FUTERFAS:  Yes, your Honor.

4          THE COURT:   Blue Water is ten million, Halcion is

5    260,000, Rosone Development is 20,000, Lakki Enterprises is 23

6    million, Parone Real Estate is 21 million, East West Holdings

7    is 3.6 million, Camal Group is 5.26 million.  Those are,

8    generally speaking --

9          MR. FUTERFAS:  That was then.  The situation has

10   changed.

11         THE COURT:  The report was as of December 1, 2009, a

12   year ago.

13         MR. FUTERFAS:  Right.  It's different today.  But I

14   can walk you through that if you want.

15         THE COURT:   It would be helpful.

16         MR. FUTERFAS:  Your Honor, do you have government

17   Exhibit 20 of -- that is the 2009 financial statement?

18         THE COURT:   Why don't we take break until 2:15.

19         Let me see what other issues I have so that we can

20   deal with them.  Let's make it 3:30.  Be ready to discuss the

21   issue of the assets as compared to a year ago, where these

22   assets went and in what form they currently exist and the

23   defendant's control over the assets, the extent of the

24   defendant's control over the assets.

25         You should also, to the extent that he doesn't

1   control the assets, you're going to have to answer the

2   question of whether the defendant was in effect trying to

3   avoid the court from having the ability to reach those assets

4   to pay a fine or to pay restitution.

5          All of those are important issues.  We will talk

6   about them briefly but concisely at 3:30.

7          (Recess.)

8          (Open court.)

9          THE CLERK:  Recalling U.S. v. Gushlak.

10         (Appearances noted.)

11         THE COURT:   Please be seated.

12         All right.  Let me just ask a few questions here.

13  I'm sorry for the delay but we have been hard at work on this

14  case, that's the reason for it.

15         In terms of the directing of the shares held by

16  EH&P's Cofolo account to Neumann, to his account, you assert

17  that had that was a legitimate transfer, is that basically

18  correct?

19         MR. FUTERFAS:  Yes, your Honor.

20         THE COURT:   Okay.  But did the defendant have

21  control over those shares or were those shares controlled by

22  EH&P?

23         I don't understand where the defendant's control of

24  it was if EH&P was an independent entity and the shares were

25  just representative of assets that the defendant had placed in

1   the fund as if it were a mutual fund?

2           MR. FUTERFAS:  I understand your Honor's question.

3   May I consult for a moment?

4           THE COURT:   Sure.

5           (Pause.)

6           MR. FUTERFAS:  Your Honor, we were just trying to

7   figure out the nature of your Honor's question.  I think the

8   transfers were done in late 2006, very early 2007 and if the

9   question is did my client have the ability to direct those

10  transfers, the answer is yes.

11          THE COURT:   So he had control over the -- it wasn't

12  like a blind trust where he would just put the money in and

13  make recommendations as to how the money ought to be utilized

14  but had no control over the disposition and the direction of

15  the investments?

16          MR. FUTERFAS:  The trust was formed in May of 2007.

17  So I believe these transfers occurred before the trust was

18  created.

19          THE COURT:  And these funds were the product of what

20  transactions?

21          MR. FUTERFAS:  The shares, the stock?

22          THE COURT:   Yes.

23          MR. FUTERFAS:  Primarily, him purchasing the shares

24  at a very low price from shareholders who had pledged those

25  shares as collateral with Bank Sarasin, I believe, in

1  Switzerland -- in Switzerland -- so when he acquired the

2  shares, the shares he acquired at a very low price, pennies a

3  share.

4           THE COURT:   But he acquired the shares -- he had to

5  pay cash for the shares, right?

6           MR. FUTERFAS:  Yes.  But it was relatively speaking

7  nominal.

8           THE COURT:   And so at some point Cofolo trust had,

9  or the account had assets of the Crossroads Trust; is that

10  right?

11           MR. FUTERFAS:  Yes.  I think May 27th I think is the

12  exact date, May 27th the trust was formed.  There were shares

13  in the trust, there were some assets in the trust -- it was

14  all originally shares in the trust.

15           THE COURT:   So did the defendant have the power to

16  control the disposition of the assets of the trust?

17           MR. FUTERFAS:  Once the assets are in the trust, the

18  defendant did have the ability to -- let me just check on

19  that, your Honor.

20           (Pause.)

21           MR. FUTERFAS:  Once the shares are in the trust, he

22  had the ability to recommend sales and purchases.

23           THE COURT:   And the assets that were placed in the

24  Crossroads Trust, where did those assets come from?  That was

25  a substantial amount -- I'm trying to remember how much it

1    was -- it's in the addendum.  Maybe it's not.

2            What was the amount, was that part of the

3    $86 million?

4            MR. FUTERFAS:  Yes.

5            THE COURT:   It came from which one of these

6    entities, like Blue Water, Lakki, Parone, East West, or Camal?

7            MR. FUTERFAS:  Maybe I could explain to your Honor.

8    The shares are, and at some point assets, are held within

9    Rosone or within Lakki, which belonged to EH&P, but they

10   become owned by the trust.

11           So it's as if you had Ford shares at Fidelity -- you

12   have those shares at Fidelity, and at some point you say,

13   Okay, I have a hundred shares of Ford Motor Company and I'm

14   creating a trust, and you call Fidelity and say, You know that

15   Fidelity account, those shares, I'm going to create the

16   paperwork, those shares are now going to belong to the trust.

17           So up until May 27th they did not belong to the

18   trust, they belonged to entities but ultimately my client, but

19   once they were put into the trust they belonged to the trust.

20   They were still held in those companies but they belonged to

21   the trust.

22           THE COURT:  The Crossroads Trust, that is an

23   irrevocable trust?

24           MR. FUTERFAS:  Yes, it is.

25           THE COURT:  Who are the trust beneficiaries?

1          MR. FUTERFAS:  My client's children.

2          THE COURT:  So how much is in that trust now?

3          MR. FUTERFAS:  I can answer that.  The trust holds

4     about approximately 50 million.

5          THE COURT:   50 million?

6          MR. FUTERFAS:  Yes.

7          THE COURT:  And all of those assets were acquired

8     after the defendant pleaded guilty, is that basically correct?

9          MR. FUTERFAS:  Yes.  He pled back in 2003.  Yes.

10         THE COURT:   Got it.

11         So those assets are basically not available to pay,

12    as you understand it, to pay any fine or restitution; is that

13    right?

14         MR. FUTERFAS:  It is, your Honor.

15         I actually met with the trustee, and these are real

16    people, this is what they do for a living over there, as your

17    Honor may well be aware, and they have their own fiduciary

18    duties to the beneficiaries.

19         THE COURT:   Okay.

20         MR. FUTERFAS: I don't know honestly how much

21    flexibility --

22         THE COURT:   That's not my problem.  I'm just asking

23    you what your understanding of it is.  If someone wants to

24    invade the trust, that's a matter for lawyers not a matter for

25    the court.

1        The court is only engaged in sentencing the

2  defendant, not in invading a trust, but it important for me to

3  know what was done subsequent to the guilty plea where the

4  defendant was subject potentially to an extremely high fine

5  and the requirement of restitution.

6        MR. FUTERFAS:  I can answer that specific question.

7        THE COURT:  It would appear on the face of it that

8  this was a convenient way of placing these assets beyond the

9  reach of the court.

10       MR. FUTERFAS:  I understand.

11       Can I answer that concern of the court?

12       THE COURT:   Sure, if you can.

13       MR. FUTERFAS:  I think I can, your Honor.

14       The defendant received -- the defendant purchased

15  large amounts of shares in the very end of 2006 and the early

16  part of 2007.  Eventually those shares were placed into a

17  trust.  Most of those shares when they were placed into the

18  trust still did not have most significant value.  They

19  increased in value when they were in the trust.

20       I agree with your Honor that a trust was set up --

21       THE COURT:  He could have put them into Commonwealth

22  or Fidelity and they increased in value too, but what he did

23  is, he put them in a trust for the benefit of his children

24  beyond the reach of himself to pay any fine or provide any

25  restitution for the crimes to which he's pleaded guilty,

1   that's all I'm saying.

2           This was a conscious choice to protect these funds.

3   He was just protecting the funds, he's saying, for the benefit

4   of his children, but he was also protecting the funds, in

5   effect, to keep them out of the reach of the court.

6           MR. FUTERFAS:  I think I can answer that.  If you

7   look at the Government Exhibit 20, which is the financial

8   statement of August 2009, if the defendant was inclined to

9   keep assets away from the court, then the defendant certainly

10  would not have had $8 million in cash sitting in accounts that

11  were readily available, which is disclosed in the August 2009

12  financial statement.

13          The defendant would not have a house worth over

14  $10 million with a mortgage of about $2 million if he chose or

15  wanted to put assets outside the reach of the court.

16          THE COURT:  I didn't say he put all of his assets

17  outside the reach of the court, but he put $50 million of his

18  assets outside the reach of the court, or a sum that grew to

19  be $50 million.

20          I'm not complaining or commenting that he kept all

21  of his assets outside the reach of the court, I'm only talking

22  about a substantial part of those assets that were gained

23  after he pleaded guilty and was allegedly cooperating with the

24  government.

25          Let me ask you, Mr. Spector, can you provide me with

1 some explanation as to what kind of cooperation the defendant

2 was giving you with respect to his own situation as opposed to

3 whatever everybody he also had done to violate the securities

4 laws?

5         MR. SPECTOR:  I'm not sure I quite understand the

6 question.

7         THE COURT:  Well, you know, he's cooperating and in

8 his cooperation he's talking about transactions with others

9 that may have violated the secures laws, right?

10         MR. SPECTOR:  Correct, your Honor.

11         THE COURT:  All right.

12         And to what degree was he providing you with the

13 kind of guidance that would identify the instrumentalities or

14 the fruits of his own financial situation as a result of all

15 of this?

16         MR. SPECTOR:  Well, I think the question is probably

17 best answered in two parts.  With respect to what was

18 happening right after he got arrested, that is back in 2003,

19 as far as I understand, I don't have any evidence that he gave

20 anything other than a full disclosure, but in more recent

21 times, the answer is nothing other than providing the

22 financial statement in 2009 which, for the reasons we have

23 discussed extensively, we believe was incomplete.

24         MR. FUTERFAS:  Your Honor, you have a 2005 financial

25 statement in October.  Anytime the government asked for a

1   financial report they got an extraordinarily complete

2   comprehensive report.

3           In October 15, 2005, it's one of the exhibits, a

4   financial statement was given.  The government has no

5   information to suggest that a dime of that disclosed is not

6   accurate or that there was something else elsewhere that

7   wasn't disclosed.

8           Then, in August 2009, when none of these issues that

9   are before the court with respect to the European issues had

10  raised their head at all, the defendant puts together a

11  financial statement disclosing $86 million in disclosing all

12  of these accounts with detailed footnotes.

13          I'm not sure what the government is saying was not

14  disclosed on that report that was $86 million and, to answer

15  your Honor's question, which was, Hold on a second.  Was this

16  trust used as a vehicle to keep assets away from the court?

17          If he had been sentenced in August 2009, there would

18  have been $8 million in cash sitting in RVC accounts, there

19  was a house worth 10 to $12 million at a $2 million mortgage,

20  that is $20 million in assets free and clear.

21          I don't think it's reasonable for the defendant to

22  think that any fine or forfeiture or restitution is going to

23  exceed $20 million and so, I mean, that was there, that's on

24  that report.

25          THE COURT:  Yes.  But the house is owned in part by

1  his wife. He's not the owner of the fee, he's a joint tenant

2  and it's the subject of litigation.

3       So when you say the house is worth X, his wife, who

4  is engaged in, as you described it, in effect, a bitter

5  divorce proceeding, may end up with the house or may end up

6  with a large portion of the $20 million.

7       So it's not $20 million it's maybe $10 million or $8

8  million or whatever million it is, but obviously he knew his

9  wife had certain problems before 2009, I assume, and he did

10 make his wife the settler of the trust, didn't he?

11      MR. FUTERAS:  In 2007.

12      THE COURT:  How did she get the money?

13      MR. FUTERFAS:  Sorry?

14      THE COURT:  How did she get the money to create

15 this trust?  She didn't earn it.

16      MR. FUTERFAS:  No, no, she's just a settler of the

17 trust.

18      THE COURT:  He gave the money to her?

19      MR. FUTERFAS:  When you just settle a trust, you're

20 creating the trust and assets can be put into that trust.

21      But I think the question for the court, what is

22 bothering your Honor, and I think I can address it, is this

23 part of a concerted effort?

24      In 2007 when the trust is created there is no

25 friction between husband and wife; indeed, when August comes

1   around there is 8 million dollars cash sitting in the account

2   and your Honor is right, the house is jointly owned.  So if

3   they had to liquidate the house, it would be half.

4          Is the defendant supposed to think 13 million in

5   liquid assets is not enough to satisfy a fine or forfeiture or

6   restitution?

7          In the Appel case with four different frauds there

8   is the restitution figure of 2.8 million, so is defendant is

9   supposed to think that 14 or 15 million in assets is

10  insufficient?  I certainly wouldn't draw that conclusion, your

11  Honor.

12          THE COURT:   Thank you.

13          MR. FUTERFAS:  What happened is eventually the

14  divorce unfortunately unfolded after that and she removed

15  funds and now there's a fight, but the real question is, if

16  there's an intent to hide money or to secret money so that

17  there is nothing left, then why would the defendant have 8

18  million sitting in an account when he needed it for bail, it

19  was here, the wife took some of it --

20          THE COURT:   He needed it for legal fees.  You don't

21  come cheap, do you?

22          MR. FUTERFAS:  It depends on how you define cheap,

23  your Honor.

24          THE COURT:   I'm being serious.  He's retained

25  counsel.

1        MR. FUTERFAS:  Yes, your Honor.

2        THE COURT:  And you have been his counsel for a

3   long time and so I assume that he's using some of this money

4   to pay his lawyers, which is understandable that he would do

5   that.  It's not all available for other purposes is what I'm

6   saying.

7        MR. FUTERFAS:  Honestly, your Honor, I agree, but

8   millions and millions of dollars are not -- I'm just saying

9   that in August, when he filled out a financial statement, if

10  someone wanted to say I don't want the court to have anything,

11  I'm worried about that then, you know what, you keep half a

12  million in an account, 250, you mortgage the house to the

13  hilt, take the mortgage money, put that somewhere so there is

14  nothing.  That wasn't the case.

15       MR. SPECTOR:  Can we be heard on that?  There are a

16  couple of points that need to be clarified.  You know what was

17  on in 2007 when he created the trust?  That's when the media

18  reports came out about the German fraud.  That's when the

19  defendant realized he could get in trouble for the stock

20  fraud.  That's when he put this into the trust.

21       THE COURT:  It wasn't that he was trying to hide it

22  from me, from the court, he might have been trying to hide it

23  from the German prosecutors.  That is the theory --

24       MR. SPECTOR:  That's true.

25       THE COURT:  If you take that to its natural

1  conclusion, if that was in his mind then that's what he may

2  have been trying to do.  But we don't know that.

3          MR. SPECTOR:  Correct.

4          By extension, it is ultimately hiding it from this

5  court because if, as has happened, everything came to light

6  both here and in Germany, then ultimately he would be in a

7  position that he's now sitting in with $50 million in assets

8  out of anyone's reach.

9          There is another point here that I think is

10  important to make.  There is no legitimate reason for him to

11  have set up this trust.  People sometimes in certain countries

12  do that for tax reasons.  He doesn't pay tax.  We saw that on

13  his financial disclosure.

14          THE COURT:  Why doesn't he pay taxes?

15          MR. SPECTOR:  Presumably because he's in the Cayman

16  Islands.  I don't know the answer to that.  What I do know in

17  his financial disclosure he says he doesn't pay taxes.  The

18  only reason he could have done that is to hide it.

19          THE COURT:  Anything else?

20          MR. SPECTOR:  No, your Honor.

21          MR. FUTERFAS:  Your Honor, the trust was --

22          THE COURT:  This is your last comment then I have to

23  make some findings.

24          MR. FUTERFAS:  The trust was set up May 27th.  I

25  don't believe there was a single media report, a single

76

1    complaint, a single anything on May 27th.

2         With respect to setting up trusts, people set up in

3    this country trusts all the time.

4         The defendant has been doing business in Europe and

5    Switzerland for 17 years.  If something happens there is a

6    complicated probate, complicated state issues, if he passes

7    away or something happens and there's a trustee it's much

8    easier for the trustees to get the assets.  Trusts are used

9    for lots of reasons.

10        I think the issue for the court is was there a

11   concerted effort to keep money from this court at this time?

12   I don't think, with the kind of disclosure that was made, that

13   that shows that.

14             THE COURT:   Thank you.

15        When did you advise the defendant that he was not

16   going to get a 5K1 letter?

17             MR. SPECTOR:  We sent a letter to him, which I

18   believe the court was copied on, I believe it was late

19   October, early November.

20             THE COURT:   Of '09?

21             MR. SPECTOR:  Of this year.

22             THE COURT:   So he didn't know one way or the other

23   until --

24             MR. SPECTOR:  Well, in fairness, after our bail

25   revocation hearing in December 2009, we knew we had serious

1    concerns but we hadn't made a final decision.

2           THE COURT:  Let me make a few findings here and then

3    we'll go on to 3553(a).

4           With regard to good faith.  Without expressing any

5    views on whether the defendant in fact committed any

6    violations of foreign law -- and the court really doesn't want

7    to get into that one way or the other, and it might result in

8    a trial within a sentencing -- I'm not interested in moving in

9    that direction, I'll let the German prosecutors and the German

10   courts and the German lawyers deal with that if they wish to.

11          I find from the evidence submitted by the government

12   as to the German transactions and from the defendant's

13   unwillingness to meet with the government to explain his

14   actions adequately, that the government determined that the

15   defendant breached the cooperation in good faith.  So the act

16   by the government to abrogate the cooperation agreement was

17   made in good faith.

18          Regarding the base offense level.  The defendant was

19   convicted under count two of the information of conspiracy to

20   commit money laundering in violation of Section 1956

21   (a)(1)(a)(1), and that is the section that is set forth in the

22   information.

23          Section 2S1.1A and Section 1B1.3, Application Note

24   6, of the 2000 sentencing guidelines, which are operative for

25   purposes of this calculation, require application of a base

78

1    level of 23.

2         If you want to see the 2000 book, I have it here,

3    but I don't think I need any further briefing on it  because I

4    think it's very clear.

5         Now, with regard to the specific offense

6    characteristics.  The amount of money involved in the money

7    laundering conspiracy was clearly more than $10 million so an

8    8 level enhancement applies.

9         With respect to the obstruction enhancement,

10   although the government has presented significant evidence of

11   possible obstructive acts, the court does not find by a

12   preponderance of the evidence that the obstruction enhancement

13   applies.

14        So in computing the adjusted offense level for the

15   money laundering conspiracy, count two, with the base offense

16   level of 23 and an 8 level enhancement for the amount of money

17   involved in the money laundering conspiracy, the defendant's

18   adjusted offense level for count two is a 31.

19        Now, with respect to the securities fraud conspiracy

20   guideline calculation, the defendant agrees with the PSR

21   calculation of an adjusted offense level of 26 for count one

22   of the information, which charges the defendant with

23   conspiracy to commit securities fraud.

24        The government agrees with the PSR calculation

25   except asks the court to impose a two level enhancement for

1    obstruction of justice.  The court will not apply that

2    enhancement.  The guidelines range for count one is 26.

3              Acceptance of responsibility.  The court has

4    determined that the defendant has not accepted responsibility

5    for his criminal conduct.  Under Application Note 1E to

6    Section 3E1.1 of the guidelines, the court considers

7    defendant's voluntary efforts to assist the government in

8    identifying and obtaining assets which are the fruits and

9    instrumentalities of the conduct of conviction.  In an

10   economic crime such as this, a defendant's willingness to aid

11   the government in identifying and disgorging the proceeds of

12   his illicit activities is especially relevant in determining

13   whether he has accepted responsibility for his actions.

14             Although the defendant did assist law enforcement in

15   the prosecution of financial crimes committed by others, the

16   government has made clear that the defendant has not been

17   particularly forthcoming with information about his own

18   finances.  Moreover, his conduct, including his e-mail to an

19   executive in which he falsely stated that he had no run-ins

20   with the SEC and misleadingly stated that he had no criminal

21   record though he had pleaded guilty to the information,

22   indicates that he has not manifested acceptance of

23   responsibility.  The court gives the defendant no credit for

24   acceptance of responsibility.

25             Consequently, with a total offense level for count

1   two of 31, under the 2000 guidelines, the defendant's

2   guidelines range for his sentence is 108 to 135 months.  I'll

3   get onto the issue of the fine when I sentence the defendant.

4          So that is the court's finding, and I understand the

5   defense's objections which are part of the record, and

6   whatever objections the government has as to the calculations

7   are also part of the record, so you have your record for

8   appeal on the calculation of the guideline.

9          The next step then is to hear from you about where

10  the defendant should be sentenced with regard to Title 18

11  United States Code, Section 3553(a).

12         Mr. Futerfas.

13         MR. FUTERFAS:  Your Honor, standing here is a

14  defendant who endeavored to cooperate and indeed did cooperate

15  very, very significantly, very, very substantially from the

16  time of his arrest by the federal authorities.  Indeed, as our

17  memorandum makes clear, he contacted counsel in an effort to

18  do that prior to his arrest by the federal authorities.

19         As soon as he got wind that there was a state

20  investigation, he contacted counsel, counsel began speaking

21  with the state and those arrangements were in progress when

22  unbeknownst by the state authorities or him he was arrested by

23  the federal authorities and thereafter, your Honor, he gave

24  extraordinarily substantial and detailed cooperation.

25         His cooperation is summarized and detailed in our

1   memo, but the list of individuals against whom he cooperated

2   and the results of their cooperation is substantial.  Right

3   off the bat he cooperated against an individual named Howard

4   Appel and made the case, made it absolutely an ironclad case

5   against Mr. Appel who thereafter cooperated and thereafter

6   there are significant fruits of Mr. Apple's cooperation.

7           He is directly and uniquely responsible for.

8   Mr. Apple's cooperation.  Mr. Appel received a lenient

9   sentence from Judge Gleeson of less than a year, but this

10  defendant is directly, uniquely responsible for that

11  cooperation.

12          There are a number of other individuals, in fact as

13  many as ten other individuals, he provided information against

14  over the next five years, many of whom pled guilty and some of

15  them cooperated, although we do not know the fruits or results

16  of their cooperation.

17          He met with the District Attorney's office on 14

18  different occasions.  He met with the Eastern District of New

19  York on 17 different occasions, provided information in the

20  Southern District of New York on individuals that they didn't

21  know the whereabouts of.  He met numerous times with the SEC

22  and this was a very, very extensive cooperation.

23          I think, your Honor, one of the points to be made is

24  that if we put the German investigation aside, there is no

25  question that the government would write, if they have not

1  already written -- in fact, I was in touch with the prior

2  prosecutor on this case who had advised me that there was a

3  very significant 5K1 memo on the file when that prosecutor

4  left the office and the government here does not dispute in

5  their memo the nature and extent and quality of the

6  cooperation.

7           So if you put the German investigation aside, I

8  think logically there is no question that the government would

9  be here with a 5K1 and be here arguing for an extraordinarily

10 lenient sentence.  I think there is no doubt about that.

11          So the question then is, well, if we're saying that

12 the German -- the investigation is for the Germans to make a

13 determination and we're not going to have that trial here,

14 which I agree with the court, we're not going to have a trial

15 of that case here, we're not going to make a determination of

16 that here, let them do it -- they don't come to any resolution

17 of that, if they don't decide there's a case there against

18 this defendant or that this defendant did not actually at the

19 end of the day do anything wrong, then where are we?

20          Really where we are, if that happens -- and that may

21 come to pass, I predict that will come to pass because of what

22 I've seen with Frick and what I've seen with the nature of the

23 case, the interactions I've had with that office and with the

24 European lawyers -- so if that comes to pass, what we're faced

25 with, and what your Honor is faced with is an individual who

1  cooperated for 6 or 7 years, resulted in extraordinary

2  cooperation, who, without the German case, the government

3  would be here saying is entitled to a significant, very

4  significant reduction and that's where we would be.

5  I think if your Honor is going to determine that

6  that investigation and that case is for another authority and

7  for a later day, then I think logically the case has to be

8  looked at from that perspective, and from that perspective,

9  you have a person who made a lot of money, no question about

10  it -- was it made legally or illegally, that is up to another

11  authority to make that determination.

12  If they determine there is not a crime or not even

13  sufficient to charge a crime, if that determination is

14  nonetheless abrogated in some way or circumvented by being

15  brought into this court here at sentence, I don't think the

16  court would want to be in a position to do that.

17  I think that logically, if we're going to leave that

18  to another authority then we have to look at putting that

19  aside, what did this individual do and what kind of

20  information did he provide and if there are -- if there's

21  things he shouldn't have done, like the statement to Kealy,

22  take that into account, but I don't think that anyway

23  justifies going from where I think without any of this he

24  would be to somewhere years more.  I don't think it does at

25  all, your Honor.

1          THE COURT:  All right.  Anything else?

2          MR. FUTERFAS:  Sorry?

3          THE COURT:  Anything else?

4          MR. FUTERFAS:  Your Honor, he was prepared to

5     testify in a number of cases, including a significant

6     investigation here that ended up in a plea.  He provided

7     information.

8          There is a whole series of dispositions on page 26

9     of our memorandum of individuals, lawyers, people who were

10    involved in this business who either were indicted or the SEC

11    went after them, and I think that has to be given very, very

12    significant consideration for the court and leave, if we're

13    going to leave Germany for another day in another

14    jurisdiction, to leave it for another day and for another

15    jurisdiction.

16         And with respect to the money issue, and I know your

17    Honor is concerned about it, there was full disclosure of that

18    money in August.  Had he been sentenced in August, there would

19    have been significant assets, millions and millions of dollars

20    available for a fine, for whatever it might be, and --

21         THE COURT:  He didn't consult with the government

22    before he created this trust?

23         MR. FUTERFAS:  Sorry?

24         THE COURT:  He didn't consult with the government

25    about anything like the plan to create a trust that would have

1    taken these funds out of the reach of the court?

2            MR. FUTERFAS:  No, your Honor.

3            THE COURT:   Okay.

4            MR. FUTERFAS:  But I think the question is, is that

5    an intent; in other words, would someone reasonably think that

6    at that stage of the case that having 15 or potentially more,

7    15 or $18 million in liquid assets, even if you take half the

8    house let's say is 5 million, and you take 8 million in the

9    banks, that is 13, plus you've got personal things, jewelry

10    and everything else, for someone to think I'm going to keep

11    $15 million available for the government to take if they need

12    would somehow be indicative of trying to deprive the

13    government of an opportunity to get significant fine or

14    money -- I mean, that's a lot of money to leave there, to

15    leave out there for the government to get or fines or pay

16    restitution.

17            If your real intent is, I don't want the government

18    to get anything and I want to keep everything hidden, I don't

19    think you would leave 15 million or thereabouts available.

20            THE COURT:  In the money laundering account, the

21    defendant pleaded guilty to having laundered funds contained

22    in three sales of securities, right?  They added up to almost

23    $14 million.

24            So if, as law authorizes, the court imposed a fine

25    of up to twice the gross amount of the gain or loss caused by

1   the offenses, that would mean that the court could impose a

2   fine of up to nearly $28 million, isn't that right?

3          MR. FUTERFAS:  Yes, your Honor, theoretically under

4   that statute.  But if we look at the cases that -- the types

5   of cases that have gone on where individuals have cooperated

6   like this, you know, going back to cases that were before this

7   court where people had hundred million dollar restitution

8   issues -- I mean, Howard Appel in GlobalNet had a $2.8 million

9   restitution; other cases before this court have hundred

10  million dollar restitutions where the people, the individuals

11  received time served, or $81 million in restitution -- that

12  was an attorney who was before you, defendant Jason Cohen,time

13  served with an $81 million restitution.

14         So I think if someone is looking to see what are --

15  and Appel had a $2.8 million restitution, so I think having

16  15, or something thereabouts, million available would, if the

17  intent really was to say, I don't want the government to have

18  more than 15 million -- I think if your intent is to keep

19  money away from the court, to keep it away, then you would do

20  that.

21         THE COURT:  All right.  Anything else?  I've read

22  your submissions so I know all about the other personal issues

23  which I sympathize with obviously.  I don't think we need to

24  discuss them here, unless you feel there is something that you

25  need to add.

1      MR. FUTERFAS:  Not beyond the letters that were

2  submitted.

3      THE COURT:  I've read everything.

4      MR. FUTERFAS:  Thank you, your Honor.

5      THE COURT:   Thank you.

6      All right.  Mr. Spector.

7      MR. SPECTOR:  Your Honor, from our perspective the

8  defendant should get absolutely no credit whatsoever for the

9  cooperation in light of everything that has gone on.  One

10  analogy that I think is helpful, because Mr. Futerfas is

11  essentially suggesting, well, if the defendant faces charges

12  somewhere else then we should just ignore that conduct.  That

13  is ridiculous, that is not the law, and an analogy that comes

14  up in --

15      THE COURT:  All I did was say that I wasn't

16  including it for the purpose of establishing the guideline.

17      MR. SPECTOR: I understand that.

18      THE COURT:  I'm not discrediting it or crediting it

19  for any other purpose.

20      MR. SPECTOR:  I appreciate that, Judge, thank you.

21      An analogy we often see where it does come into play

22  is, for example, a felon in possession case where the

23  defendant committed a murder somewhere else that couldn't be

24  proven up or wasn't proven up beyond a reasonable doubt, but

25  can be proven up by a preponderance of the evidence at the

1   sentencing for the felon in possession.

2          This case shouldn't be treated any differently just

3   because it's a more complicated fact pattern.  When you looked

4   at the facts as we discussed extensively this morning, there

5   are three witness statements who all say the same thing, and

6   that is the defendant committed securities fraud.

7          When you asked the defense what they had to counter

8   that, their answer essentially was, well, he hasn't been

9   charged in Germany, which really isn't any answer at all.  So

10  the German fraud by itself in our view completely eviscerates

11  the cooperation credit.

12         But, as you know, that is not the only problem.

13  There is also the Kealy e-mail, which the court has already

14  discussed, and there is also something we have not talked with

15  today and that his posting repeatedly on his Website the

16  GlobalNet Company as an example of a company he helped to take

17  public.

18         We attached printouts from the Website in our

19  sentencing submission.  That by itself is another fraud.  That

20  is a fraud in the inducement because if clients really knew

21  the truth about GlobalNet, they would be very unlikely to deal

22  with the defendant.

23         The reason this is so important when you try to

24  evaluate the cooperation credit is, you can imagine what would

25  have happened if we had put him on the witness stand in some

1    of those cases we contemplated and this came out on cross.  It

2    would have been a complete disaster; he would have been total

3    think discredited as a witness, he wouldn't be usable to us as

4    a witness and a person like that, who does these things

5    essentially behind the back of the government for years, is

6    not entitled to any credit for cooperation.

7         I just want to say a couple of points about

8    deterrence because I think it is particularly apt here.  There

9    are two avenues of sentencing that are normally available that

10   are not available here.  The first is supervised release, the

11   supervised release component of sentencing.  He's not

12   supervisable because he's going to be get deported.  Once he's

13   gone, as we've have seen, he can still commit fraud that

14   affects the United States and investors in the United States

15   and there is no effective way to supervise him.

16        The second is the fine.  As the court's noted

17   already, he put $50 million outside the reach of this court

18   or, as far as I can tell, any court.  Because those two

19   avenues are not available a higher range of imprisonment

20   should be imposed than might otherwise have been.

21        Today really is our last best chance from the

22   perspective of the United States government to try to punish

23   the defendant in a way that is going to effectively deter him

24   because he's not going to be in the United States again, and

25   when you look at this, even a sentence of five years, just

1   taking the $50 million that he's put aside, that is $10

2   million a year for every year in jail -- that seems like a

3   pretty good deal for a lot of people.

4           So I think the task from our perspective is for the

5   court is to impose a sentence that is serious enough that the

6   defendant is going to be deterred from doing this again,

7   because whatever sentence you impose he's going to come out

8   still with a lot of time ahead of him in his life, and he

9   certainly has the intelligence and the wherewithal to commit

10  this crime again -- these kinds of crimes again, and it's

11  going to be very tempting for him and so the sentence has to

12  be high enough that he's going to think twice about doing it

13  because he'll know that he faces serious punishment.

14          THE COURT:    Thank you.

15          MR. FUTERFAS:  May I respond?

16          THE COURT:    Sure.  Keep your voice up.  I don't

17  know what has happened to the audio system.

18          MR. FUTERFAS:  Very well.

19          THE COURT:  Please keep your voice up so everyone

20  can hear.

21          MR. FUTERFAS:  The government has made much of a

22  refusal to meet.  We put in our letter he's offered to have

23  the phone call.

24          He was obviously arranging this for his family and

25  could have -- I mean, I think that is a nonexcuse, and

1   particularly the time that the government began saying we need

2   this meeting was just literally a few weeks ago.

3            Number two, the GlobalNet.  Every time the defendant

4   met with the government he gave them his card, his Website was

5   on the card.  It was obviously inadvertent.  As soon as it

6   came to his attention it was taken off the Website.  You give

7   someone years and years in jail for leaving that up on a

8   Website?  I don't think so.

9            Lastly, and most importantly, the government says

10  "from doing this again."  Again they are presuming that what

11  happened in Germany is a crime, and the real crime would be

12  that if this court indicts, tries, sentences the defendant

13  because he made a lot of money in a deal.

14           The information we put before your Honor shows he's

15  lost millions in other deals, millions of dollars.  Does that

16  mean every one of those deals he's a victim and every one of

17  those deals was bad?

18           He also made a lot of money in legitimate deals.  He

19  created E-Music in about 2000 out of nothing, with a

20  20-year-old kid who was developing the very first software to

21  download music to the Internet.  So he funded this kid by a

22  million dollars.  That company sold for a hundred million

23  dollars two and a half years later with a million dollar

24  investment.

25           Then he got another company that he's invested in,

1   Vinicia --

2         THE COURT:  We're not discussing his

3   entrepreneurial skills, we're discussing his deceit, his

4   fraud, the fact that he ripped off investors, that is what

5   we're talking about here.

6         People do a lot of things right in their lives and,

7   for purposes of this proceeding, certainly I assume, and I

8   conclude, that he's not all bad and that he has a lot of

9   skill, he has a lot of ability.  If he turned that ability to

10  lawful activities that's all well and good, but if you then go

11  from the lawful activities and try to enhance your financial

12  situation through a pump and dump scheme, then I have to

13  sentence him for what he did.

14        MR. FUTERFAS:  I understand, your Honor.

15        THE COURT:  So I'm not saying he didn't do good

16  things, sure he did.  People come in here all the time to be

17  sentenced and I get reams of letters about all the great

18  things that they have done.  I understand that.

19        MR. FUTERFAS:  I guess I didn't make my point clear,

20  your Honor.  What I was saying was this: Your Honor is

21  sentencing him on GlobalNet.  On GlobalNet he cooperated

22  substantially and the people who cooperated on the GlobalNet

23  case got very minimal sentences.

24        The government's pitch today is not really about

25  GlobalNet, their pitch is -- and I'm doing this again -- what

1    he did in Germany is a crime.  They're asking your Honor,

2    despite your Honor's findings, to say nonetheless what

3    happened in Germany is a crime, all the money there is the

4    proceeds of a crime and therefore you must punish him very

5    significantly.  That's the syllogism, that is the argument

6    they're making.

7            THE COURT:  I don't think so.  I think what is

8    happening here is that I'm not taking into account what

9    happened in Germany, but I am taking into account the fact of

10   that he has not demonstrated his full cooperation with the

11   government and therefore he's stuck with his guilty plea as to

12   the crimes to which he pleaded guilty.  There are two crimes,

13   there is the securities fraud and then there's the money

14   laundering.

15           I'm sentencing him basically as if he were any other

16   defendant coming to me having pleaded guilty and not having

17   adequately cooperated to get a 5K letter, that's how I'm

18   sentencing him.

19           This has nothing to do with Germany except that the

20   assets that he acquired through his transactions in Germany

21   have become unavailable for the purposes of paying restitution

22   or a fine to a great extent because he has placed them in an

23   unreachable irrevocable trust for the benefit of his children,

24   that's the only connection, that he's made extra money and now

25   that money isn't available for purposes of paying a fine, for

1    instance.

2         Whatever he may have thought about how much the fine

3    would be, when I took thinks guilty plea I made it very clear

4    that, no matter what you or the prosecutor said, he was still

5    subject to being sentenced by me based upon what was before me

6    at the time of sentence.

7         So if he jumped to conclusions, or you jumped to

8    conclusion about what would be enough, then you jumped in the

9    wrong direction.  That's where we are.

10        I tell this to everybody.  It's not just for the

11   poor guy who came back to the country to visit his three-year

12   old daughter without the permission of the Attorney General,

13   it goes for people who are living in style in the Cayman

14   Islands, that's who it's for.

15        I wasn't wasting my breath when I took his guilty

16   plea and I don't want to hear about what I had in mind or what

17   I would have done if this issue with Germany hadn't come up.

18        Perhaps if the issue with German hadn't come up or

19   he hadn't demonstrated that he was trying to secret these

20   funds the government would have a different perspective on the

21   matter.  That's where we are now.

22        Anything else?

23   MR. FUTERFAS:  Your Honor, I understand that.  I

24   think, as your Honor is clearly aware, your Honor is has the

25   full discretion with or without the 5K1, and the only reason,

1   the most significant reason the government has pulled the 5K1

2   is what happened in Germany, there is no question about that.

3           That is the significant basis for them to pull the

4   letter, otherwise he's given extraordinary cooperation and I

5   think your Honor under 3553, in addition to the family

6   circumstances, can take that very fully into account, your

7   Honor.

8           THE COURT:   Do you have anything else?

9           MR. SPECTOR:  No, your Honor.

10          THE COURT:   All right.

11          Does the defendant have anything to say before I

12  sentence him?

13          THE DEFENDANT:  Good afternoon, your Honor.

14          THE COURT:   Good afternoon.

15          THE DEFENDANT:  I appreciate very much the

16  opportunity to address the court.  I want to thank you, your

17  Honor, for your patience and consideration in this case.  I

18  genuinely regret my errors.  These past seven years have been

19  a real growing and maturing experience.  I take full

20  responsibility for GlobalNet and my guilty plea to those

21  offenses.

22          I tried very hard to assist the government.  I knew

23  and still believe that immediately accepting responsibility

24  and cooperating was the right course of action.  That is why I

25  contacted Mr. Futerfas when I heard a rumor of an

1   investigation and offered my complete cooperation.

2           For years I have called and met the government on 42

3   separate occasions and called and met them with current and

4   developing information.  I believe my cooperation assisted the

5   government in resolving many cases.

6           I also regret and accept responsibility for not

7   advising the government of the German investigation.  I truly

8   was following the guidance from my European attorneys that

9   advised me they thought the matter would be resolved

10  relatively quickly.

11          I am disappointed in the government's point of view

12  of how they reacted to the German investigation.  I have never

13  lied to the government.  I have never deceived the government.

14  I did not commit any crimes or cross the line with my

15  investment and banking activities in Germany.

16          I have traveled dozens of times to the US to meet

17  and provide information and was prepared and ready to testify

18  in any case if called.

19          I provided information about current deals to the

20  government that the government had not even heard of and were

21  not investigating at the time.  Even if the government chose

22  not to pursue the information, I had provided it.  I have used

23  the past seven years to make amends for using terrible

24  judgment in the GlobalNet matter.

25          Mr. Futerfas has written to you about my son Ryan

1 and I feel compelled to speak about him briefly. Over a

2 number of weeks I have been trying to shore up Ryan. He does

3 not know about this case and I'm concerned that it may

4 mentally devastate him after his suicide attempt. I have been

5 arranging for his care and trying to sell my home in Cayman

6 Islands not knowing what may happen here.

7      I offered to speak to the government by phone the

8 week of the house auction and when I had been in court in the

9 Cayman Islands in my divorce case during that entire week.

10      I have spoken with the government by phone many

11 times before. On this particular week Ryan was my priority

12 and I was the one that made this decision.

13      Given the interview of December 4th, 2009 with the

14 government, I was fairly confident that the government would

15 not care or listen to the facts at this time. I was still

16 willing to speak with them by phone. The government refused

17 the phone call, your Honor, not I.

18      I apologize to the court again for my offenses. I

19 have worked very hard to make amends and make a difference. I

20 believe that there is so much more good that I can do. I ask

21 your Honor to consider my cooperation and my most difficult

22 family issues.

23      Ryan is very sick but stable. He is in huge need of

24 support and attention and I am his only parent. Ryan and I

25 speak many times a day. He has daily ups and downs. I hope

1    over time he'll become solvent and emotionally self

2    sufficient.  We are far from that at this current time.  I

3    very much want to be close to him and continue helping him.

4              Thank you, your Honor.

5              THE COURT:  All right.  Thank you.

6              As you can tell, this sentencing poses a difficult

7    set of issues.  There is clearly a major disconnect between

8    the views of the government and the views of the defense. It

9    is clear that if I sentence the defendant within the guideline

10   range that the sentence will be substantial.

11             Quite frankly, I continue to think about everyone's

12   views and normally I don't postpone sentencing, but I need to

13   think about it overnight because everyone's been very

14   eloquent, everyone has the strength of his convictions, it

15   would appear.

16             Mr. Gushlak appears sincere in his statement.  I

17   have a long history with Mr. Gushlak -- he's been before me

18   many times over the last seven years -- but I appreciate the

19   government's views on the subject of some of Mr. Gushlak's

20   mistakes, whether they were intentional or unintentional.

21             Can everyone be here tomorrow morning at 11 o'clock?

22             MR. FUTERFAS:  Yes, your Honor.

23             THE COURT:  Mr. Spector?

24             MR. SPECTOR:  Yes, your Honor.

25             THE COURT:  All right.

99

1          MR. SPECTOR:  Judge, I think I have to ask the

2     defendant be remanded now.  There is just, from our

3     perspective, after today's proceeding, there is clearly a high

4     risk from his perspective that he's going to go to jail and

5     going to go to jail for a long time and that really didn't

6     exist in the way that it does now until right now.  We've

7     always believed there is a risk of flight and I just think

8     it's too great a risk.

9          MR. FUTERFAS:  The defendant has been here for seven

10    years.  The government has made their position known back in

11    December of 2009.  They have made their position known.  The

12    reason the defendant was arranging things was because he

13    certainly is aware and very cognizant of the possibility and

14    there were no illusions with respect to his knowledge or

15    understanding of the possibilities.

16          He's here and was here last week in state court and

17    will be here tomorrow morning.  There is significant bail up

18    and again I don't think in this one it's a close call given

19    every single court appearance.

20          THE COURT:  I've set the guideline, but of course

21    the guidelines are only advisory so nobody has any -- I hope

22    no one can read my mind as to what I'm going to do tomorrow

23    and thus far Mr. Gushlak has been prompt and attentive to all

24    the court's instructions and I expect that he'll be here

25    tomorrow morning to be sentenced.

1          Is that right, Mr. Gushlak?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  If he cares about his son and he cares

4  about some of these other concerns that he has, he could do

5  nothing else.  So we'll resume at 11 o'clock tomorrow morning.

6          MR. SPECTOR:  Thank you, Judge.

7          MR. FUTERFAS:  Thank you.

8          * * * * * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10** [4] - 69:14, 72:7, 78:7, 90:1
**$12** [1] - 59:11, 71:19
**$14** [1] - 85:23
**$15** [1] - 85:11
**$18** [1] - 85:7
**$20** [5] - 44:22, 71:20, 71:23, 72:6, 72:7
**$25** [1] - 11:9
**$250,000** [2] - 54:2, 54:4
**$28** [1] - 86:2
**$50** [5] - 69:17, 69:19, 75:7, 89:17, 90:1
**$500,000** [1] - 17:4
**$81** [2] - 86:11, 86:13
**$86** [7] - 16:19, 26:9, 35:19, 61:19, 66:3, 71:11, 71:14

## '

**'04** [1] - 60:3
**'05** [1] - 60:3
**'06** [1] - 25:8
**'09** [2] - 49:15, 76:20
**'O7** [1] - 25:8

## 0

**001** [1] - 43:4
**03cr833** [1] - 1:3

## 1

**1** [4] - 2:11, 19:10, 49:3, 62:11
**10** [6] - 7:21, 8:1, 9:5, 9:10, 56:9, 71:19
**100** [1] - 19:7
**108** [1] - 80:2
**11** [3] - 12:13, 98:21, 100:5
**11201** [2] - 1:15, 1:21
**11:15** [1] - 1:6
**13** [3] - 17:11, 73:4, 85:9
**135** [1] - 80:2
**14** [2] - 73:9, 81:17
**15** [10] - 19:17, 25:9, 45:6, 71:3, 73:9, 85:6, 85:7, 85:19, 86:16, 86:18
**15th** [1] - 4:22
**16** [6] - 2:10, 21:17, 21:18, 22:3, 23:7, 25:5
**17** [1] - 1:5, 76:5, 81:19
**18** [2] - 12:4, 80:10
**1956** [1] - 77:20
**1956(a)(1)(a)(1** [1] - 12:5
**1:00** [1] - 4:17
**1B1.3** [2] - 12:2, 77:23
**1E** [1] - 79:5

## 2

**2** [3] - 29:23, 69:14, 71:19
**2.8** [3] - 73:8, 86:8, 86:15
**20** [13] - 4:8, 8:15, 9:8, 11:9, 11:10, 12:13, 13:4, 21:22, 22:2, 22:8, 22:9, 62:17, 69:7
**20,000** [1] - 62:5
**20-year-old** [1] - 91:20
**200** [1] - 36:18
**2000** [8] - 11:25, 13:6, 50:7, 56:8, 77:24, 78:2, 80:1, 91:19
**2003** [6] - 14:4, 31:1, 31:4, 59:10, 67:9, 70:18
**2005** [28] - 14:4, 14:16, 17:25, 19:16, 19:17, 19:19, 19:25, 20:5, 20:6, 20:14, 20:15, 20:16, 20:25, 21:3, 21:5, 25:21, 25:23, 26:16, 58:18, 58:24, 59:2, 59:3, 59:18, 59:21, 59:23, 70:24, 71:3
**2006** [18] - 14:8, 16:8, 17:3, 17:22, 17:25, 18:15, 20:12, 20:18, 25:16, 55:12, 55:18, 56:9, 59:19, 59:20, 64:8, 68:15
**2007** [12] - 25:16, 40:7, 43:13, 43:14, 44:2, 50:9, 64:8, 64:16, 68:16, 72:11, 72:24, 74:17
**2008** [5] - 19:10, 24:10, 24:25, 50:11, 59:1
**2009** [31] - 2:10, 2:11, 14:4, 15:15, 15:20, 16:7, 20:14, 24:11, 24:23, 24:24, 25:15, 25:21, 26:4, 26:7, 26:18, 44:7, 45:24, 46:2, 49:5, 61:15, 62:11, 62:17, 69:8, 69:11, 70:22, 71:8, 71:17, 72:9, 76:25, 97:13, 99:11
**2010** [4] - 1:5, 4:9, 43:9, 43:15
**2011** [1] - 47:6
**20th** [2] - 3:11, 4:13
**21** [1] - 62:6
**225** [1] - 1:20
**23** [4] - 12:3, 62:5, 78:1, 78:16
**24** [1] - 4:15
**25** [1] - 11:8
**250** [2] - 44:22, 74:12
**26** [3] - 78:21, 79:2, 84:8
**260,000** [1] - 62:5
**271** [1] - 1:14
**27th** [5] - 65:11, 65:12, 66:17, 75:24, 76:1
**2:15** [1] - 62:18
**2S1.1A** [2] - 12:2, 77:23
**2S1.1D2K** [1] - 7:21

## 3

**3.6** [1] - 62:7
**30** [1] - 50:23
**302** [2] - 36:1, 37:6
**31** [2] - 78:18, 80:1
**34** [1] - 12:13

## 35

**35** [1] - 10:25
**3553** [2] - 48:20, 95:5
**3553(a)** [2] - 77:3, 80:11
**3:30** [2] - 62:20, 63:6
**3E1.1** [1] - 79:6

## 4

**42** [1] - 96:2
**4th** [1] - 97:13

## 5

**5** [14] - 14:10, 17:3, 20:23, 20:24, 21:2, 56:22, 57:3, 59:16, 59:20, 60:4, 60:5, 60:20, 85:8
**5.26** [1] - 62:7
**50** [2] - 67:4, 67:5
**500,000** [2] - 14:10, 60:21
**5K** [6] - 10:2, 10:5, 33:4, 33:11, 48:1, 93:17
**5K.1** [1] - 48:9
**5K1** [5] - 48:12, 76:16, 82:3, 82:9, 94:25, 95:1
**5K1.1** [1] - 5:5

## 6

**6** [4] - 12:2, 21:2, 77:24, 83:1
**613-2481** [1] - 1:21
**613-2505** [1] - 1:22

## 7

**7** [2] - 45:8, 83:1
**7.5** [4] - 54:20, 54:24, 56:11, 56:12
**718** [2] - 1:21, 1:22

## 8

**8** [18] - 7:20, 8:3, 8:12, 8:15, 9:7, 11:18, 11:19, 11:20, 11:21, 14:12, 69:10, 71:18, 72:7, 73:1, 73:17, 78:8, 78:16, 85:8
**80** [2] - 11:7, 36:18
**86** [3] - 35:21, 42:24, 61:24
**8th** [1] - 3:9

## 9

**90** [3] - 58:12, 59:25, 60:6

## A

**a)(1)(a)(1** [2] - 12:6, 77:21
**ability** [7] - 48:11, 63:3, 64:9, 65:18, 65:22, 92:9

**able** [2] - 7:11, 34:24
**abrogate** [1] - 77:16
**abrogated** [1] - 83:14
**absolutely** [6] - 14:7, 18:21, 42:2, 54:5, 81:4, 87:8
**absurd** [1] - 39:13
**Abu** [1] - 44:25
**accept** [2] - 9:10, 96:6
**acceptance** [8] - 26:24, 27:9, 32:12, 32:16, 32:18, 79:3, 79:22, 79:24
**accepted** [4] - 9:20, 27:4, 79:4, 79:13
**accepting** [1] - 95:23
**according** [3] - 11:6, 11:25, 30:12
**account** [38] - 18:24, 19:7, 19:9, 19:13, 19:24, 20:9, 20:10, 21:5, 21:10, 23:11, 23:15, 23:17, 23:20, 23:24, 24:19, 26:15, 45:8, 55:3, 58:21, 58:22, 58:25, 59:1, 60:10, 61:6, 63:16, 65:9, 66:15, 73:1, 73:18, 74:12, 83:22, 85:20, 93:8, 93:9, 95:6
**accounts** [18] - 20:11, 23:3, 23:4, 23:10, 23:12, 23:13, 23:15, 24:5, 24:7, 24:9, 24:21, 26:10, 26:12, 46:6, 46:13, 69:10, 71:12, 71:18
**accurate** [5] - 25:23, 26:8, 26:19, 55:9, 71:6
**acquaintances** [1] - 42:17
**acquired** [7] - 50:12, 65:1, 65:2, 65:4, 67:7, 93:20
**acquisition** [2] - 50:12, 50:13
**across-the-board** [1] - 8:24
**act** [2] - 40:2, 77:15
**acted** [3] - 39:22, 39:23, 39:25
**action** [1] - 95:24
**actions** [2] - 77:14, 79:13
**active** [1] - 30:2
**actively** [2] - 29:24, 30:11
**activities** [5] - 53:16, 79:12, 92:10, 92:11, 96:15
**acts** [1] - 78:11
**actual** [1] - 56:22
**add** [1] - 86:25
**added** [1] - 85:22
**addendum** [6] - 2:10, 2:14, 2:17, 4:2, 62:2, 66:1
**adding** [1] - 58:11
**addition** [3] - 16:3, 27:23, 95:5
**address** [7] - 10:23, 35:25, 49:10, 52:4, 58:9, 72:22, 95:16
**addressed** [1] - 10:4
**adequately** [2] - 77:14, 93:17
**adjusted** [3] - 78:14, 78:18, 78:21
**admissible** [1] - 41:4
**admission** [2] - 17:6, 35:19
**admits** [6] - 37:6, 37:8, 37:11, 37:12, 40:24
**admitted** [1] - 7:25
**advise** [1] - 76:15
**advised** [2] - 82:2, 96:9
**advising** [1] - 96:7
**advisory** [1] - 99:21

**affects** [1] - 89:14
**affidavit** [2] - 15:15, 25:17
**afternoon** [2] - 95:13, 95:14
**afterwards** [1] - 37:13
**aggregate** [1] - 48:3
**ago** [8] - 3:9, 4:15, 19:9, 43:15, 58:17, 62:12, 62:21, 91:2
**agree** [4] - 29:7, 29:12, 30:5, 53:18, 68:20, 74:7, 82:14
**agreed** [2] - 5:11, 59:18
**agreeing** [1] - 11:20, 48:13
**agreement** [4] - 6:10, 12:21, 28:3, 77:16
**agrees** [2] - 78:20, 78:24
**ahead** [6] - 7:13, 10:24, 22:8, 35:24, 52:22, 90:8
**aid** [1] - 79:10
**ALAN** [1] - 1:16
**allegations** [1] - 18:21
**alleged** [1] - 27:10
**allegedly** [1] - 69:23
**allocation** [1] - 11:4
**allocution** [3] - 7:24, 10:16
**almost** [4] - 33:2, 37:3, 60:11, 85:22
**aloud** [1] - 49:7
**amazing** [1] - 59:23
**amended** [4] - 14:6, 20:12, 55:11, 55:18
**amends** [2] - 96:23, 97:19
**AMERICA** [1] - 1:3
**amount** [12] - 6:19, 8:1, 11:3, 56:14, 56:22, 58:1, 61:20, 65:25, 66:2, 78:6, 78:16, 85:25
**amounts** [1] - 68:15
**ample** [3] - 16:25, 18:16, 37:17
**analogy** [4] - 33:2, 87:10, 87:13, 87:21
**analysis** [3] - 36:16, 36:18, 56:18
**answer** [15] - 10:12, 42:19, 42:20, 51:20, 63:1, 64:10, 67:3, 68:6, 68:11, 69:6, 70:21, 71:14, 75:16, 88:8, 88:9
**answered** [2] - 3:20, 70:17
**answers** [1] - 46:17
**anytime** [1] - 70:25
**anyway** [1] - 83:22
**apologize** [2] - 12:11, 97:18
**appeal** [1] - 80:8
**appear** [5] - 12:9, 14:20, 46:17, 68:7, 98:15
**appearance** [1] - 99:19
**appearances** [2] - 2:1, 63:10
**APPEARANCES** [1] - 1:11
**Appel** [21] - 5:6, 6:17, 8:6, 8:8, 8:24, 8:25, 9:5, 9:8, 9:25, 10:5, 10:10, 10:18, 11:7, 58:7, 73:7, 81:4, 81:5, 81:8, 86:8, 86:15
**apple's** [1] - 81:6
**Apple's** [1] - 81:8
**Application** [3] - 12:2, 77:23, 79:5
**application** [9] - 5:4, 8:11, 8:12, 13:12, 25:21, 26:5, 58:13, 77:25
**applied** [1] - 9:5

**applies** [3] - 41:18, 78:8, 78:13
**apply** [7] - 8:4, 10:17, 13:3, 13:4, 13:5, 13:6, 79:1
**applying** [1] - 13:6
**appreciate** [3] - 87:20, 95:15, 98:18
**approach** [4] - 8:6, 8:7, 16:1, 29:21
**appropriate** [8] - 8:13, 17:20, 29:12, 30:9, 32:15, 48:8, 56:18, 60:15
**appropriately** [1] - 28:7
**apt** [1] - 89:8
**argue** [1] - 39:12
**arguing** [1] - 82:9
**argument** [13] - 19:14, 19:15, 19:23, 25:20, 26:2, 28:2, 31:14, 38:15, 41:17, 42:15, 55:21, 61:5, 93:5
**arguments** [5] - 26:21, 37:19, 44:4
**arrangements** [1] - 80:21
**arranging** [3] - 90:24, 97:5, 99:12
**arrest** [2] - 80:16, 80:18
**arrested** [2] - 70:18, 80:22
**articles** [1] - 40:9
**Asaro** [1] - 31:3
**ascertained** [1] - 58:3
**ascribe** [1] - 16:18
**aside** [6] - 29:18, 31:13, 81:24, 82:7, 83:19, 90:1
**aspects** [1] - 27:17
**assert** [1] - 63:16
**assess** [3] - 30:6, 42:13, 45:13
**assets** [53] - 13:17, 14:13, 14:17, 18:25, 19:8, 19:10, 19:12, 21:11, 26:9, 55:20, 57:17, 58:1, 59:3, 59:4, 59:22, 61:9, 61:14, 61:16, 61:21, 62:21, 62:22, 62:23, 62:24, 63:1, 63:3, 63:25, 65:9, 65:13, 65:16, 65:17, 65:23, 65:24, 66:8, 67:7, 67:11, 68:8, 69:9, 69:15, 69:16, 69:18, 69:21, 69:22, 71:16, 71:20, 72:20, 73:5, 73:9, 75:7, 76:8, 79:8, 84:19, 85:7, 93:20
**assigned** [1] - 30:25
**assist** [3] - 79:7, 79:14, 95:22
**assistance** [1] - 2:4
**Assistant** [2] - 1:14, 1:18
**assistant** [2] - 30:24, 30:25
**assisted** [1] - 96:4
**associated** [1] - 19:11
**associates** [1] - 53:21
**assume** [4] - 57:12, 72:9, 74:3, 92:7
**assumed** [1] - 38:1
**assuming** [8] - 15:18, 15:19, 16:7, 17:24, 28:9, 37:1, 56:13, 57:12
**attached** [3] - 4:13, 49:3, 88:18
**attaches** [1] - 27:19
**attempt** [2] - 40:19, 97:4
**attempted** [2] - 46:4, 46:11
**attention** [4] - 28:6, 33:10, 91:6, 97:24
**attentive** [1] - 99:23
**attorney** [4] - 2:5, 28:5, 28:20, 86:12
**Attorney** [4] - 1:13, 1:14, 1:18, 94:12
**Attorney's** [1] - 81:17
**attorneys** [1] - 96:8

**auction** [1] - 97:8
**audio** [1] - 90:17
**August** [15] - 3:11, 4:8, 4:13, 20:14, 26:18, 44:19, 61:15, 69:8, 69:11, 71:8, 71:17, 72:25, 74:9, 84:18
**authorities** [16] - 29:22, 29:25, 42:21, 43:3, 43:6, 43:8, 43:10, 44:12, 45:3, 45:16, 55:5, 80:16, 80:18, 80:22, 80:23
**authority** [3] - 83:6, 83:11, 83:18
**authorizes** [1] - 85:24
**available** [16] - 28:21, 36:10, 56:15, 58:1, 61:10, 67:11, 69:11, 74:5, 84:20, 85:11, 85:19, 86:16, 89:9, 89:10, 89:19, 93:25
**avenues** [2] - 89:9, 89:19
**avoid** [3] - 28:21, 29:2, 63:3
**aware** [5] - 50:6, 50:13, 67:17, 94:24, 99:13

**B**

**B-A-U-E-R** [1] - 39:21
**bad** [2] - 91:17, 92:8
**bail** [4] - 49:3, 73:18, 76:24, 99:17
**bank** [11] - 18:25, 19:1, 19:7, 23:3, 23:10, 23:14, 23:21, 37:23, 56:10, 56:11, 58:24
**Bank** [1] - 64:25
**banked** [1] - 23:16
**banker** [1] - 40:20
**banking** [2] - 54:20, 96:15
**banks** [4] - 23:8, 46:6, 46:13, 85:9
**base** [8] - 8:14, 11:24, 12:3, 12:9, 12:13, 77:18, 77:25, 78:15
**based** [6] - 7:23, 10:21, 18:4, 41:24, 47:20, 94:5
**bases** [2] - 13:15, 19:14
**basing** [1] - 9:6
**basis** [10] - 16:25, 17:1, 27:8, 30:10, 32:12, 33:14, 33:21, 47:20, 55:21, 95:3
**bat** [1] - 81:3
**Bauer** [2] - 39:18, 39:24
**beat** [1] - 32:7
**become** [3] - 66:10, 93:21, 98:1
**becomes** [1] - 13:2
**BEFORE** [1] - 1:9
**began** [2] - 80:20, 91:1
**begin** [1] - 44:2
**begun** [1] - 45:2
**behalf** [2] - 4:7, 23:25
**behave** [1] - 40:1
**behaved** [1] - 33:10
**behavior** [1] - 30:17
**behind** [1] - 89:5
**belief** [2] - 7:10, 49:23
**belong** [5] - 19:11, 20:10, 20:11, 66:16, 66:17
**belonged** [4] - 66:9, 66:18, 66:19, 66:20
**belongs** [2] - 52:11, 54:9

**bench** [1] - 45:13
**beneficial** [4] - 16:10, 19:12, 22:17, 25:12
**beneficially** [1] - 23:19
**beneficiaries** [2] - 66:25, 67:18
**beneficiary** [2] - 21:18, 21:19
**benefit** [3] - 68:23, 69:3, 93:23
**best** [3] - 58:10, 70:17, 89:21
**better** [3] - 29:11, 29:19, 30:5
**between** [6] - 20:13, 22:18, 38:21, 61:12, 72:25, 98:7
**beyond** [5] - 31:4, 68:8, 68:24, 87:1, 87:24
**big** [1] - 44:8
**binder** [3] - 4:9, 4:16, 4:23
**bit** [3] - 15:17, 18:2, 37:20
**bitter** [1] - 72:4
**blind** [1] - 64:12
**blocks** [1] - 54:11
**blue** [1] - 62:4
**Blue** [2] - 56:6, 66:6
**board** [1] - 8:24
**bogged** [2] - 45:22, 58:11
**bogs** [1] - 58:10
**book** [1] - 78:2
**borrowed** [2] - 57:6, 57:8
**bothering** [2] - 51:6, 72:22
**bottom** [2] - 59:6, 59:7
**breach** [1] - 36:17
**breached** [1] - 77:15
**break** [2] - 60:16, 62:18
**breath** [1] - 94:15
**brief** [9] - 4:14, 17:11, 18:4, 18:5, 18:18, 19:3, 28:13, 34:3, 38:1
**briefing** [1] - 78:3
**briefly** [8] - 27:11, 27:14, 27:15, 47:8, 47:9, 63:6, 97:1
**broad** [2] - 48:12
**Brooklyn** [3] - 1:4, 1:15, 1:21
**brought** [3] - 28:6, 33:10, 83:15
**bu** [1] - 44:25
**Burton** [1] - 1:20
**busiest** [1] - 43:21
**business** [9] - 16:5, 25:17, 29:4, 42:17, 52:2, 53:21, 57:7, 76:4, 84:10
**busy** [1] - 34:23
**but/for** [1] - 33:8
**buy** [2] - 54:11, 54:13
**buys** [1] - 23:8

**C**

**Cadman** [2] - 1:14, 1:20
**calculated** [1] - 58:8
**calculation** [7] - 11:5, 11:24, 77:25, 78:20, 78:21, 78:24, 80:8
**calculations** [1] - 80:6
**calendar** [2] - 43:16, 44:3
**called-appearances** [1] - 2:1
**Camal** [2] - 62:7, 66:6

**candid** [1] - 32:18
**card** [2] - 91:4, 91:5
**care** [2] - 97:5, 97:15
**careful** [1] - 52:1
**carefully** [1] - 51:9
**cares** [2] - 100:3
**cars** [1] - 61:22
**case** [49] - 2:1, 2:16, 2:17, 6:12, 8:8, 9:2, 9:13, 9:16, 9:22, 10:1, 11:4, 27:20, 27:22, 28:19, 28:20, 28:24, 30:3, 30:17, 31:1, 31:8, 31:16, 31:18, 39:16, 43:14, 45:5, 50:5, 51:8, 63:14, 73:7, 74:14, 81:4, 82:2, 82:15, 82:17, 82:23, 83:2, 83:6, 83:7, 85:6, 87:22, 88:2, 92:23, 95:17, 96:18, 97:3, 97:9
**cases** [9] - 29:10, 30:18, 84:5, 86:4, 86:5, 86:6, 86:9, 89:1, 96:5
**cash** [7] - 21:2, 24:20, 59:20, 65:5, 69:10, 71:18, 73:1
**CAT** [1] - 1:25
**caused** [1] - 85:25
**Cayman** [5] - 75:15, 94:13, 97:5, 97:9
**certain** [5] - 5:14, 13:17, 53:20, 72:9, 75:11
**certainly** [22] - 6:5, 7:12, 7:19, 9:18, 10:11, 14:15, 17:18, 27:13, 28:11, 28:20, 28:23, 29:11, 29:18, 36:25, 38:11, 40:21, 59:20, 69:9, 73:10, 90:9, 92:7, 99:13
**challenging** [1] - 47:25
**chambers** [1] - 4:17
**chance** [5] - 2:25, 18:18, 25:5, 34:8, 89:21
**change** [2] - 25:19, 61:1
**changed** [4] - 11:12, 26:12, 61:3, 62:10
**changing** [1] - 40:9
**characteristics** [1] - 78:6
**charge** [1] - 83:13
**charged** [5] - 43:12, 43:14, 45:4, 51:8, 88:9
**charges** [6] - 12:6, 27:21, 44:1, 58:3, 78:22, 87:11
**charging** [1] - 47:13
**Charles** [1] - 1:17
**chased** [2] - 45:1, 54:2
**cheap** [2] - 73:21, 73:22
**check** [1] - 65:18
**children** [4] - 67:1, 68:23, 69:4, 93:23
**choice** [1] - 69:2
**chose** [2] - 69:14, 96:21
**chosen** [1] - 59:15
**circumstances** [4] - 28:4, 61:1, 61:3, 95:6
**circumvented** [1] - 83:14
**cite** [2] - 38:20, 51:23
**claim** [5] - 15:5, 37:23, 38:17, 40:3, 57:6
**claimed** [2] - 16:12, 44:23
**claiming** [1] - 18:9
**claims** [9] - 14:22, 14:23, 15:1, 15:14,

18:3, 30:11, 42:10, 44:8, 44:17
**clarified** [1] - 74:16
**clarify** [1] - 21:14
**cleaner** [1] - 32:20
**clear** [17] - 10:16, 17:7, 18:13, 48:6, 48:25, 49:8, 49:13, 53:11, 61:24, 71:20, 78:4, 79:16, 80:17, 92:19, 94:3, 98:9
**clearly** [11] - 7:24, 11:3, 16:7, 23:19, 24:14, 27:20, 36:2, 78:7, 94:24, 98:7, 99:3
**CLERK** [1] - 63:9
**clever** [1] - 57:8
**client** [5] - 3:15, 3:17, 6:2, 64:9, 66:18
**client's** [1] - 67:1
**clients** [2] - 18:25, 88:20
**close** [8] - 35:2, 35:3, 46:20, 46:21, 46:23, 98:3, 99:18
**coconspirator** [1] - 57:24
**coconspirators** [1] - 42:16
**Code** [2] - 12:4, 80:11
**Cofolo** [42] - 13:19, 13:24, 14:3, 14:18, 14:22, 15:8, 15:9, 15:10, 15:12, 15:16, 16:2, 16:24, 18:23, 19:7, 19:10, 19:23, 20:3, 20:9, 20:10, 21:10, 21:15, 22:15, 22:20, 23:2, 23:6, 23:11, 23:17, 23:20, 23:24, 24:1, 24:3, 24:12, 24:23, 24:24, 25:15, 58:20, 58:24, 60:10, 63:16, 65:8
**cognizant** [1] - 99:13
**Cohen,time** [1] - 86:12
**collapsed** [2] - 40:8, 50:9
**collateral** [1] - 64:25
**colloquy** [2] - 8:2, 9:7
**coming** [3] - 56:5, 60:9, 93:16
**comment** [2] - 12:15, 75:22
**commenting** [1] - 69:20
**commit** [6] - 12:4, 77:20, 78:23, 89:13, 90:9, 96:14
**committed** [8] - 35:5, 36:10, 36:19, 39:18, 77:5, 79:15, 87:23, 88:6
**committing** [1] - 41:9
**commonly** [1] - 41:17
**Commonwealth** [1] - 68:21
**communicate** [1] - 39:6
**communications** [1] - 39:8
**companies** [11] - 20:4, 43:25, 46:7, 46:14, 49:23, 50:2, 50:10, 50:11, 50:17, 54:22, 66:20
**Company** [3] - 23:9, 66:13, 88:16
**company** [13] - 13:25, 19:6, 44:21, 44:22, 51:11, 52:8, 54:24, 56:6, 56:7, 56:8, 88:16, 91:22, 91:25
**compared** [1] - 62:21
**compelled** [1] - 97:1
**complaining** [1] - 69:20
**complaint** [2] - 27:20, 76:1
**complete** [7] - 45:12, 60:1, 60:6, 60:12, 71:1, 89:2, 96:1
**completely** [2] - 47:12, 88:10
**complicated** [3] - 76:6, 88:3
**component** [2] - 29:1, 89:11
**comprehensive** [1] - 71:2

**computation** [3] - 7:25, 12:17, 13:4
**computing** [1] - 78:14
**con** [1] - 41:10
**concealing** [1] - 13:16
**concede** [3] - 38:16, 40:22, 41:8
**conceding** [2] - 25:22, 26:1
**concern** [4] - 8:5, 8:22, 38:14, 68:11
**concerned** [3] - 49:22, 84:17, 97:3
**concerns** [3] - 34:15, 77:1, 100:4
**concerted** [2] - 72:23, 76:11
**concisely** [1] - 63:6
**conclude** [1] - 92:8
**concluding** [1] - 27:4
**conclusion** [6] - 18:13, 55:7, 55:8, 73:10, 75:1, 94:8
**conclusions** [2] - 30:8, 94:7
**conclusively** [2] - 18:21, 58:23
**conduct** [16] - 8:25, 27:5, 28:16, 29:3, 31:5, 35:3, 35:5, 35:8, 36:17, 36:23, 53:13, 79:5, 79:9, 79:18, 87:12
**conducted** [1] - 31:22
**confer** [1] - 6:19
**confess** [1] - 12:18
**confident** [3] - 9:25, 10:3, 97:14
**confronted** [1] - 34:14
**connection** [4] - 5:13, 5:25, 6:6, 93:24
**conscious** [1] - 69:2
**consent** [1] - 5:10
**consequently** [1] - 79:25
**consider** [6] - 6:16, 32:22, 33:16, 36:5, 53:23, 97:21
**consideration** [3] - 32:15, 84:12, 95:17
**considerations** [1] - 36:21
**considered** [1] - 39:2
**considering** [1] - 32:24
**considers** [1] - 79:6
**consistent** [3] - 8:6, 8:11, 8:23
**conspiracy** [7] - 12:3, 77:19, 78:7, 78:15, 78:17, 78:19, 78:23
**conspiring** [1] - 41:18
**constitutes** [1] - 27:8
**consult** [3] - 64:3, 84:21, 84:24
**consulting** [1] - 30:17
**contact** [2] - 27:25, 29:13
**contacted** [4] - 28:5, 80:17, 80:20, 95:25
**contacts** [1] - 31:12
**contained** [1] - 85:21
**contemplated** [1] - 89:1
**contemporaneously** [1] - 46:24
**contention** [1] - 26:25
**contents** [1] - 3:24
**contested** [1] - 13:11
**context** [3] - 27:18, 46:7, 46:13
**continue** [3] - 51:24, 98:3, 98:11
**continued** [2] - 50:9, 50:11
**contract** [1] - 56:21
**contradicting** [1] - 38:6
**contradictory** [1] - 14:21

**contrasting** [1] - 15:12
**control** [8] - 62:23, 62:24, 63:1, 63:21, 63:23, 64:11, 64:14, 65:16
**controlled** [1] - 63:21
**controlling** [1] - 38:19
**convenient** [1] - 68:8
**conversation** [1] - 15:21
**conversations** [1] - 34:17
**convey** [1] - 27:21
**convicted** [3] - 30:12, 30:13, 77:19
**conviction** [1] - 79:9
**convictions** [2] - 32:2, 98:14
**cooperate** [2] - 80:14
**cooperated** [10] - 28:14, 81:1, 81:3, 81:5, 81:15, 83:1, 86:5, 92:21, 92:22, 93:17
**cooperating** [6] - 17:23, 29:10, 30:11, 69:23, 70:7, 95:24
**cooperation** [37] - 6:9, 12:21, 17:20, 28:3, 28:4, 29:23, 32:21, 33:3, 33:6, 33:13, 35:10, 47:21, 47:24, 48:21, 70:1, 70:8, 77:15, 77:16, 80:24, 80:25, 81:2, 81:6, 81:8, 81:11, 81:16, 81:22, 82:6, 83:2, 87:9, 88:11, 88:24, 89:6, 93:10, 95:4, 96:1, 96:4, 97:21
**cooperators** [1] - 34:13
**copied** [1] - 76:18
**copies** [1] - 2:20
**copy** [2] - 4:18, 8:8
**cornerstone** [1] - 49:19
**corporate** [1] - 51:11
**corporations** [1] - 22:13
**correct** [24] - 5:7, 5:14, 8:16, 9:4, 10:7, 10:11, 11:25, 12:7, 12:22, 14:7, 16:20, 26:17, 26:20, 27:1, 30:20, 32:5, 34:2, 36:25, 48:24, 55:13, 63:18, 67:8, 70:10, 75:3
**correctly** [2] - 12:12, 37:23
**corroborates** [1] - 40:4
**counsel** [9] - 2:21, 10:9, 29:14, 46:2, 73:25, 74:2, 80:17, 80:20
**count** [6] - 77:19, 78:15, 78:18, 78:21, 79:2, 79:25
**counter** [1] - 88:7
**countries** [1] - 75:11
**country** [2] - 76:3, 94:11
**County** [1] - 1:18
**couple** [6] - 17:5, 30:20, 55:22, 57:11, 74:16, 89:7
**course** [3] - 23:21, 95:24, 99:20
**court** [15] - 2:1, 47:19, 53:15, 63:8, 75:5, 76:11, 83:15, 86:7, 86:9, 89:17, 89:18, 91:12, 97:8, 99:16, 99:19
**COURT** [1] - 1:1
**Court** [1] - 1:20
**court's** [4] - 33:10, 80:4, 89:16, 99:24
**court-case** [1] - 2:1
**Courthouse** [1] - 1:4
**courtroom** [4] - 41:25, 43:21, 45:6, 45:14
**courts** [1] - 77:10

**cover** [1] - 4:22
**craft** [1] - 56:23
**crafted** [1] - 52:1
**crashed** [2] - 31:22, 37:13
**crashes** [1] - 50:3
**create** [4] - 61:5, 66:15, 72:14, 84:25
**created** [8] - 18:24, 18:25, 44:20, 64:18, 72:24, 74:17, 84:22, 91:19
**creating** [2] - 66:14, 72:20
**credibility** [3] - 40:19, 45:14, 47:1
**credit** [19] - 17:21, 17:23, 32:21, 33:3, 33:5, 33:14, 35:11, 42:8, 42:14, 47:21, 48:20, 53:22, 55:3, 55:4, 79:23, 87:8, 88:11, 88:24, 89:6
**credited** [2] - 43:8, 43:11
**crediting** [1] - 87:18
**crime** [18] - 28:24, 36:19, 55:4, 55:5, 79:10, 83:12, 83:13, 90:10, 91:11, 93:1, 93:3, 93:4
**crimes** [7] - 56:15, 68:25, 79:15, 90:10, 93:12, 96:14
**criminal** [12] - 27:7, 27:19, 28:10, 28:16, 29:3, 29:16, 29:17, 31:5, 31:16, 45:2, 79:5, 79:20
**critical** [1] - 10:8
**cross** [2] - 89:1, 96:14
**Crossroads** [2] - 65:9, 65:24, 66:22
**current** [4] - 61:14, 96:3, 96:19, 98:2
**cut** [2] - 60:16, 60:25

## D

**daily** [2] - 26:11, 97:25
**dangerous** [1] - 47:14
**DANIEL** [1] - 1:13
**date** [7] - 3:7, 21:25, 22:5, 22:24, 25:4, 43:18, 65:12
**dated** [2] - 2:10, 2:11
**dates** [1] - 22:22
**daughter** [1] - 94:12
**days** [2] - 3:9, 58:12
**deal** [18] - 6:23, 7:1, 29:3, 29:5, 52:19, 54:16, 58:12, 59:7, 60:7, 60:20, 60:25, 61:1, 61:18, 62:20, 77:10, 88:21, 90:3, 91:13
**dealing** [2] - 43:6, 55:6
**dealings** [1] - 20:18
**deals** [5] - 91:15, 91:16, 91:17, 91:18, 96:19
**dealt** [1] - 28:6
**Deborah** [1] - 22:16
**deceit** [1] - 92:3
**deceived** [1] - 96:13
**December** [11] - 2:11, 44:7, 45:24, 46:2, 49:5, 49:15, 56:9, 62:11, 76:25, 97:13, 99:11
**decide** [2] - 48:12, 82:17
**decided** [1] - 60:7
**decision** [7] - 34:15, 36:13, 47:6, 47:25, 48:11, 77:1, 97:12

**DEFENDANT** [4] - 2:6, 95:13, 95:15, 100:2
**defendant** [75] - 7:24, 13:16, 13:21, 14:2, 14:13, 15:11, 16:11, 27:4, 28:9, 34:17, 35:19, 36:4, 37:6, 39:18, 39:21, 39:22, 40:14, 47:21, 48:21, 58:3, 61:12, 63:2, 63:20, 63:25, 65:15, 65:18, 67:8, 68:2, 68:4, 68:14, 69:8, 69:9, 69:13, 70:1, 71:10, 71:21, 73:4, 73:8, 73:17, 74:19, 76:4, 76:15, 77:5, 77:15, 77:18, 78:20, 78:22, 79:4, 79:14, 79:16, 79:23, 80:3, 80:10, 80:14, 81:10, 82:18, 85:21, 86:12, 87:8, 87:11, 87:23, 88:6, 88:22, 89:23, 90:6, 91:3, 91:12, 93:16, 95:11, 98:9, 99:2, 99:9, 99:12
**Defendant** [2] - 1:6, 1:16
**defendant's** [20] - 7:23, 9:6, 10:16, 14:19, 15:1, 21:23, 22:11, 31:16, 32:13, 39:16, 40:5, 55:19, 62:23, 62:24, 63:23, 77:12, 78:17, 79:7, 79:10, 80:1
**defendants** [1] - 8:12
**defense** [15] - 4:7, 7:9, 8:5, 8:18, 10:9, 15:4, 25:10, 34:3, 37:3, 37:19, 38:6, 39:7, 48:25, 88:7, 98:8
**defense's** [2] - 57:5, 80:5
**define** [1] - 73:22
**degree** [1] - 70:12
**delay** [2] - 2:2, 63:13
**deliberately** [1] - 25:20
**delineated** [1] - 62:1
**demonstrated** [2] - 93:10, 94:19
**denies** [3] - 37:14, 37:15, 37:16
**deny** [1] - 47:21
**denying** [2] - 27:9, 32:12
**Department** [2] - 8:20, 12:8
**departure** [3] - 5:5, 10:6, 10:10
**deported** [1] - 89:12
**deposited** [1] - 45:8
**deprive** [1] - 85:12
**described** [1] - 72:4
**describes** [1] - 22:13
**despite** [1] - 93:2
**destitute** [2] - 59:19, 59:21
**destroyed** [3] - 45:6, 59:9, 59:11
**detail** [2] - 46:5, 46:11
**detailed** [3] - 71:12, 80:24, 80:25
**details** [3] - 45:22, 46:22, 53:20
**deter** [1] - 89:23
**determination** [4] - 82:13, 82:15, 83:11, 83:13
**determine** [2] - 83:5, 83:12
**determined** [2] - 77:14, 79:4
**determining** [2] - 32:16, 55:3, 79:12
**deterred** [1] - 90:6
**deterrence** [1] - 89:8
**devastate** [1] - 97:4
**devastating** [1] - 35:9
**developing** [2] - 91:20, 96:4
**Development** [1] - 62:5
**devote** [1] - 44:19
**devoted** [1] - 28:13

**diamonds** [1] - 44:24
**difference** [3] - 7:5, 32:4, 97:19
**different** [11] - 8:12, 10:19, 23:10, 45:7, 47:13, 62:13, 73:7, 81:18, 81:19, 94:20
**differently** [1] - 88:2
**difficult** [2] - 97:21, 98:6
**diligence** [1] - 54:23
**dime** [1] - 71:5
**direct** [2] - 39:8, 64:9
**directing** [1] - 63:15
**direction** [3] - 64:14, 77:9, 94:9
**directly** [5] - 19:5, 31:11, 36:1, 81:7, 81:10
**directors** [1] - 50:10
**disappointed** [1] - 96:11
**disaster** [1] - 89:2
**disclose** [3] - 13:17, 14:5, 15:15, 17:18, 24:23, 28:3, 55:19
**disclosed** [20] - 14:2, 14:14, 14:16, 15:5, 15:25, 21:1, 21:3, 24:8, 24:15, 24:16, 24:17, 24:18, 24:19, 26:9, 44:12, 58:22, 69:11, 71:5, 71:7, 71:14
**disclosing** [1] - 71:11
**disclosure** [17] - 14:3, 14:4, 14:17, 14:20, 15:20, 16:3, 16:6, 21:11, 21:23, 22:19, 29:2, 30:2, 70:20, 75:13, 75:17, 76:12, 84:17
**disconnect** [1] - 98:7
**discount** [1] - 48:20
**discredited** [1] - 89:3
**discrediting** [1] - 87:18
**discretion** [3] - 48:13, 48:14, 94:25
**discuss** [2] - 62:20, 86:24
**discussed** [4] - 27:6, 70:23, 88:4, 88:14
**discussing** [2] - 92:2, 92:3
**discussion** [2] - 57:13, 61:17
**disgorging** [1] - 79:11
**dismissal** [2] - 27:20, 32:3
**dismissed** [2] - 27:22, 31:19
**disposal** [1] - 56:23
**disposition** [2] - 64:14, 65:16
**dispositions** [1] - 84:8
**dispositive** [1] - 9:21
**dispute** [8] - 9:13, 13:23, 21:10, 25:6, 31:14, 33:7, 39:18, 82:4
**disputes** [1] - 37:14
**disputing** [1] - 25:10
**disseminated** [1] - 37:9
**distraction** [1] - 37:3
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [4] - 1:18, 81:17, 81:18, 81:20
**disturbing** [2] - 27:16, 28:17
**divorce** [4] - 34:23, 72:5, 73:14, 97:9
**docket** [1] - 47:15
**documentation** [2] - 13:22, 18:10
**documented** [1] - 52:4
**documents** [16] - 2:12, 5:19, 5:24, 8:24, 14:24, 15:2, 15:3, 15:7, 15:10, 44:5, 44:6, 45:19, 54:4, 54:7, 56:4

**dollar** [8] - 35:15, 35:22, 36:7, 57:20, 61:24, 86:7, 86:10, 91:23
**dollars** [19] - 7:22, 8:1, 11:8, 17:6, 18:2, 18:6, 36:4, 44:23, 55:22, 56:6, 56:12, 56:15, 57:16, 73:1, 74:8, 84:19, 91:15, 91:22, 91:23
**done** [10] - 6:17, 47:13, 60:11, 64:8, 68:3, 70:3, 75:18, 83:21, 92:18, 94:17
**doubt** [2] - 82:10, 87:24
**down** [6] - 13:16, 34:8, 45:22, 48:18, 58:10, 58:11
**download** [1] - 91:21
**downs** [1] - 97:25
**downward** [1] - 5:4
**dozens** [2] - 23:14, 96:16
**draw** [1] - 73:10
**driving** [1] - 11:4
**due** [1] - 54:23
**dump** [10] - 37:5, 37:14, 39:23, 40:1, 49:20, 50:2, 50:19, 50:20, 54:22, 92:12
**during** [5] - 19:24, 25:7, 29:22, 41:17, 97:9
**duties** [1] - 67:18
**dwarfs** [1] - 11:2

## E

**e-mail** [10] - 27:7, 27:11, 27:17, 28:17, 28:25, 31:21, 31:23, 51:2, 79:18, 88:13
**e-mailing** [1] - 39:5
**e-mails** [5] - 34:19, 38:20, 39:1, 39:3, 54:14
**E-Music** [1] - 91:19
**early** [4] - 43:13, 64:8, 68:15, 76:19
**earn** [1] - 72:15
**earnings** [1] - 16:12
**earth** [1] - 42:1
**easier** [2] - 7:15, 76:8
**East** [5] - 1:14, 1:20, 44:14, 62:6, 66:6
**Eastern** [1] - 81:18
**EASTERN** [1] - 1:1
**easy** [2] - 7:17, 42:19
**economic** [1] - 79:10
**effect** [4] - 29:18, 63:2, 69:5, 72:4
**effective** [1] - 89:15
**effectively** [1] - 89:23
**effort** [4] - 15:22, 72:23, 76:11, 80:17
**efforts** [1] - 79:7
**EH&P** [22] - 14:23, 15:6, 18:24, 19:2, 19:5, 19:8, 22:14, 22:15, 23:4, 23:6, 23:8, 23:14, 23:17, 23:18, 23:21, 23:23, 24:25, 63:22, 63:24, 66:9
**EH&P's** [2] - 24:9, 63:16
**eight** [3] - 20:19, 24:10, 24:16
**either** [3] - 6:15, 57:19, 84:10
**elements** [1] - 37:4
**eloquent** [1] - 98:14
**elsewhere** [1] - 71:6
**emotionally** [1] - 98:1
**end** [5] - 41:21, 68:15, 72:5, 82:19

**endeavored** [1] - 80:14
**ended** [2] - 40:9, 84:6
**Energy** [8] - 17:6, 18:7, 31:22, 40:13, 44:25, 52:25, 54:19, 55:23
**energy** [5] - 19:20, 19:21, 19:22, 24:2, 50:12
**enforcement** [1] - 79:14
**engaged** [2] - 68:1, 72:4
**engaging** [1] - 57:7
**enhance** [1] - 92:11
**enhancement** [21] - 7:21, 8:4, 8:13, 8:15, 9:2, 9:6, 9:7, 9:11, 10:17, 10:20, 10:21, 13:12, 13:15, 16:25, 18:16, 78:8, 78:9, 78:12, 78:16, 78:25, 79:2
**entered** [1] - 17:5
**Enterprises** [1] - 62:5
**entire** [3] - 44:20, 56:21, 97:9
**entirely** [1] - 37:3
**entities** [9] - 14:22, 14:24, 15:8, 15:13, 15:25, 22:18, 22:20, 66:6, 66:18
**entitled** [3] - 54:6, 83:3, 89:6
**entity** [6] - 13:20, 14:23, 15:9, 38:18, 63:24
**entrepreneurial** [1] - 92:3
**erroneous** [1] - 12:14
**error** [1] - 12:9
**errors** [1] - 95:18
**especially** [1] - 79:12
**ESQ** [2] - 1:12, 1:16
**essentially** [7] - 22:14, 28:10, 41:16, 57:17, 87:11, 88:8, 89:5
**established** [2] - 46:5, 46:12
**establishing** [1] - 87:16
**Estate** [2] - 23:13, 62:6
**ETFs** [2] - 24:20, 24:21
**Europe** [2] - 34:25, 76:4
**European** [3] - 71:9, 82:24, 96:8
**European's** [1] - 53:8
**evacuated** [1] - 59:12
**evaluate** [1] - 88:24
**events** [1] - 45:7
**eventually** [2] - 68:16, 73:13
**Evidence** [1] - 41:3
**evidence** [25] - 15:18, 18:7, 18:9, 18:16, 20:5, 20:17, 21:6, 21:12, 26:3, 35:7, 37:17, 37:21, 39:3, 39:9, 40:15, 47:18, 48:19, 52:10, 58:19, 61:7, 70:19, 77:11, 78:10, 78:12, 87:25
**evidentiary** [2] - 21:9, 38:11
**eviscerates** [1] - 88:10
**ex** [3] - 5:2, 5:9, 8:9
**exact** [1] - 65:12
**exactly** [3] - 5:18, 14:11, 25:13
**examined** [1] - 45:18
**example** [4] - 23:8, 54:1, 87:22, 88:16
**exceed** [1] - 71:23
**exceeded** [1] - 8:1
**exceeding** [3] - 7:21, 9:8
**excellent** [1] - 36:15
**except** [2] - 78:25, 93:19
**exception** [1] - 16:23

**exclude** [1] - 35:10
**excuse** [1] - 51:10
**executive** [1] - 79:19
**exhibit** [4] - 4:9, 4:16, 4:23, 22:1
**Exhibit** [15] - 19:2, 21:17, 21:18, 21:22, 22:2, 22:8, 22:9, 23:6, 23:7, 25:5, 25:9, 43:17, 49:3, 62:17, 69:7
**Exhibits** [2] - 43:17, 54:9
**exhibits** [7] - 4:10, 4:13, 18:18, 19:2, 38:2, 52:7, 71:3
**exist** [4] - 54:22, 54:25, 62:22, 99:6
**existed** [1] - 12:1
**expect** [1] - 99:24
**experience** [1] - 95:19
**explain** [5] - 28:11, 46:5, 46:11, 66:7, 77:13
**explained** [1] - 34:13
**explains** [1] - 22:11
**explanation** [6] - 15:12, 32:21, 33:4, 34:22, 40:6, 70:1
**expose** [1] - 35:4
**express** [1] - 44:3
**expressed** [1] - 21:6
**expressing** [1] - 77:4
**extension** [1] - 75:4
**extensive** [1] - 81:22
**extensively** [3] - 28:14, 70:23, 88:4
**extent** [7] - 33:16, 53:15, 57:23, 62:23, 62:25, 82:5, 93:22
**extra** [1] - 93:24
**extraordinarily** [3] - 71:1, 80:24, 82:9
**extraordinary** [2] - 83:1, 95:4
**extremely** [1] - 68:4

## F

**face** [3] - 29:10, 38:15, 68:7
**faced** [2] - 82:24, 82:25
**faces** [2] - 87:11, 90:13
**facing** [1] - 34:7
**fact** [23] - 15:21, 34:21, 35:8, 49:18, 49:19, 51:18, 52:18, 53:7, 53:8, 55:21, 57:1, 57:12, 57:13, 57:18, 59:5, 59:22, 60:11, 77:5, 81:12, 82:1, 88:3, 92:4, 93:9
**factor** [3] - 32:22, 33:16, 37:14
**facts** [5] - 18:14, 42:9, 60:13, 88:4, 97:15
**factual** [2] - 33:7, 38:14
**factually** [1] - 32:3
**failed** [1] - 7:19
**failing** [1] - 13:16
**failure** [1] - 55:19
**fair** [5] - 6:19, 7:6, 36:11
**fairly** [3] - 9:25, 58:11, 97:14
**fairness** [1] - 76:24
**faith** [7] - 30:10, 33:14, 33:21, 47:20, 77:4, 77:15, 77:17
**false** [16] - 20:1, 20:2, 20:7, 27:21, 31:17, 37:12, 49:16, 50:21, 50:22,

50:24, 51:17, 51:22, 51:23
**falsely** [1] - 79:19
**family** [3] - 90:24, 95:5, 97:22
**far** [7] - 2:5, 7:2, 43:21, 70:19, 89:18, 98:2, 99:23
**Fatico** [1] - 42:3
**Fax** [1] - 1:22
**federal** [5] - 29:22, 29:25, 80:16, 80:18, 80:23
**fee** [1] - 72:1
**fees** [1] - 73:20
**felon** [2] - 87:22, 88:1
**few** [8] - 18:2, 19:9, 29:7, 31:12, 36:17, 63:12, 77:2, 91:2
**Fidelity** [5] - 66:11, 66:12, 66:14, 66:15, 68:22
**fiduciary** [1] - 67:17
**fight** [1] - 73:15
**figure** [5] - 36:7, 59:17, 61:24, 64:7, 73:8
**figured** [1] - 58:2
**file** [7] - 26:11, 26:14, 38:2, 38:3, 38:8, 43:5, 82:3
**filed** [12] - 3:7, 3:8, 4:15, 4:17, 5:9, 5:21, 20:16, 20:20, 26:8, 33:11, 38:7, 58:18
**filings** [2] - 5:13, 5:15
**filled** [2] - 24:16, 74:9
**final** [3] - 34:15, 36:13, 77:1
**finances** [2] - 25:23, 79:18
**financial** [48] - 14:3, 15:20, 16:3, 17:13, 19:15, 19:17, 19:25, 20:7, 20:13, 20:16, 20:25, 21:3, 21:5, 21:23, 24:11, 24:17, 26:12, 26:14, 26:19, 46:16, 58:18, 59:3, 59:5, 59:10, 59:21, 59:23, 60:1, 60:16, 61:6, 61:8, 61:16, 61:18, 61:24, 62:17, 69:7, 69:12, 70:14, 70:22, 70:24, 71:1, 71:4, 71:11, 74:9, 75:13, 75:17, 79:15, 92:11
**Finanz** [7] - 13:24, 38:17, 52:8, 52:11, 52:15, 54:8, 54:9
**findings** [4] - 47:1, 75:23, 77:2, 93:2
**fine** [21] - 11:16, 11:22, 26:22, 36:8, 58:1, 61:10, 63:4, 67:12, 68:4, 68:24, 71:22, 73:5, 80:3, 84:20, 85:13, 85:24, 86:2, 89:16, 93:22, 93:25, 94:2
**fines** [1] - 85:15
**finished** [1] - 30:22
**firm** [1] - 54:20
**first** [19] - 13:8, 13:19, 15:19, 17:16, 18:22, 19:15, 25:4, 25:20, 27:18, 30:24, 32:20, 33:2, 33:3, 38:1, 50:15, 51:1, 57:11, 89:10, 91:20
**five** [3] - 42:22, 81:14, 89:25
**flexibility** [1] - 67:21
**flight** [1] - 99:7
**flowed** [1] - 13:25
**fluff** [1] - 51:12
**fly** [1] - 34:25
**following** [2] - 49:21, 96:8
**follows** [1] - 42:20

**footnote** [1] - 21:16
**footnotes** [3] - 15:24, 22:11, 71:12
**Ford** [8] - 23:9, 23:15, 23:19, 23:22, 23:25, 24:24, 66:11, 66:13
**foreign** [1] - 77:6
**foremost** [1] - 33:4
**forfeit** [1] - 14:13
**forfeiture** [13] - 14:6, 14:9, 20:13, 20:20, 20:23, 55:11, 55:15, 56:15, 60:8, 61:2, 71:22, 73:5
**form** [2] - 22:19, 62:22
**formed** [2] - 64:16, 65:12
**forth** [2] - 8:2, 77:21
**forthcoming** [1] - 79:17
**forward** [4] - 43:18, 47:4, 51:7, 51:12
**forwarded** [1] - 4:8
**four** [3] - 10:19, 10:21, 73:7
**frame** [2] - 41:19, 48:20
**frameworks** [1] - 33:1
**framing** [1] - 32:18
**Frankel** [1] - 46:1
**frankly** [7] - 15:2, 15:17, 22:1, 35:18, 47:14, 57:22, 98:11
**fraud** [35] - 10:19, 11:11, 16:12, 16:18, 27:10, 32:14, 33:9, 33:13, 35:13, 35:16, 35:20, 36:4, 36:5, 36:10, 36:17, 37:5, 41:9, 41:11, 55:19, 56:20, 57:24, 58:16, 58:20, 60:19, 74:18, 74:20, 78:19, 78:23, 88:6, 88:10, 88:19, 88:20, 89:13, 92:4, 93:13
**frauds** [2] - 39:17, 73:7
**fraudster** [1] - 44:13
**fraudsters** [1] - 40:1
**fraudulent** [1] - 57:21
**free** [1] - 71:20
**Frick** [35] - 13:22, 14:1, 16:23, 37:10, 37:11, 37:15, 38:4, 40:9, 40:17, 40:22, 40:24, 41:1, 42:22, 42:24, 43:8, 43:11, 43:14, 43:19, 43:20, 44:11, 45:5, 45:6, 45:9, 49:9, 49:16, 50:24, 51:17, 51:21, 51:25, 52:3, 52:14, 52:15, 53:10, 82:22
**Frick's** [7] - 40:21, 41:22, 45:7, 50:22, 51:1, 51:9
**friction** [1] - 72:25
**friend** [2] - 18:12, 23:16
**front** [2] - 12:24, 43:24
**fruits** [4] - 70:14, 79:8, 81:6, 81:15
**full** [6] - 55:20, 70:20, 84:17, 93:10, 94:25, 95:19
**fully** [1] - 95:6
**fund** [3] - 54:23, 64:1
**funded** [1] - 91:21
**funds** [15] - 7:21, 7:25, 8:1, 36:9, 55:1, 58:25, 62:1, 64:19, 69:2, 69:3, 69:4, 73:15, 85:1, 85:21, 94:20
**FUTERAS** [1] - 72:11
**Futerfas** [9] - 15:21, 31:15, 34:12, 34:17, 35:23, 80:12, 87:10, 95:25, 96:25
**FUTERFAS** [112] - 1:16, 2:15, 2:24, 3:3, 3:12, 3:14, 3:16, 3:19, 3:22, 3:25,

4:3, 4:5, 4:12, 5:10, 5:18, 6:3, 6:14, 6:22, 6:25, 7:3, 8:19, 10:18, 11:16, 11:19, 12:11, 18:17, 18:20, 19:5, 22:21, 22:24, 23:1, 24:14, 25:19, 25:25, 26:3, 26:7, 29:6, 30:21, 30:23, 31:7, 31:10, 32:6, 41:24, 42:5, 42:19, 46:10, 48:7, 49:10, 50:8, 51:5, 52:23, 53:18, 53:24, 55:2, 56:1, 58:15, 61:15, 62:3, 62:9, 62:13, 62:16, 63:19, 64:2, 64:6, 64:16, 64:21, 64:23, 65:6, 65:11, 65:17, 65:21, 66:4, 66:7, 66:24, 67:1, 67:3, 67:6, 67:9, 67:14, 67:20, 68:6, 68:10, 68:13, 69:6, 70:24, 72:13, 72:16, 72:19, 73:13, 73:22, 74:1, 74:7, 75:21, 75:24, 80:13, 84:2, 84:4, 84:23, 85:2, 85:4, 86:3, 87:1, 87:4, 90:15, 90:18, 90:21, 92:14, 92:19, 94:23, 98:22, 99:9, 100:7

**G**

**gain** [1] - 85:25
**gained** [2] - 61:20, 69:22
**galling** [2] - 28:1, 28:12
**GARAUFIS** [1] - 1:9
**General** [2] - 23:16, 94:12
**generally** [1] - 62:8
**generous** [1] - 61:8
**genuinely** [1] - 95:18
**geological** [1] - 50:1
**German** [53] - 4:11, 13:21, 14:25, 15:4, 16:12, 16:14, 16:15, 24:7, 27:10, 32:14, 32:25, 33:9, 33:13, 33:25, 35:13, 35:16, 36:5, 37:7, 38:5, 38:9, 42:20, 43:3, 43:5, 43:7, 43:16, 44:12, 45:3, 45:16, 46:8, 46:14, 47:3, 47:11, 49:19, 55:21, 55:5, 57:24, 61:13, 61:20, 61:25, 74:18, 74:23, 77:9, 77:10, 77:12, 81:24, 82:7, 82:12, 83:2, 88:10, 94:18, 96:7, 96:12
**Germans** [12] - 15:7, 15:10, 47:12, 47:17, 49:22, 50:13, 50:15, 51:7, 51:16, 51:20, 51:24, 82:12
**Germany** [18] - 42:8, 43:22, 43:23, 44:1, 53:14, 53:16, 75:6, 84:13, 88:9, 91:11, 93:1, 93:3, 93:9, 93:19, 93:20, 94:17, 95:2, 96:15
**given** [9] - 2:5, 34:6, 40:23, 45:6, 71:4, 84:11, 95:4, 97:13, 99:18
**glaring** [1] - 33:22
**Gleeson** [4] - 8:8, 9:10, 58:8, 81:9
**Gleeson's** [1] - 8:6
**GlobalNet** [15] - 10:22, 11:1, 11:3, 11:6, 11:11, 86:8, 88:16, 88:21, 91:3, 92:21, 92:22, 92:25, 95:20, 96:24
**gold** [2] - 24:20, 24:21
**Gold** [16] - 38:23, 40:13, 44:25, 50:11, 53:1, 54:14
**good-faith** [4] - 30:10, 33:14, 33:21, 47:20
**government** [102] - 3:6, 3:12, 5:2, 6:5, 6:18, 7:8, 8:23, 17:13, 17:22, 18:8, 18:14, 18:22, 19:14, 21:6, 23:2, 24:22,

25:23, 27:3, 28:15, 42:23, 44:7, 44:15, 45:11, 45:23, 45:24, 47:3, 48:5, 49:12, 49:20, 51:10, 51:19, 52:17, 52:21, 52:23, 53:4, 55:14, 59:6, 59:13, 59:15, 59:17, 60:2, 60:4, 60:7, 60:9, 60:13, 60:15, 61:7, 62:16, 69:24, 70:25, 71:4, 71:13, 77:11, 77:13, 77:14, 77:16, 78:10, 78:24, 79:7, 79:11, 79:16, 80:6, 81:25, 82:4, 82:8, 83:2, 84:21, 84:24, 85:11, 85:13, 85:15, 85:17, 86:17, 89:5, 89:22, 90:21, 91:1, 91:4, 91:9, 93:11, 94:20, 95:11, 95:22, 96:2, 96:5, 96:7, 96:13, 96:20, 96:21, 97:7, 97:10, 97:14, 97:16, 98:8, 99:10

**Government** [3] - 1:12, 54:9, 69:7

**government's** [13] - 4:14, 5:4, 44:4, 46:8, 46:15, 47:25, 48:11, 52:5, 52:7, 53:20, 92:24, 96:11, 98:19

**granted** [1] - 10:5

**gratuitous** [1] - 28:1

**great** [1] - 92:17, 93:22, 99:8

**grew** [1] - 69:18

**gross** [1] - 85:25

**grounds** [1] - 27:3

**Group** [1] - 62:7

**growing** [1] - 95:19

**guess** [5] - 7:14, 13:5, 22:6, 41:24, 92:19

**guest** [1] - 42:4

**guidance** [2] - 70:13, 96:8

**guideline** [12] - 7:5, 8:11, 9:25, 10:2, 13:3, 13:7, 32:23, 78:20, 80:8, 87:16, 98:9, 99:20

**guidelines** [13] - 5:5, 9:13, 9:15, 12:1, 13:6, 13:10, 33:17, 77:24, 79:2, 79:6, 80:1, 80:2, 99:21

**guilty** [19] - 9:1, 35:7, 39:16, 41:10, 58:4, 61:12, 67:8, 68:3, 68:25, 69:23, 79:21, 81:14, 85:21, 93:11, 93:12, 93:16, 94:3, 94:15, 95:20

**GUSHLAK** [1] - 1:5

**Gushlak** [66] - 2:4, 2:18, 4:8, 8:25, 10:22, 19:6, 19:9, 19:11, 19:19, 19:23, 20:3, 20:9, 21:15, 21:20, 22:17, 22:18, 24:1, 28:20, 29:15, 29:17, 30:16, 31:4, 31:23, 32:8, 38:16, 38:18, 38:21, 39:3, 39:5, 39:7, 40:11, 40:17, 40:24, 41:10, 41:12, 41:19, 43:12, 43:16, 44:10, 44:16, 45:4, 45:14, 46:4, 46:11, 46:18, 47:5, 47:15, 49:2, 49:9, 49:14, 50:9, 51:8, 52:16, 52:18, 53:5, 54:10, 54:15, 54:17, 57:16, 59:24, 63:9, 98:16, 98:17, 99:23, 100:1

**Gushlak's** [8] - 2:17, 32:1, 32:6, 42:18, 53:16, 53:21, 56:13, 98:19

**guy** [2] - 41:16, 94:11

## H

**Halcion** [1] - 62:4

**half** [7] - 44:19, 51:2, 58:17, 73:3,

74:11, 85:7, 91:25

**hand** [1] - 14:21, 15:14, 17:23

**handle** [3] - 29:11, 29:13, 30:6

**handled** [1] - 29:19

**handwritten** [1] - 31:11

**happy** [1] - 8:9

**hard** [5] - 51:14, 51:15, 63:13, 95:22, 97:19

**head** [1] - 71:10

**heading** [1] - 22:10

**hear** [14] - 7:8, 7:9, 8:17, 13:7, 25:1, 25:10, 27:14, 29:7, 35:22, 48:23, 80:9, 90:20, 94:16

**heard** [8] - 19:19, 20:4, 25:2, 41:24, 52:21, 74:15, 95:25, 96:20

**hearing** [4] - 21:9, 38:12, 42:4, 76:25

**hearsay** [1] - 44:6

**heavily** [1] - 13:11

**hedge** [2] - 54:22, 55:1

**held** [15] - 19:10, 23:9, 23:15, 23:17, 23:20, 24:3, 24:4, 24:23, 26:10, 26:15, 60:10, 63:15, 66:8, 66:20

**helped** [1] - 88:16

**helpful** [2] - 62:15, 87:10

**helping** [1] - 98:3

**heretofore** [1] - 14:13

**herring** [2] - 21:16, 40:10

**hid** [1] - 60:9

**hidden** [1] - 85:18

**hide** [5] - 53:7, 73:16, 74:21, 74:22, 75:18

**hiding** [2] - 21:4, 75:4

**high** [3] - 68:4, 90:12, 99:3

**higher** [1] - 89:19

**hilt** [1] - 74:13

**himself** [6] - 7:24, 35:2, 35:5, 39:21, 40:24, 68:24

**history** [1] - 98:17

**Hold** [3] - 25:22, 26:11, 71:15

**hold** [1] - 20:3

**holding** [3] - 19:8, 23:3, 23:25

**holdings** [2] - 16:5, 25:17

**Holdings** [1] - 62:6

**holds** [2] - 18:25, 67:3

**home** [3] - 50:3, 61:22, 97:5

**honest** [2] - 9:14, 17:24

**honestly** [2] - 67:20, 74:7

**Honor** [142] - 2:24, 3:14, 3:16, 3:19, 4:12, 4:25, 5:10, 5:18, 5:19, 6:3, 6:6, 6:13, 6:14, 6:16, 7:3, 7:7, 7:12, 7:19, 8:16, 8:19, 9:14, 9:18, 10:11, 10:18, 11:16, 11:19, 12:7, 12:11, 12:12, 12:18, 14:7, 16:20, 18:17, 19:1, 20:6, 21:19, 22:4, 22:21, 23:2, 23:7, 23:8, 25:19, 25:25, 26:4, 27:2, 27:13, 29:6, 29:20, 29:24, 31:7, 31:10, 34:2, 42:5, 42:20, 43:4, 43:7, 43:10, 43:17, 43:19, 43:20, 44:3, 44:15, 44:16, 44:18, 45:20, 46:1, 46:3, 46:10, 46:25, 47:2, 48:7, 49:10, 49:11, 50:4, 51:1, 52:14, 52:20, 53:18, 53:24, 54:6, 55:2, 55:13, 56:1, 56:5,

58:15, 59:22, 60:14, 60:16, 60:18, 60:25, 61:15, 62:16, 63:19, 64:6, 65:19, 66:7, 67:14, 67:17, 68:13, 68:20, 70:10, 70:24, 72:22, 73:2, 73:11, 73:23, 74:1, 74:7, 75:20, 75:21, 80:13, 80:23, 81:23, 82:25, 83:5, 83:25, 84:4, 84:17, 85:2, 86:3, 87:4, 87:7, 91:14, 92:14, 92:20, 93:1, 94:23, 94:24, 95:5, 95:7, 95:9, 95:13, 95:17, 97:17, 97:21, 98:4, 98:22, 98:24

**Honor's** [4] - 64:2, 64:7, 71:15, 93:2

**HONORABLE** [1] - 1:9

**hope** [2] - 97:25, 99:21

**horse** [1] - 32:8

**hour** [1] - 58:17

**house** [22] - 59:9, 59:10, 59:11, 59:14, 59:17, 59:25, 60:4, 60:5, 60:11, 60:12, 69:13, 71:19, 71:25, 72:3, 72:5, 73:2, 73:3, 74:12, 85:8, 97:8

**Howard** [3] - 5:6, 81:3, 86:8

**huge** [1] - 97:23

**hundred** [4] - 66:13, 86:7, 86:9, 91:22

**hundreds** [4] - 37:24, 43:24, 49:24

**hurricane** [5] - 20:19, 42:1, 59:9, 59:12, 60:2

**husband** [1] - 72:25

## I

**idea** [3] - 23:2, 51:5, 52:24

**identified** [4] - 5:25, 23:12, 32:13, 35:16

**identify** [2] - 50:23, 70:13

**identifying** [2] - 79:8, 79:11

**ignore** [1] - 87:12

**ignoring** [1] - 40:14

**illegally** [1] - 83:10

**illicit** [1] - 79:12

**illusion** [1] - 21:4

**illusions** [1] - 99:14

**imagine** [1] - 88:24

**immediately** [1] - 95:23

**implies** [1] - 17:18

**implored** [1] - 28:21

**important** [6] - 12:16, 40:14, 63:5, 68:2, 75:10, 88:23

**importantly** [1] - 91:9

**impose** [5] - 12:3, 78:25, 86:1, 90:5, 90:7

**imposed** [2] - 85:24, 89:20

**impression** [2] - 27:21, 31:18

**imprisonment** [1] - 89:19

**improperly** [1] - 60:23

**in-person** [1] - 35:2

**inaccurate** [2] - 26:4, 37:12

**inadvertent** [1] - 91:5

**inch** [1] - 51:2

**inclined** [2] - 61:2, 69:8

**include** [1] - 8:20

**included** [4] - 16:2, 61:21, 61:22

includes [1] - 61:16
including [3] - 79:18, 84:5, 87:16
incomplete [1] - 70:23
inconsistent [1] - 47:3
incorrect [3] - 19:16, 19:18, 32:3
incorrectly [1] - 58:8
increase [1] - 56:14
increased [2] - 68:19, 68:22
inculpates [2] - 40:24, 41:6
inculpatory [1] - 41:1
indeed [3] - 72:25, 80:14, 80:16
independent [2] - 40:16, 63:24
indicated [1] - 13:3
indicates [1] - 79:22
indicative [1] - 85:12
indict [1] - 45:14
indicted [1] - 84:10
indicts [1] - 91:12
individual [4] - 56:2, 81:3, 82:25, 83:19
individuals [7] - 81:1, 81:12, 81:13, 81:20, 84:9, 86:5, 86:10
induced [2] - 55:18, 60:19
inducement [3] - 56:21, 58:16, 88:20
information [26] - 6:12, 6:21, 12:5, 12:22, 12:24, 17:15, 33:8, 37:9, 37:11, 46:23, 55:9, 71:5, 77:19, 77:22, 78:22, 79:17, 79:21, 81:13, 81:19, 83:20, 84:7, 91:14, 96:4, 96:17, 96:19, 96:22
initial [2] - 18:5, 49:23
inquiry [2] - 32:10, 53:14
inside [1] - 45:19
instance [1] - 94:1
instruction [1] - 13:12
instructions [1] - 99:24
instrumentalities [2] - 70:13, 79:9
insufficient [1] - 73:10
intelligence [1] - 90:9
intended [1] - 27:21
intent [5] - 73:16, 85:5, 85:17, 86:17, 86:18
intentional [2] - 30:7, 98:20
interactions [1] - 82:23
interest [4] - 16:7, 41:4, 42:18, 53:15
interested [3] - 22:22, 46:22, 77:8
interesting [4] - 45:23, 50:25, 51:19, 51:21
interestingly [1] - 51:6
interests [1] - 42:18
internal [1] - 31:21
Internet [1] - 91:21
interview [2] - 45:13, 97:13
interviewed [5] - 30:16, 32:9, 42:21, 54:2
interviewing [1] - 55:6
interviews [1] - 42:24
invade [1] - 67:24
invading [1] - 68:2
invest [2] - 44:22, 54:24
invested [4] - 18:6, 19:21, 55:22, 91:25

investigating [1] - 96:21
investigation [24] - 2:9, 14:25, 15:2, 24:8, 31:21, 38:10, 40:23, 43:13, 45:2, 45:12, 46:8, 46:15, 47:11, 49:19, 53:22, 80:20, 81:24, 82:7, 82:12, 83:6, 84:6, 96:1, 96:7, 96:12
investigations [1] - 30:2
investing [1] - 17:5
investment [5] - 54:20, 56:10, 56:11, 91:24, 96:15
investments [1] - 64:15
investor [1] - 57:8
investors [3] - 37:10, 89:14, 92:4
involved [6] - 11:1, 15:9, 34:6, 78:6, 78:17, 84:10
involvement [2] - 27:10, 32:13
ironclad [1] - 81:4
irrelevant [3] - 37:3, 47:12, 56:23
irrevocable [2] - 66:23, 93:23
is,but [1] - 55:8
island [1] - 59:12
Islands [4] - 75:16, 94:14, 97:6, 97:9
issue [32] - 7:15, 9:16, 10:2, 10:3, 10:9, 13:10, 16:24, 21:15, 26:25, 29:9, 32:18, 32:25, 33:12, 34:11, 40:11, 40:12, 41:8, 42:4, 47:11, 47:17, 47:18, 47:22, 48:22, 49:18, 57:25, 58:9, 62:21, 76:10, 80:3, 84:16, 94:17, 94:18
issued [1] - 51:11
issues [15] - 13:2, 13:9, 29:17, 33:9, 33:12, 49:18, 62:19, 63:5, 71:8, 71:9, 76:6, 86:8, 86:22, 97:22, 98:7
itself [5] - 16:24, 35:9, 35:13, 88:10, 88:19

**J**

jail [5] - 34:7, 90:2, 91:7, 99:4, 99:5
January [3] - 19:10, 24:10, 24:25
Jason [1] - 86:12
jewelry [1] - 85:9
Jim [1] - 51:14
joint [1] - 72:1
jointly [1] - 73:2
Jonathan [1] - 50:4
Judge [19] - 2:22, 8:6, 8:7, 9:10, 13:20, 25:14, 26:23, 32:18, 34:10, 36:11, 41:22, 45:12, 48:17, 55:16, 56:17, 58:7, 81:9, 87:20, 100:6
JUDGE [1] - 1:10
judge [2] - 21:12, 99:1
judgment [1] - 96:24
jump [1] - 34:7
jumped [2] - 94:7, 94:8
June [5] - 20:12, 20:18, 50:9, 55:12, 59:19
jurisdiction [2] - 84:14, 84:15
jury [1] - 41:17
justice [2] - 13:14, 79:1
justifies [1] - 83:23

**K**

Kealy [12] - 27:6, 27:11, 27:17, 28:10, 29:15, 31:15, 31:17, 31:18, 47:16, 83:21, 88:13
keep [13] - 31:23, 32:8, 69:5, 69:9, 71:16, 74:11, 76:11, 85:10, 85:18, 86:18, 86:19, 90:16, 90:19
keeping [1] - 59:16
keeps [1] - 49:12
kept [2] - 31:24, 69:20
key [1] - 55:4
kid [2] - 91:20, 91:21
kind [5] - 38:13, 70:1, 70:13, 76:12, 83:19
kinds [4] - 29:10, 30:7, 58:21, 90:10
knowing [2] - 42:9, 97:6
knowledge [5] - 6:4, 10:19, 11:13, 54:1, 99:14
known - 14:23, 99:10, 99:11
knows [3] - 23:21, 31:15, 35:6
Kramer [2] - 43:22, 51:15

**L**

lack [1] - 14:20
Lakki [3] - 23:12, 24:4, 24:14, 41:8, 41:11, 62:5, 66:6, 66:9
LAKKI [1] - 23:13
Lakki's [2] - 41:7, 41:14
language [3] - 16:6, 17:17, 34:4
large [3] - 11:2, 68:15, 72:6
largely [2] - 51:9, 51:10
last [8] - 21:19, 29:25, 34:11, 34:12, 75:22, 89:21, 98:18, 99:16
lastly [2] - 28:17, 91:9
late [4] - 34:19, 56:8, 64:8, 76:18
laundered [1] - 7:25, 8:1, 85:21
laundering [10] - 7:16, 10:21, 11:5, 11:25, 77:20, 78:7, 78:15, 78:17, 85:20, 93:14
law [6] - 4:16, 30:12, 77:6, 79:14, 85:24, 87:13
lawful [3] - 36:23, 92:10, 92:11
lawfully [2] - 46:5, 46:12
laws [2] - 70:4, 70:9
lawyer [2] - 42:8, 44:6
lawyers [12] - 2:18, 38:9, 42:7, 43:16, 44:25, 49:14, 52:6, 67:24, 74:4, 77:10, 82:24, 84:9
learned [4] - 14:24, 15:6, 15:7, 15:8
learns [1] - 24:7
least [4] - 29:1, 35:16, 42:12, 47:6
leave [7] - 83:17, 84:12, 84:13, 84:14, 85:14, 85:15, 85:19
leaves [1] - 47:15
leaving [1] - 91:7
left [6] - 15:23, 22:20, 24:24, 52:15, 73:17, 82:4

**legal** [3] - 21:15, 22:18, 73:20
**legally** [1] - 83:10
**legitimate** [5] - 49:23, 49:25, 63:17, 75:10, 91:18
**Leiduck** [14] - 38:5, 44:8, 44:10, 44:12, 44:16, 44:20, 45:6, 49:1, 49:2, 49:8, 54:1
**length** [1] - 32:10
**lenient** [2] - 81:8, 82:10
**less** [4] - 29:5, 39:24, 51:8, 81:9
**letter** [18] - 4:22, 10:2, 10:4, 19:1, 19:5, 23:5, 23:6, 24:25, 33:4, 33:11, 46:1, 48:1, 58:24, 76:16, 76:17, 90:22, 93:17, 95:4
**letters** [3] - 38:8, 87:1, 92:17
**level** [18] - 8:14, 11:24, 12:3, 12:9, 12:13, 13:3, 13:4, 13:7, 77:18, 78:1, 78:8, 78:14, 78:16, 78:18, 78:21, 78:25, 79:25
**levels** [1] - 17:16
**liabilities** [1] - 21:1
**liar** [1] - 54:2
**license** [1] - 28:8
**lie** [2] - 28:8, 42:25
**lied** [5] - 18:8, 18:14, 28:10, 57:1, 96:13
**life** [1] - 90:8
**light** [2] - 75:5, 87:9
**likely** [2] - 29:5, 35:6
**line** [4] - 29:23, 59:6, 59:7, 96:14
**Linehan** [2] - 1:17, 31:16
**link** [1] - 43:20
**liquid** [2] - 73:5, 85:7
**liquidate** [1] - 73:3
**list** [1] - 81:1
**listed** [5] - 5:22, 21:17, 21:20, 25:8, 61:16
**listen** [1] - 97:15
**lists** [1] - 11:1
**literally** [1] - 91:2
**litigated** [1] - 10:12
**litigation** [2] - 58:6, 72:2
**lives** [1] - 92:6
**living** [1] - 57:7, 67:16, 94:13
**loan** [14] - 18:3, 18:6, 18:9, 18:10, 55:24, 56:1, 56:2, 56:3, 57:12, 57:15, 57:19, 57:20, 57:23
**loaned** [2] - 56:3, 57:23
**logically** [3] - 82:8, 83:7, 83:17
**look** [20] - 2:20, 4:18, 10:15, 10:25, 12:1, 13:1, 17:12, 18:18, 22:9, 38:13, 39:15, 40:21, 43:4, 51:8, 54:6, 60:1, 69:7, 83:18, 86:4, 89:25
**Look** [2] - 24:22, 29:14
**lookback** [3] - 16:5, 25:16, 26:6
**looked** [6] - 12:10, 12:14, 44:9, 45:17, 83:8, 88:3
**looking** [4] - 9:4, 21:25, 51:12, 86:14
**looks** [1] - 24:21
**lORETTA** [1] - 1:12
**loss** [6] - 11:3, 11:4, 11:6, 11:7, 11:8,

**losses** [2] - 11:1, 11:2
**lost** [1] - 91:15
**low** [3] - 37:7, 64:24, 65:2
**lower** [2] - 38:11, 47:19
**lying** [2] - 42:11, 43:1
**LYNCH** [1] - 1:12

**M**

**mail** [10] - 27:7, 27:11, 27:17, 28:17, 28:25, 31:21, 31:23, 51:2, 79:18, 88:13
**mailing** [1] - 39:5
**mails** [5] - 34:19, 38:20, 39:1, 39:3, 54:14
**major** [3] - 29:1, 49:18, 98:7
**man** [1] - 41:10
**manifested** [1] - 79:22
**March** [1] - 2:10
**margin** [1] - 11:2
**marketplace** [2] - 30:1, 54:11
**Markus** [5] - 13:22, 37:10, 42:22, 42:24, 43:13
**material** [2] - 51:2, 51:18
**materials** [6] - 2:8, 3:5, 6:19, 48:3, 49:24, 51:21
**matter** [12] - 2:5, 6:17, 29:16, 36:8, 36:9, 40:10, 67:24, 94:4, 94:21, 96:9, 96:24
**matters** [1] - 36:7
**maturing** [1] - 95:19
**mean** [12] - 29:15, 30:6, 35:1, 45:22, 46:25, 59:5, 71:23, 85:14, 86:1, 86:8, 90:25, 91:16
**means** [1] - 12:5
**mechanical** [1] - 1:24
**media** [2] - 74:17, 75:25
**meet** [9] - 33:24, 33:25, 34:21, 35:9, 45:25, 77:13, 90:22, 96:16
**meeting** [14] - 28:19, 29:22, 29:24, 31:8, 31:12, 34:16, 34:20, 35:6, 36:2, 46:2, 46:4, 46:24, 49:15, 91:2
**meetings** [2] - 28:15, 31:4
**memo** [6] - 4:14, 4:15, 31:10, 81:1, 82:3, 82:5
**memorandum** [11] - 3:6, 3:11, 4:7, 4:12, 4:16, 4:22, 8:3, 44:18, 52:7, 80:17, 84:9
**mentally** [1] - 97:4
**mention** [4] - 10:2, 18:5, 18:11, 39:4
**met** [10] - 42:21, 45:16, 45:23, 67:15, 81:17, 81:18, 81:21, 91:4, 96:2, 96:3
**Michael** [1] - 31:3
**Middle** [1] - 44:14
**might** [9] - 5:19, 30:3, 30:5, 36:8, 36:9, 74:22, 77:7, 84:20, 89:20
**million** [99] - 7:22, 8:1, 9:8, 9:9, 11:8, 11:9, 11:10, 14:10, 16:19, 17:4, 17:6, 18:2, 18:6, 20:23, 20:24, 21:2, 26:9, 35:19, 35:21, 36:18, 44:22, 45:8, 54:20,

54:24, 55:22, 56:6, 56:11, 56:12, 56:15, 56:22, 57:3, 57:15, 57:20, 59:11, 59:16, 59:20, 60:5, 60:20, 61:19, 61:24, 62:4, 62:6, 62:7, 66:3, 67:4, 67:5, 69:10, 69:14, 69:17, 69:19, 71:11, 71:14, 71:18, 71:19, 71:20, 71:23, 72:6, 72:7, 72:8, 73:1, 73:4, 73:8, 73:9, 73:18, 74:12, 75:7, 78:7, 85:7, 85:8, 85:11, 85:19, 85:23, 86:2, 86:7, 86:8, 86:10, 86:11, 86:13, 86:15, 86:16, 86:18, 89:17, 90:1, 90:2, 91:22, 91:23
**millions** [7] - 36:3, 74:8, 84:19, 91:15
**mind** [3] - 75:1, 94:16, 99:22
**minimal** [1] - 92:23
**minute** [2] - 34:11, 37:21
**minutes** [1] - 45:5
**minutiae** [1] - 46:20
**misleadingly** [1] - 79:20
**misled** [1] - 25:20
**miss** [1] - 2:9
**missed** [2] - 12:19, 12:20
**misstates** [1] - 12:21
**mistakes** [1] - 98:20
**misunderstood** [1] - 34:5
**moment** [3] - 7:20, 61:13, 64:3
**Monday** [3] - 3:8, 3:9, 4:17
**money** [71] - 7:16, 10:21, 11:4, 11:24, 16:9, 17:9, 18:1, 18:11, 20:22, 21:3, 36:6, 36:24, 39:24, 44:13, 44:23, 45:7, 45:9, 50:10, 52:25, 53:1, 53:2, 56:3, 56:4, 56:5, 56:8, 56:14, 56:22, 57:2, 57:6, 57:8, 57:9, 57:23, 58:21, 58:23, 60:17, 60:18, 60:22, 60:24, 61:11, 64:12, 64:13, 72:12, 72:14, 72:18, 73:16, 74:3, 74:13, 76:11, 77:20, 78:6, 78:15, 78:16, 78:17, 83:9, 84:16, 84:18, 85:14, 85:20, 86:19, 91:13, 91:18, 93:3, 93:13, 93:24, 93:25
**month** [1] - 26:13
**months** [11] - 17:5, 18:2, 20:19, 24:10, 24:16, 26:13, 34:24, 43:15, 55:22, 56:11, 80:2
**moon** [1] - 42:1
**moreover** [2] - 31:20, 79:18
**morning** [5] - 88:4, 98:21, 99:17, 99:25, 100:5
**mortgage** [4] - 69:14, 71:19, 74:12, 74:13
**Moscow** [1] - 54:23
**most** [9] - 29:20, 33:22, 40:14, 43:22, 51:25, 68:17, 68:18, 91:9, 95:1, 97:21
**motion** [2] - 47:24, 49:3
**motive** [2] - 29:1
**Motor** [3] - 23:9, 24:24, 66:13
**Motors** [1] - 23:16
**move** [3] - 31:14, 46:20, 47:9
**moving** [1] - 77:8
**MR** [209] - 2:13, 2:15, 2:22, 2:24, 3:2, 3:3, 3:8, 3:12, 3:14, 3:16, 3:19, 3:22, 3:25, 4:3, 4:5, 4:12, 4:25, 5:7, 5:10, 5:18, 5:20, 6:3, 6:13, 6:14, 6:22, 6:25,

7:3, 7:7, 7:12, 7:14, 7:19, 8:16, 8:19, 9:4, 9:12, 9:18, 9:24, 10:7, 10:11, 10:15, 10:18, 10:23, 10:25, 11:13, 11:16, 11:19, 12:7, 12:11, 12:18, 12:24, 13:10, 13:14, 14:7, 14:11, 16:11, 16:15, 16:17, 16:20, 18:17, 18:20, 19:5, 21:12, 21:22, 22:2, 22:4, 22:9, 22:13, 22:21, 22:24, 23:1, 24:14, 25:2, 25:4, 25:13, 25:19, 25:25, 26:1, 26:3, 26:7, 26:23, 27:2, 27:13, 27:16, 28:5, 29:6, 30:20, 30:21, 30:23, 30:24, 31:3, 31:7, 31:10, 31:15, 32:6, 32:17, 33:1, 33:19, 33:21, 34:2, 35:13, 35:18, 35:25, 36:11, 36:14, 36:25, 37:2, 39:21, 41:24, 42:5, 42:19, 46:10, 47:8, 47:11, 48:7, 48:17, 48:24, 49:5, 49:7, 49:10, 50:8, 51:5, 52:23, 53:18, 53:24, 55:2, 55:13, 55:16, 56:1, 56:17, 56:20, 57:1, 57:11, 58:5, 58:15, 61:15, 62:3, 62:9, 62:13, 62:16, 63:19, 64:2, 64:6, 64:16, 64:21, 64:23, 65:6, 65:11, 65:17, 65:21, 66:4, 66:7, 66:24, 67:1, 67:3, 67:6, 67:9, 67:14, 67:20, 68:6, 68:10, 68:13, 69:6, 70:5, 70:10, 70:16, 70:24, 72:11, 72:13, 72:16, 72:19, 73:13, 73:22, 74:1, 74:7, 74:15, 74:24, 75:3, 75:15, 75:20, 75:21, 75:24, 76:17, 76:21, 76:24, 80:13, 84:2, 84:4, 84:23, 85:2, 85:4, 86:3, 87:1, 87:4, 87:7, 87:17, 87:20, 90:15, 90:18, 90:21, 92:14, 92:19, 94:23, 95:9, 98:22, 98:24, 99:1, 99:9, 100:6, 100:7
  **murder** [1] - 87:23
  **music** [1] - 91:21
  **Music** [1] - 91:19
  **must** [4] - 15:11, 19:24, 25:9, 93:4
  **mutual** [1] - 64:1
  **MYRON** [1] - 1:5
  **Myron** [5] - 2:3, 21:20, 22:16, 41:10, 41:19
  **mysterious** [1] - 58:21

## N

  **name** [7] - 24:18, 31:23, 31:24, 32:6, 32:8, 32:10, 56:2
  **named** [3] - 38:18, 52:11, 81:3
  **names** [3] - 24:6, 24:8, 24:18
  **narrow** [1] - 53:16
  **natural** [1] - 74:25
  **nature** [6] - 46:6, 46:12, 48:14, 64:7, 82:5, 82:22
  **nearly** [1] - 86:2
  **necessary** [1] - 10:13
  **need** [17] - 3:1, 21:8, 22:7, 25:18, 34:18, 35:10, 50:20, 50:21, 54:19, 74:16, 78:3, 85:11, 86:23, 86:25, 91:1, 97:23, 98:12
  **needed** [2] - 73:18, 73:20
  **negotiating** [1] - 56:10
  **Neumann** [17] - 38:18, 38:22, 39:4, 39:6, 39:8, 39:10, 39:12, 39:14, 39:25,

41:21, 52:12, 53:11, 54:8, 54:10, 54:13, 63:16
  **Neumann's** [1] - 39:10
  **never** [20] - 14:2, 19:6, 19:19, 20:3, 20:4, 27:8, 30:16, 38:24, 42:25, 44:12, 47:2, 49:15, 51:23, 58:22, 61:23, 96:12, 96:13
  **NEW** [1] - 1:1
  **new** [2] - 43:18, 56:23
  **New** [7] - 1:4, 1:15, 1:21, 54:20, 54:22, 81:18, 81:20
  **newsletter** [1] - 50:24
  **newsletters** [4] - 51:1, 51:9, 51:22, 52:1
  **next** [3] - 31:14, 80:9, 81:14
  **NICHOLAS** [1] - 1:9
  **Nixon** [2] - 31:21, 31:24
  **Nixon-Peabody** [2] - 31:21, 31:24
  **nobody** [1] - 99:21
  **nominal** [1] - 65:7
  **nominee** [4] - 39:13, 39:22, 39:23, 40:1
  **nominees** [1] - 40:2
  **none** [5] - 20:7, 20:17, 24:24, 71:8
  **nonetheless** [2] - 83:14, 93:2
  **nonexcuse** [1] - 90:25
  **nonsensical** [1] - 14:21
  **normally** [2] - 89:9, 98:12
  **note** [3] - 4:10, 12:15, 17:11
  **Note** [3] - 12:2, 77:23, 79:5
  **noted** [5] - 2:1, 8:19, 46:23, 63:10, 89:16
  **notes** [4] - 12:12, 22:11, 31:11, 46:24
  **nothing** [9] - 6:4, 24:23, 38:12, 70:21, 73:17, 74:14, 91:19, 93:19, 100:5
  **November** [3] - 1:5, 4:22, 76:19
  **nowhere** [1] - 37:20
  **number** [16] - 13:18, 17:16, 21:19, 22:13, 23:10, 27:16, 35:15, 35:22, 36:2, 49:22, 50:2, 50:18, 81:12, 84:5, 91:3, 97:2
  **numbers** [1] - 22:10
  **numerous** [4] - 18:25, 39:8, 50:4, 81:21
  **NY** [1] - 1:18

## O

  **o'clock** [3] - 4:17, 98:21, 100:5
  **object** [1] - 9:2
  **objecting** [2] - 11:19, 11:20
  **objection** [3] - 6:11, 6:15, 6:22
  **objections** [2] - 80:5, 80:6
  **obligation** [2] - 26:11, 32:4
  **observed** [1] - 40:20
  **obstruction** [7] - 13:14, 16:25, 18:16, 30:7, 78:9, 78:12, 79:1
  **obstructive** [2] - 27:5, 78:11
  **obtain** [1] - 35:7
  **obtained** [2] - 14:25, 35:19

  **obtaining** [1] - 79:8
  **obviously** [11] - 6:9, 7:25, 8:20, 9:21, 22:22, 29:4, 56:2, 72:8, 86:23, 90:24, 91:5
  **occasions** [2] - 81:18, 81:19, 96:3
  **occurred** [2] - 13:24, 64:17
  **October** [22] - 19:15, 19:16, 19:17, 19:19, 19:25, 20:5, 20:6, 20:13, 20:14, 20:15, 20:16, 20:25, 21:3, 25:21, 26:16, 58:18, 59:3, 59:21, 60:3, 70:25, 71:3, 76:19
  **OF** [3] - 1:1, 1:3, 1:9
  **offense** [14] - 8:14, 11:24, 12:3, 12:9, 13:3, 13:4, 13:7, 77:18, 78:5, 78:14, 78:15, 78:18, 78:21, 79:25
  **offenses** [2] - 86:1, 95:21, 97:18
  **offered** [4] - 40:25, 90:22, 96:1, 97:7
  **offers** [1] - 27:3
  **office** [3] - 81:17, 82:4, 82:23
  **officer** [1] - 46:3
  **officer's** [1] - 9:1
  **officers** [1] - 50:10
  **often** [1] - 87:21
  **Oil** [12] - 38:24, 40:4, 40:7, 40:12, 50:13, 52:18, 52:19, 52:25, 53:2, 53:3, 53:5, 54:16
  **Oil's** [1] - 53:9
  **old** [1] - 94:12
  **omnibus** [11] - 18:24, 23:4, 23:14, 23:20, 24:5, 24:7, 24:9, 24:18, 24:19, 46:6, 46:13
  **once** [5] - 56:20, 65:17, 65:21, 66:19, 89:12
  **one** [44] - 7:20, 9:24, 13:2, 13:11, 14:21, 17:21, 18:20, 21:14, 21:19, 23:10, 23:11, 23:12, 25:12, 26:15, 27:4, 28:23, 29:6, 30:4, 34:22, 35:17, 38:19, 39:16, 39:20, 42:24, 49:18, 49:22, 50:19, 51:7, 51:18, 55:7, 57:4, 66:5, 71:3, 76:22, 77:7, 78:21, 79:2, 81:23, 87:9, 91:16, 97:12, 99:18, 99:22
  **Open** [1] - 2:1
  **open** [5] - 46:20, 46:21, 46:22, 59:25, 63:8
  **operating** [2] - 41:3, 47:19
  **operation** [2] - 46:5, 46:12
  **operative** [1] - 77:24
  **opinion** [1] - 7:5
  **opportunity** [5] - 6:18, 16:8, 34:14, 85:13, 95:16
  **opposed** [1] - 70:2
  **order** [19] - 14:6, 14:8, 14:12, 17:3, 17:5, 17:9, 17:12, 17:18, 18:1, 20:20, 27:20, 55:11, 55:15, 55:17, 55:18, 56:22, 56:24, 57:3
  **organized** [1] - 28:24
  **original** [2] - 55:17, 59:16
  **originally** [1] - 65:14
  **otherwise** [3] - 57:15, 89:20, 95:4
  **ought** [2] - 42:3, 64:13
  **ourselves** [1] - 31:17

**outlined** [1] - 39:17
**outrageous** [3] - 45:11, 45:15, 47:7
**outside** [6] - 42:1, 69:15, 69:17, 69:18, 69:21, 89:17
**overinclusive** [2] - 15:20, 15:23
**overlooked** [1] - 6:9
**overnight** [1] - 98:13
**own** [18] - 10:16, 15:16, 17:6, 23:6, 23:19, 23:21, 23:24, 28:16, 30:17, 31:5, 35:19, 52:5, 57:17, 67:17, 70:2, 70:14, 79:17
**owned** [12] - 18:23, 19:6, 19:7, 19:24, 20:3, 20:9, 22:14, 23:16, 23:21, 66:10, 71:25, 73:2
**owner** [3] - 19:12, 21:15, 72:1
**owners** [2] - 22:17, 25:12
**ownership** [2] - 13:19, 14:2
**owns** [2] - 19:23, 23:4

**P**

**p.m** [1] - 1:6
**page** [9] - 4:15, 12:13, 17:11, 22:10, 38:3, 44:19, 49:2, 50:23, 84:8
**pages** [8] - 28:13, 37:24, 42:23, 42:24, 43:5, 48:2, 49:24, 51:1
**paid** [1] - 60:21
**paper** [3] - 20:6, 20:8, 52:13
**papers** [6] - 8:20, 8:23, 39:17, 52:5, 59:18
**paperwork** [1] - 66:16
**paragraph** [3] - 10:25, 12:13, 14:12
**parens** [1] - 59:25
**parent** [1] - 97:24
**Parone** [5] - 23:13, 24:4, 24:15, 62:6, 66:6
**part** [11] - 8:25, 49:16, 51:25, 57:20, 66:2, 68:16, 69:22, 71:25, 72:23, 80:5, 80:7
**parte** [3] - 5:3, 5:9, 8:9
**participants** [2] - 42:11, 42:13
**particular** [1] - 97:11
**particularly** [6] - 27:25, 28:12, 28:24, 79:17, 89:8, 91:1
**partnership** [1] - 39:19
**parts** [1] - 70:17
**pass** [3] - 82:21, 82:24
**passes** [1] - 76:6
**past** [2] - 95:18, 96:23
**patience** [1] - 95:17
**patient** [1] - 49:11
**pattern** [1] - 88:3
**Pause** [5] - 2:23, 4:20, 9:23, 64:5, 65:20
**pay** [14] - 20:23, 58:1, 61:10, 63:4, 65:5, 67:11, 67:12, 68:24, 74:4, 75:12, 75:14, 75:17, 85:15
**paying** [2] - 93:21, 93:25
**payoff** [1] - 40:17
**Peabody** [2] - 31:21, 31:24

**penal** [1] - 41:4
**penalties** [1] - 30:8
**pennies** [1] - 65:2
**penniless** [1] - 21:1
**people** [18] - 29:3, 29:9, 41:15, 41:18, 43:24, 54:23, 57:10, 67:16, 75:11, 76:2, 84:9, 86:7, 86:10, 90:3, 92:6, 92:16, 92:22, 94:13
**percent** [5] - 11:7, 19:7, 43:4, 59:25, 60:6
**perfectly** [1] - 39:25
**perhaps** [2] - 42:13, 94:18
**period** [1] - 25:8
**permission** [1] - 94:12
**permitted** [1] - 58:12
**person** [7] - 35:2, 38:18, 52:11, 57:15, 57:23, 83:9, 89:4
**personal** [3] - 18:12, 85:9, 86:22
**personally** [1] - 42:21
**perspective** [14] - 7:15, 14:20, 18:13, 35:8, 36:16, 48:19, 83:8, 87:7, 89:22, 90:4, 94:20, 99:3, 99:4
**pertain** [1] - 5:15
**phone** [5] - 90:23, 97:7, 97:10, 97:16, 97:17
**pictures** [1] - 59:13
**piece** [6] - 20:5, 20:8, 33:23, 37:16, 40:15, 52:13
**pitch** [2] - 92:24, 92:25
**place** [1] - 57:3
**placed** [3] - 63:25, 65:23, 68:16, 68:17, 93:22
**placement** [5] - 38:23, 39:11, 54:13, 54:18, 54:19
**placing** [1] - 68:8
**plain** [1] - 16:6
**plaintiff** [1] - 23:10
**plan** [1] - 84:25
**planet** [1] - 20:8
**play** [1] - 87:21
**Plaza** [2] - 1:14, 1:20
**plea** [10] - 7:23, 9:7, 10:16, 30:13, 68:3, 84:6, 93:11, 94:3, 94:16, 95:20
**pleaded** [10] - 30:19, 58:3, 61:12, 67:8, 68:25, 69:23, 79:21, 85:21, 93:12, 93:16
**pleading** [2] - 12:22, 12:23
**pled** [7] - 8:25, 10:19, 10:22, 39:16, 41:10, 67:9, 81:14
**pledged** [1] - 64:24
**plus** [2] - 8:15, 85:9
**point** [27] - 7:20, 8:4, 8:13, 8:15, 9:5, 9:7, 9:10, 9:24, 11:12, 12:16, 21:14, 24:9, 25:14, 25:15, 36:1, 36:20, 44:5, 47:4, 57:4, 65:8, 66:8, 66:12, 75:9, 92:19, 96:11
**point-by-point** [1] - 44:5
**points** [10] - 11:18, 11:20, 11:21, 36:11, 36:15, 53:20, 74:16, 81:23, 89:7
**police** [1] - 54:3
**poor** [2] - 41:19, 94:11

**portion** [2] - 16:3, 72:6
**portions** [2] - 8:2
**poses** [1] - 98:6
**position** [17] - 9:2, 9:3, 11:18, 17:7, 17:8, 17:9, 17:20, 17:24, 17:25, 18:4, 39:7, 39:13, 48:15, 75:7, 83:16, 99:10, 99:11
**positions** [1] - 8:23
**possession** [5] - 19:20, 36:24, 41:22, 87:22, 88:1
**possessions** [1] - 53:8
**possibilities** [1] - 99:15
**possibility** [1] - 99:13
**possible** [1] - 78:11
**posting** [1] - 88:15
**postpone** [1] - 98:12
**potentially** [3] - 30:2, 68:4, 85:6
**power** [1] - 65:15
**practical** [1] - 29:16
**practice** [1] - 15:4
**predict** [1] - 82:21
**preliminarily** [1] - 35:16
**preliminary** [12] - 14:6, 14:8, 17:3, 17:8, 17:12, 17:18, 18:1, 38:14, 55:10, 55:15, 55:18, 56:24
**prepared** [3] - 58:9, 84:4, 96:17
**preponderance** [3] - 33:15, 78:12, 87:25
**preposterous** [1] - 42:2
**Present** [1] - 1:17
**presented** [3] - 45:20, 45:25, 78:10
**presentence** [5] - 2:9, 2:11, 3:17, 11:11, 62:2
**press** [2] - 40:8, 49:17
**presumably** [1] - 75:15
**presume** [1] - 37:23
**presuming** [1] - 91:10
**pretty** [1] - 90:3
**previous** [1] - 5:13
**price** [2] - 64:24, 65:2
**primarily** [2] - 33:12, 64:23
**printouts** [1] - 88:18
**priority** [1] - 97:11
**private** [7] - 38:23, 39:11, 46:6, 46:13, 54:13, 54:18, 54:19
**probate** [1] - 76:6
**Probation** [2] - 8:20, 12:8
**probation** [2] - 9:1, 12:12
**problem** [3] - 51:24, 67:22, 88:12
**problems** [2] - 29:16, 72:9
**procedure** [2] - 5:11, 58:10
**proceeded** [1] - 45:4
**proceeding** [6] - 2:3, 5:16, 5:21, 5:25, 58:11, 72:5, 92:7, 99:3
**proceedings** [2] - 5:14, 34:23
**Proceedings** [1] - 1:24
**PROCEEDINGS** [1] - 1:9
**proceeds** [2] - 79:11, 93:4
**process** [2] - 6:17, 34:13
**produced** [1] - 1:25
**product** [2] - 11:10, 64:19

**proffered** [1] - 31:4
**profit** [1] - 36:4
**profitable** [1] - 53:10
**progress** [1] - 80:21
**prolific** [1] - 43:22
**promised** [2] - 54:13, 54:18
**promotes** [1] - 43:25
**prompt** [1] - 99:23
**proof** [4] - 19:17, 23:5, 38:20, 54:5
**proofs** [1] - 54:9
**properly** [1] - 60:23
**proposed** [2] - 39:11, 46:16
**prosecution** [2] - 47:18, 79:15
**prosecutor** [3] - 82:2, 82:3, 94:4
**prosecutors** [3] - 28:19, 74:23, 77:9
**protect** [1] - 69:2
**protecting** [2] - 69:3, 69:4
**prove** [1] - 54:5
**proven** [3] - 87:24, 87:25
**provide** [9] - 7:20, 8:9, 33:3, 34:19,
  37:22, 68:24, 69:25, 83:20, 96:17
**provided** [17] - 4:9, 13:22, 14:19,
  29:24, 37:11, 37:18, 37:22, 42:23, 47:2,
  47:23, 49:24, 56:5, 81:13, 81:19, 84:6,
  96:19, 96:22
**provides** [4] - 5:3, 12:13, 14:12, 18:10
**providing** [3] - 46:18, 70:12, 70:21
**provision** [2] - 14:9, 14:11, 16:5
**PSR** [11] - 7:19, 8:8, 9:5, 9:8, 9:17,
  10:20, 10:25, 11:7, 78:20, 78:24
**public** [4] - 29:2, 30:1, 50:24, 88:17
**publicly** [1] - 43:23
**pull** [1] - 95:3
**pulled** [1] - 95:1
**pump** [10] - 37:5, 37:13, 39:23, 40:1,
  49:20, 50:2, 50:19, 50:20, 54:21, 92:12
**punish** [2] - 89:22, 93:4
**punishment** [1] - 90:13
**purchased** [2] - 37:7, 68:14
**purchases** [1] - 65:22
**purchasing** [1] - 64:23
**purport** [1] - 37:22
**purpose** [2] - 36:16, 87:16, 87:19
**purposes** [6] - 57:13, 74:5, 77:25,
  92:7, 93:21, 93:25
**pursuant** [2] - 5:5, 28:2
**pursue** [1] - 96:22
**pursued** [1] - 44:14
**put** [26] - 21:5, 26:3, 50:10, 54:18,
  54:20, 56:11, 59:24, 61:2, 61:18, 64:12,
  66:19, 68:21, 68:23, 69:15, 69:16,
  69:17, 72:20, 74:13, 74:20, 81:24, 82:7,
  88:25, 89:17, 90:1, 90:12, 91:14
**puts** [1] - 71:10
**putting** [1] - 83:18

## Q

**quality** [1] - 82:5
**questioning** [1] - 35:3

**questions** [3] - 3:20, 46:15, 63:12
**quickly** [1] - 96:10
**quite** [3] - 15:20, 70:5, 98:11
**quote** [9] - 46:19, 46:20, 46:21, 46:22,
  46:23, 50:19

## R

**Radke** [6] - 38:4, 38:21, 39:3, 40:18,
  43:11, 45:7
**Radke's** [1] - 40:19
**raised** [6] - 8:5, 10:3, 10:9, 34:12,
  37:19, 71:10
**raises** [2] - 29:9, 54:21
**Rake** [1] - 39:6
**ran** [1] - 44:24
**range** [6] - 25:11, 32:23, 79:2, 80:2,
  89:19, 98:10
**rather** [1] - 60:18
**rational** [1] - 29:21
**reach** [11] - 63:3, 68:9, 68:24, 69:5,
  69:15, 69:17, 69:18, 69:21, 75:8, 85:1,
  89:17
**reaching** [1] - 34:13
**reacted** [1] - 96:12
**read** [8] - 18:18, 38:1, 46:9, 47:14,
  49:7, 86:21, 87:3, 99:22
**readily** [1] - 69:11
**reading** [1] - 8:10
**ready** [2] - 62:20, 96:17
**Real** [2] - 23:13, 62:6
**real** [12] - 29:1, 49:25, 50:1, 50:17,
  50:18, 67:15, 73:15, 85:17, 91:11,
  95:19
**realized** [1] - 74:19
**really** [28] - 13:16, 15:18, 17:7, 17:19,
  25:6, 32:20, 33:21, 34:22, 35:9, 37:4,
  37:16, 39:2, 40:10, 40:14, 42:1, 45:20,
  48:18, 53:22, 57:6, 60:25, 77:6, 82:20,
  86:17, 88:9, 88:20, 89:21, 92:24, 99:5
**reams** [1] - 92:17
**reason** [15] - 9:24, 15:14, 16:2, 28:9,
  35:4, 40:25, 41:5, 41:14, 63:14, 75:10,
  75:18, 88:23, 94:25, 95:1, 99:12
**reasonable** [3] - 39:25, 71:21, 87:24
**reasonably** [1] - 85:5
**reasons** [6] - 14:19, 18:15, 51:7,
  70:22, 75:12, 76:9
**rebut** [1] - 18:20
**rebutted** [1] - 44:4
**recalling** [1] - 63:9
**receive** [2] - 33:5, 33:13
**received** [6] - 5:24, 15:10, 15:11, 37:1,
  42:25, 68:14, 81:8, 86:11
**receiving** [1] - 4:14
**recent** [1] - 70:20
**Recess** [1] - 63:7
**recognizing** [1] - 48:10
**recollection** [3] - 9:13, 9:15, 10:1
**recommend** [1] - 65:22

**recommendations** [2] - 40:9, 64:13
**recommends** [1] - 43:24
**record** [15] - 9:4, 23:5, 27:7, 27:19,
  28:10, 48:16, 48:24, 48:25, 49:8, 49:12,
  49:13, 79:21, 80:5, 80:7
**recorded** [1] - 1:24
**records** [5] - 24:8, 37:18, 37:23, 45:17,
  53:8
**red** [2] - 21:16, 40:10
**redoing** [1] - 61:8
**reduce** [2] - 59:18, 60:7
**reduction** [1] - 83:4
**referred** [1] - 31:20
**referring** [1] - 5:19
**reflect** [1] - 54:15
**reflected** [1] - 10:20
**refusal** [2] - 33:23, 90:22
**refused** [3] - 34:21, 35:8, 97:16
**refuted** [2] - 44:4, 49:21
**regard** [5] - 26:24, 47:24, 48:14, 77:4,
  78:5, 80:10
**regarding** [2] - 33:25, 77:18
**regret** [2] - 95:18, 96:6
**reinstated** [1] - 55:17
**relationship** [2] - 22:18, 27:24
**relatively** [2] - 29:21, 65:6, 96:10
**release** [2] - 89:10, 89:11
**releases** [1] - 49:17
**relevant** [7] - 8:2, 22:6, 22:24, 25:6,
  36:20, 36:24, 79:12
**reliable** [1] - 41:5
**rely** [3] - 52:5, 52:6
**relying** [1] - 38:6
**remain** [2] - 2:19, 6:20
**remand** [1] - 44:16
**remanded** [1] - 99:2
**remember** [4] - 15:21, 32:17, 34:17,
  65:25
**removed** [1] - 73:14
**repaid** [1] - 56:12
**repeatedly** [2] - 34:25, 88:15
**reply** [6] - 4:15, 4:21, 18:18, 19:3,
  34:3, 44:5
**report** [24] - 2:10, 2:11, 3:18, 11:11,
  12:12, 29:17, 31:20, 31:21, 31:24,
  31:25, 32:1, 32:2, 32:7, 32:9, 32:11,
  51:9, 51:10, 62:2, 62:11, 71:1, 71:2,
  71:14, 71:24, 75:25
**Reporter** [1] - 1:20
**reports** [1] - 74:18
**represent** [1] - 8:7
**representation** [2] - 20:21, 20:22
**representative** [1] - 63:25
**represented** [1] - 14:17
**representing** [1] - 38:9
**require** [1] - 77:25
**required** [1] - 25:17
**requirement** [1] - 68:5
**rescinded** [1] - 56:21
**reside** [1] - 24:12
**resolution** [1] - 82:16

**resolve** [1] - 7:11
**resolved** [1] - 96:9
**resolving** [1] - 96:5
**resources** [2] - 49:25, 50:18
**respect** [15] - 9:21, 17:2, 30:15, 32:10, 32:15, 48:11, 50:19, 70:2, 70:17, 71:9, 76:2, 78:9, 78:19, 84:16, 99:14
**respectfully** [2] - 29:21, 56:17
**respond** [4] - 46:15, 47:8, 57:5, 90:15
**response** [1] - 46:18
**responsibility** [10] - 26:25, 27:9, 79:3, 79:4, 79:13, 79:23, 79:24, 95:20, 95:23, 96:6
**responsible** [2] - 81:7, 81:10
**restitution** [19] - 36:9, 36:10, 58:2, 58:8, 63:4, 67:12, 68:5, 68:25, 71:22, 73:6, 73:8, 85:16, 86:7, 86:9, 86:11, 86:13, 86:15, 93:21
**restitutions** [1] - 86:10
**result** [3] - 38:24, 70:14, 77:7
**resulted** [1] - 83:1
**results** [2] - 81:2, 81:15
**resume** [1] - 100:5
**retained** [1] - 73:24
**returned** [1] - 45:9
**returning** [1] - 44:11
**review** [1] - 2:25, 8:10
**reviewed** [7] - 2:8, 2:12, 3:17, 5:1, 6:1, 6:9
**revocation** [2] - 49:3, 76:25
**ridiculous** [2] - 41:22, 87:13
**rip** [1] - 48:9
**ripped** [1] - 92:4
**risk** [3] - 99:4, 99:7, 99:8
**rose** [2] - 37:8, 37:9, 37:12
**Rosone** [2] - 62:5, 66:9
**Rules** [1] - 41:3
**rumor** [1] - 95:25
**run** [2] - 27:8, 79:19
**run-in** [1] - 27:8
**run-ins** [1] - 79:19
**running** [1] - 39:23
**Russ** [13] - 38:24, 40:4, 40:7, 40:12, 50:13, 52:18, 52:19, 52:25, 53:2, 53:3, 53:5, 53:9, 54:16
**Russian** [5] - 19:20, 19:21, 20:4, 24:2
**RVC** [1] - 71:18
**Ryan** [5] - 96:25, 97:2, 97:11, 97:23, 97:24

## S

**sales** [2] - 65:22, 85:22
**Sarasin** [1] - 64:25
**sat** [1] - 45:18
**satisfied** [2] - 2:4, 55:14
**satisfy** [1] - 73:5
**saw** [2] - 38:2, 75:12
**scale** [1] - 33:3
**scam** [1] - 44:24

**scams** [1] - 39:25
**schedule** [2] - 34:16, 34:20
**scheme** [8] - 8:12, 37:5, 39:19, 39:24, 40:8, 44:20, 44:21, 52:20, 53:6, 57:21, 92:12
**schemes** [1] - 10:19
**scintilla** [3] - 19:16, 20:5, 55:9
**scope** [1] - 55:20
**scrutiny** [1] - 35:2
**seal** [3] - 3:7, 5:3, 6:20
**sealed** [1] - 5:3
**seated** [2] - 2:19, 63:11
**SEC** [15] - 27:8, 27:24, 27:25, 28:12, 28:14, 28:16, 30:15, 30:16, 30:17, 31:5, 31:12, 79:20, 81:21, 84:10
**second** [7] - 26:11, 27:6, 39:12, 50:20, 51:6, 71:15, 89:16
**secret** [2] - 73:16, 94:19
**section** [3] - 12:21, 12:23, 77:21
**Section** [8] - 12:2, 12:5, 16:4, 77:20, 77:23, 79:6, 80:11
**secure** [1] - 57:19
**secures** [1] - 70:9
**securities** [7] - 37:5, 70:3, 78:19, 78:23, 85:22, 88:6, 93:13
**security** [1] - 57:19
**see** [14] - 7:2, 8:17, 9:1, 9:17, 9:18, 21:18, 21:21, 22:12, 25:6, 56:25, 62:19, 78:2, 86:14, 87:21
**seeking** [1] - 10:10
**seeks** [1] - 3:6
**seem** [1] - 16:1
**sees** [1] - 24:8
**self** [1] - 98:1
**sell** [1] - 97:5
**seminars** [1] - 43:23
**send** [2] - 53:5, 54:23
**sending** [1] - 42:8
**sense** [1] - 15:13
**sent** [4] - 43:20, 50:25, 51:2, 76:17
**sentence** [15] - 45:15, 80:2, 80:3, 81:9, 82:10, 83:15, 89:25, 90:5, 90:7, 90:11, 92:13, 94:6, 95:12, 98:9, 98:10
**sentenced** [6] - 71:17, 80:10, 84:18, 92:17, 94:5, 99:25
**sentences** [2] - 91:12, 92:23
**sentencing** [27] - 2:3, 2:8, 3:6, 3:11, 4:7, 4:12, 5:5, 5:16, 5:21, 5:25, 6:6, 8:3, 32:22, 32:25, 38:12, 68:1, 77:8, 77:24, 88:1, 88:19, 89:9, 89:11, 92:21, 93:15, 93:18, 98:6, 98:12
**separate** [4] - 4:16, 53:13, 61:17, 96:3
**September** [3] - 34:20, 43:9, 60:3
**series** [1] - 84:8
**serious** [4] - 73:24, 76:25, 90:5, 90:13
**serve** [1] - 39:13
**served** [2] - 86:11, 86:13
**set** [10] - 8:2, 31:13, 59:17, 68:20, 75:11, 75:24, 76:2, 77:21, 98:7, 99:20
**setting** [1] - 76:2
**settle** [1] - 72:19

**settler** [2] - 72:10, 72:16
**seven** [4] - 95:18, 96:23, 98:18, 99:9
**several** [5] - 13:15, 14:19, 14:22, 15:24, 15:25
**share** [2] - 52:8, 65:3
**shared** [1] - 3:15
**shareholders** [1] - 64:24
**shares** [54] - 13:21, 13:25, 23:9, 23:25, 24:3, 24:5, 24:11, 24:20, 37:15, 38:17, 38:19, 38:22, 38:24, 40:11, 40:12, 40:17, 40:25, 41:20, 42:25, 44:11, 49:1, 49:9, 52:3, 52:19, 53:5, 53:11, 54:7, 54:11, 54:16, 63:15, 63:21, 63:24, 64:21, 64:23, 64:25, 65:2, 65:4, 65:5, 65:12, 65:14, 65:21, 66:8, 66:11, 66:12, 66:13, 66:15, 66:16, 68:15, 68:16, 68:17
**sheet** [1] - 47:15
**shifting** [1] - 18:4
**shocking** [1] - 18:2
**shore** [1] - 97:2
**show** [7] - 2:17, 21:6, 21:17, 37:17, 54:7, 54:9
**showed** [2] - 59:12, 59:13
**showing** [4] - 13:22, 18:7, 49:24, 56:4
**shown** [7] - 52:13, 58:23
**shows** [7] - 40:5, 53:9, 59:3, 59:4, 59:21, 76:13, 91:14
**SI** [7] - 13:24, 38:17, 52:8, 52:11, 52:15, 54:8, 54:9
**Siberia** [1] - 54:24
**sick** [1] - 97:23
**side** [1] - 27:15
**signed** [3] - 26:17, 59:19, 60:8
**significant** [17] - 41:14, 54:11, 59:3, 59:4, 68:18, 78:10, 81:6, 82:3, 83:3, 83:4, 84:5, 84:12, 84:19, 85:13, 95:1, 95:3, 99:17
**significantly** [3] - 22:20, 80:15, 93:5
**similar** [1] - 6:17
**simplistically** [1] - 46:21
**simply** [1] - 21:16
**sincere** [1] - 98:16
**single** [7] - 31:11, 38:3, 50:23, 75:25, 76:1, 99:19
**sit** [1] - 34:8
**sitting** [6] - 46:1, 69:10, 71:18, 73:1, 73:18, 75:7
**situation** [6] - 29:14, 34:1, 62:9, 70:2, 70:14, 92:12
**situations** [1] - 30:4
**six** [1] - 42:22
**skill** [1] - 92:9
**skills** [1] - 92:3
**slice** [1] - 16:8
**slowly** [2] - 2:7, 46:9
**software** [1] - 91:20
**sold** [2] - 37:13, 91:22
**solely** [1] - 7:23
**solvent** [1] - 98:1
**someone** [7] - 17:20, 67:23, 74:10,

85:5, 85:10, 86:14, 91:7
**sometime** [1] - 47:6
**sometimes** [1] - 75:11
**somewhat** [1] - 53:16
**somewhere** [4] - 74:13, 83:24, 87:12, 87:23
**son** [2] - 96:25, 100:3
**soon** [2] - 80:19, 91:5
**sorry** [9] - 2:2, 3:9, 20:14, 46:10, 59:7, 63:13, 72:13, 84:2, 84:23
**sort** [10] - 7:15, 21:14, 22:6, 33:2, 33:22, 35:10, 35:14, 38:14, 56:23, 58:10
**Southern** [1] - 81:20
**speaking** [4] - 39:9, 62:8, 65:6, 80:20
**specific** [7] - 9:15, 10:1, 22:17, 25:4, 36:7, 68:6, 78:5
**specifically** [4] - 5:16, 5:21, 16:4, 49:8
**specificity** [1] - 46:19
**Spector** [8] - 29:8, 29:12, 42:6, 46:17, 50:21, 69:25, 87:6, 98:23
**SPECTOR** [98] - 1:13, 2:13, 2:22, 3:2, 3:8, 4:25, 5:7, 5:20, 6:13, 7:7, 7:12, 7:14, 7:19, 8:16, 9:4, 9:12, 9:18, 9:24, 10:7, 10:11, 10:15, 10:23, 10:25, 11:13, 12:7, 12:18, 12:24, 13:10, 13:14, 14:7, 14:11, 16:11, 16:15, 16:17, 16:20, 21:12, 21:22, 22:2, 22:4, 22:9, 22:13, 25:2, 25:4, 25:13, 26:1, 26:23, 27:2, 27:13, 27:16, 28:5, 30:20, 30:24, 31:3, 31:15, 32:17, 33:1, 33:19, 33:21, 34:2, 35:13, 35:18, 35:25, 36:11, 36:14, 36:25, 37:2, 39:21, 47:8, 47:11, 48:17, 48:24, 49:5, 49:7, 55:13, 55:16, 56:17, 56:20, 57:1, 57:11, 58:5, 70:5, 70:10, 70:16, 74:15, 74:24, 75:3, 75:15, 75:20, 76:17, 76:21, 76:24, 87:7, 87:17, 87:20, 95:9, 98:24, 99:1, 100:6
**Spector's** [1] - 46:18
**spoken** [1] - 97:10
**stable** [1] - 97:23
**stage** [1] - 85:6
**stakes** [1] - 34:6
**stand** [7] - 43:21, 46:25, 48:4, 48:5, 55:15, 88:25
**standard** [8] - 33:14, 33:22, 41:9, 41:12, 47:13, 47:19, 47:22, 48:10
**standing** [1] - 80:13
**stands** [3] - 43:23, 48:5, 53:4
**Star** [14] - 17:6, 18:6, 31:22, 38:23, 40:12, 40:13, 44:25, 50:11, 52:25, 53:1, 54:14, 54:19, 55:22
**start** [3] - 7:14, 33:23, 42:5
**started** [3] - 43:13, 58:17
**starts** [1] - 24:2
**state** [7] - 28:15, 29:25, 76:6, 80:19, 80:21, 80:22, 99:16
**statement** [55] - 7:6, 19:15, 19:17, 19:25, 20:7, 20:13, 20:16, 20:20, 20:25, 21:3, 21:6, 23:23, 24:11, 24:17, 25:23, 26:7, 26:12, 26:17, 26:19, 28:11, 40:21,

41:1, 41:4, 41:7, 44:9, 49:2, 50:24, 51:17, 51:18, 51:23, 58:18, 58:19, 59:3, 59:5, 59:10, 59:21, 59:23, 59:24, 60:1, 60:17, 61:8, 61:16, 61:18, 61:24, 62:17, 69:8, 69:12, 70:22, 70:25, 71:4, 71:11, 74:9, 83:21, 98:16
**statements** [22] - 26:14, 27:24, 37:22, 37:25, 38:3, 38:4, 42:17, 45:18, 46:16, 47:3, 49:1, 49:16, 50:21, 50:22, 51:11, 51:13, 51:16, 51:22, 61:6, 88:5
**STATES** [3] - 1:1, 1:3, 1:10
**States** [8] - 1:13, 5:6, 12:4, 80:11, 89:14, 89:22, 89:24
**statute** [2] - 58:12, 86:4
**stay** [1] - 46:19
**stenography** [1] - 1:24
**step** [2] - 43:3, 80:9
**still** [13] - 11:23, 17:7, 21:10, 25:15, 42:7, 52:2, 66:20, 68:18, 89:13, 90:8, 94:4, 95:23, 97:15
**stock** [22] - 15:9, 23:15, 23:17, 23:19, 23:20, 23:22, 23:24, 23:25, 24:24, 25:15, 27:10, 31:22, 32:14, 32:25, 37:13, 50:3, 50:9, 53:3, 60:10, 64:21, 74:19
**stocks** [12] - 11:1, 13:21, 16:23, 19:20, 19:21, 19:22, 20:4, 24:2, 26:15, 37:7, 41:20, 43:24
**stole** [1] - 54:4
**stolen** [1] - 44:13
**straight** [2] - 37:6, 42:4
**straightforward** [1] - 60:19
**strength** [1] - 98:14
**strict** [1] - 8:10
**strip** [3] - 35:14, 36:21, 37:2
**strong** [1] - 34:3
**strongly** [1] - 14:15
**stuck** [1] - 93:11
**style** [1] - 94:13
**subject** [10] - 7:10, 11:23, 21:9, 35:2, 46:7, 46:14, 68:4, 72:2, 94:5, 98:19
**submission** [5] - 5:2, 21:17, 50:23, 51:1, 88:19
**submissions** [1] - 86:22
**submit** [1] - 39:1
**submitted** [6] - 4:13, 6:5, 19:1, 48:3, 77:11, 87:2
**subpoenas** [1] - 45:1
**subsequent** [1] - 68:3
**subsidiaries** [3] - 14:23, 15:6, 22:15
**substantial** [6] - 7:4, 65:25, 69:22, 80:24, 81:2, 98:10
**substantially** [2] - 80:15, 92:22
**successful** [2] - 39:14, 39:22
**sufficient** [4] - 21:13, 47:23, 83:13, 98:2
**suggest** [2] - 58:19, 71:5
**suggested** [1] - 48:25
**suggesting** [1] - 87:11
**suggests** [7] - 14:15, 18:8, 28:25, 52:14, 57:2, 57:13, 57:18

**suicide** [1] - 97:4
**Sulzer** [1] - 1:20
**sum** [1] - 69:18
**summarized** [1] - 80:25
**summer** [3] - 34:18, 40:7, 44:2
**supervisable** [1] - 89:12
**supervise** [1] - 89:15
**supervised** [2] - 89:10, 89:11
**support** [1] - 97:24
**suppose** [1] - 16:23
**supposed** [5] - 43:9, 43:14, 44:2, 73:4, 73:9
**surprising** [1] - 40:23
**surveys** [1] - 50:1
**suspicion** [1] - 57:22
**suspicious** [1] - 15:17
**Swiss** [2] - 46:6, 46:13
**Switzerland** [3] - 65:1, 76:5
**syllogism** [3] - 20:2, 61:5, 93:5
**sympathize** [1] - 86:23
**system** [3] - 23:3, 47:14, 90:17

**T**

**table** [2] - 45:18, 46:2
**talks** [2] - 32:2, 34:4
**target** [1] - 40:23
**targets** [1] - 38:9
**task** [1] - 90:4
**tax** [2] - 75:12
**taxes** [2] - 75:14, 75:17
**tea** [1] - 47:14
**tease** [2] - 51:14, 51:15
**tempting** [1] - 90:11
**ten** [7] - 3:9, 9:8, 28:13, 34:7, 45:5, 62:4, 81:13
**tenant** [1] - 72:1
**tens** [1] - 36:3
**terms** [6] - 33:3, 36:8, 36:9, 47:12, 53:21, 63:15
**terrible** [1] - 96:23
**testify** [4] - 28:20, 28:21, 84:5, 96:17
**THE** [6] - 1:9, 2:6, 63:9, 95:13, 95:15, 100:2
**The court** [243] - 2:2, 2:7, 2:16, 3:1, 3:4, 3:10, 3:13, 3:15, 3:17, 3:20, 3:23, 4:1, 4:4, 4:6, 4:8, 4:18, 4:21, 5:1, 5:8, 5:12, 5:23, 5:24, 6:5, 6:7, 6:11, 6:21, 6:23, 7:1, 7:4, 7:8, 7:13, 7:17, 8:7, 8:9, 8:14, 8:17, 9:10, 9:17, 9:20, 10:5, 10:8, 10:14, 10:24, 11:6, 11:15, 11:17, 11:22, 12:8, 12:15, 12:20, 13:1, 13:13, 14:5, 14:10, 16:9, 16:14, 16:16, 16:18, 16:21, 18:8, 18:15, 18:19, 19:4, 21:7, 21:12, 21:21, 21:25, 22:3, 22:6, 22:12, 22:22, 22:25, 24:13, 25:1, 25:3, 25:11, 25:20, 25:24, 26:6, 26:21, 26:24, 27:3, 27:14, 28:2, 30:19, 30:22, 31:2, 31:9, 31:13, 32:12, 32:24, 33:18, 33:20, 33:25, 35:12, 35:15, 35:21, 36:8, 36:12, 36:23,

37:1, 38:8, 38:13, 39:20, 41:23, 42:3, 42:6, 46:3, 46:9, 47:9, 47:21, 47:24, 48:15, 48:23, 49:4, 49:6, 50:6, 51:4, 52:22, 53:13, 53:19, 55:1, 55:10, 55:14, 55:24, 56:13, 56:19, 56:25, 57:5, 57:25, 58:6, 58:14, 58:24, 61:9, 62:1, 62:4, 62:11, 62:15, 62:18, 63:3, 63:11, 63:20, 64:4, 64:11, 64:19, 64:22, 65:4, 65:8, 65:15, 65:23, 66:5, 66:22, 66:25, 67:2, 67:5, 67:7, 67:10, 67:19, 67:22, 67:25, 68:1, 68:7, 68:9, 68:11, 68:12, 68:21, 69:5, 69:9, 69:15, 69:16, 69:17, 69:18, 69:21, 70:7, 70:11, 71:9, 71:16, 71:25, 72:12, 72:14, 72:18, 72:21, 73:12, 73:20, 73:24, 74:2, 74:10, 74:21, 74:22, 74:25, 75:14, 75:19, 75:22, 76:10, 76:14, 76:18, 76:20, 76:22, 77:2, 77:6, 78:11, 78:25, 79:1, 79:3, 79:6, 79:23, 82:14, 83:15, 84:1, 84:3, 84:12, 84:21, 84:24, 85:1, 85:3, 85:20, 85:24, 86:1, 86:19, 86:21, 87:3, 87:5, 87:15, 87:18, 88:13, 90:4, 90:14, 90:16, 90:19, 92:2, 92:15, 93:7, 95:8, 95:10, 95:14, 95:16, 97:18, 98:5, 98:23, 98:25, 99:20, 100:3

**themself** [1] - 41:6
**theoretically** [1] - 86:3
**theory** [5] - 38:21, 40:15, 58:16, 58:20, 74:23
**thereabouts** [2] - 85:19, 86:16
**thereafter** [1] - 80:23, 81:5
**therefore** [5] - 8:3, 19:25, 33:5, 93:4, 93:11
**they've** [1] - 47:1
**thinking** [1] - 33:18
**thinks** [1] - 94:3
**third** [4] - 27:9, 32:12, 41:15, 56:24
**thoughts** [1] - 57:11
**thousand** [1] - 44:23
**thousands** [2] - 34:5, 48:2
**three** [21] - 15:5, 16:4, 21:19, 25:16, 26:15, 27:3, 38:5, 39:17, 40:15, 41:15, 41:18, 42:23, 43:6, 46:7, 46:14, 49:2, 49:14, 54:23, 85:22, 88:5, 94:11
**three-year** [1] - 94:11
**threshold** [1] - 38:11
**throw** [1] - 30:7
**timing** [2] - 28:17, 28:25
**Title** [1] - 80:10
**today** [1] - 7:1, 7:11, 31:18, 43:21, 52:2, 58:11, 61:13, 62:13, 88:15, 89:21, 92:24
**today's** [1] - 99:3
**together** [1] - 71:10
**tomorrow** [5] - 98:21, 99:17, 99:22, 99:25, 100:5
**took** [7] - 40:25, 44:23, 45:7, 46:24, 73:19, 94:3, 94:15
**top** [2] - 30:8, 32:23
**total** [7] - 11:7, 11:8, 25:19, 61:16, 61:21, 79:25, 89:2
**totally** [3] - 22:24, 28:1, 57:16

**touch** [1] - 82:1
**tough** [1] - 51:16
**towards** [2] - 21:23, 22:9
**traded** [1] - 26:15
**trades** [1] - 24:4
**trading** [3] - 24:2, 45:17, 53:2
**transaction** [6] - 36:5, 52:25, 53:1, 53:2, 53:9, 53:11
**transactions** [13] - 16:14, 16:15, 16:16, 40:20, 42:11, 53:4, 61:13, 61:21, 61:25, 64:20, 70:8, 77:12, 93:20
**transcript** [1] - 1:24
**TRANSCRIPT** [1] - 1:9
**transfer** [7] - 13:23, 13:24, 15:9, 40:11, 40:12, 52:19, 63:17
**transferred** [7] - 13:21, 16:23, 38:16, 38:17, 38:25, 40:17, 49:9
**transferring** [2] - 37:15, 49:1
**transfers** [9] - 25:8, 37:18, 40:4, 40:6, 52:3, 52:8, 64:8, 64:10, 64:17
**traveled** [1] - 96:16
**treated** [1] - 88:2
**treatment** [2] - 15:12, 15:24
**tremendous** [1] - 15:22
**trial** [7] - 43:8, 43:11, 43:15, 43:18, 44:2, 77:8, 82:13, 82:14
**trials** [1] - 41:17
**tried** [4] - 17:15, 56:4, 95:22
**tries** [1] - 91:12
**trouble** [1] - 74:19
**troubling** [3] - 17:4, 17:16, 17:19
**true** [7] - 15:18, 15:19, 20:21, 35:25, 36:1, 41:2, 74:24
**truly** [1] - 96:7
**Trust** [3] - 65:9, 65:24, 66:22
**trust** [49] - 16:10, 46:6, 60:18, 60:24, 64:12, 64:16, 64:17, 65:8, 65:12, 65:13, 65:14, 65:16, 65:17, 65:21, 66:10, 66:14, 66:16, 66:18, 66:19, 66:21, 66:23, 66:25, 67:2, 67:3, 67:24, 68:2, 68:17, 68:18, 68:19, 68:20, 68:23, 71:16, 72:10, 72:15, 72:17, 72:19, 72:20, 72:24, 74:17, 74:20, 75:11, 75:21, 75:24, 84:22, 84:25, 93:23
**trustee** [2] - 67:15, 76:7
**trustees** [1] - 76:8
**trusts** [7] - 16:13, 16:22, 46:12, 61:17, 76:2, 76:3, 76:8
**truth** [7] - 29:2, 29:4, 30:12, 34:5, 40:22, 42:12, 88:21
**try** [7] - 28:21, 45:5, 45:14, 47:14, 88:23, 89:22, 92:11
**trying** [3] - 34:16, 34:20, 44:3, 63:2, 64:6, 65:25, 74:21, 74:22, 75:2, 85:12, 94:19, 97:2, 97:5
**turn** [2] - 21:22, 21:23
**turned** [1] - 92:9
**turning** [1] - 25:22
**turns** [3] - 29:14, 44:20, 51:25
**twice** [2] - 85:25, 90:12
**two** [28] - 2:12, 2:18, 15:2, 19:14,

21:18, 22:13, 26:13, 33:1, 42:23, 43:15, 43:23, 49:10, 50:2, 53:3, 53:10, 54:17, 56:11, 70:17, 77:19, 78:15, 78:18, 78:25, 80:1, 89:9, 89:18, 91:3, 91:23, 93:12
**types** [1] - 86:4

## U

**U.S** [3] - 1:4, 1:14, 63:9
**ultimately** [4] - 13:25, 66:18, 75:4, 75:6
**unavailable** [1] - 93:21
**unbeknownst** [1] - 80:22
**unclear** [2] - 39:5, 48:2
**uncontradictable** [1] - 52:11
**uncontradicted** [1] - 52:10
**under** [22] - 3:7, 5:3, 6:20, 7:21, 8:10, 16:6, 25:17, 26:11, 31:18, 33:22, 41:3, 44:1, 47:19, 47:22, 48:20, 57:17, 59:2, 77:19, 79:5, 80:1, 86:3, 95:5
**underlying** [1] - 42:9
**undermine** [1] - 40:19
**understandable** [1] - 74:4
**understood** [3] - 38:18, 52:17, 54:10
**undisclosed** [1] - 18:12
**undisputed** [1] - 37:4
**unfolded** [1] - 73:14
**unfortunately** [1] - 73:14
**unintentional** [1] - 98:20
**uniquely** [2] - 81:7, 81:10
**UNITED** [3] - 1:1, 1:3, 1:10
**United** [8] - 1:13, 5:6, 12:4, 80:11, 89:14, 89:22, 89:24
**unless** [1] - 86:24
**unlikely** [1] - 88:21
**unluckiest** [1] - 41:16
**unpack** [1] - 37:20
**unpacking** [1] - 39:1
**unquestionably** [1] - 54:7
**unreachable** [2] - 16:22, 93:23
**unredacted** [1] - 5:3
**unsealing** [1] - 6:11
**unsecured** [1] - 57:16
**unwillingness** [1] - 77:13
**up** [33] - 2:18, 40:9, 41:21, 43:24, 46:25, 48:9, 50:3, 50:21, 53:4, 66:17, 68:20, 72:5, 75:11, 75:24, 76:2, 83:10, 84:6, 85:22, 85:25, 86:2, 87:14, 87:24, 87:25, 90:16, 90:19, 91:7, 94:17, 94:18, 97:2, 99:17
**updated** [1] - 17:13
**ups** [1] - 97:25
**US** [1] - 96:16
**usable** [1] - 89:3
**useful** [1] - 33:8
**utilized** [1] - 64:13

## V

**value** [12] - 7:21, 37:8, 37:9, 38:15, 59:10, 59:17, 59:24, 61:22, 68:18, 68:19, 68:22
**valued** [1] - 59:11
**various** [1] - 15:25
**variously** [1] - 46:19
**vehicle** [1] - 71:16
**version** [1] - 5:4
**versions** [1] - 45:7
**versus** [1] - 26:16
**victim** [1] - 91:16
**videotape** [1] - 59:13
**view** [13] - 7:23, 8:3, 13:18, 16:25, 37:2, 37:17, 37:19, 48:18, 57:2, 58:7, 58:9, 88:10, 96:11
**views** [6] - 22:19, 77:5, 98:8, 98:12, 98:19
**vigorous** [1] - 50:16
**Vincicia** [1] - 92:1
**violate** [1] - 70:3
**violated** [1] - 70:9
**violation** [3] - 12:4, 12:6, 77:20
**violations** [1] - 77:6
**virtually** [1] - 37:4
**visit** [1] - 94:11
**voice** [2] - 90:16, 90:19
**voluntarily** [1] - 32:9
**voluntary** [1] - 79:7

## W

**walk** [1] - 62:14
**wants** [5] - 17:20, 28:23, 31:24, 39:6, 67:23
**warranted** [1] - 27:5
**wasting** [1] - 94:15
**Water** [3] - 56:6, 62:4, 66:6
**water** [2] - 57:17, 59:2
**ways** [1] - 13:18
**wealthy** [2] - 39:14, 39:22
**Website** [6] - 43:20, 88:15, 88:18, 91:4, 91:6, 91:8
**week** [6] - 4:15, 28:18, 97:8, 97:9, 97:11, 99:16
**weeks** [4] - 26:15, 43:23, 91:2, 97:2
**weighing** [1] - 48:19
**West** [2] - 62:6, 66:6
**whatsoever** [1] - 87:8
**whereabouts** [1] - 81:21
**wherewithal** [2] - 26:19, 90:9
**whole** [6] - 40:22, 44:24, 58:16, 58:20, 61:5, 84:8
**wholly** [1] - 52:10
**wife** [6] - 72:1, 72:3, 72:9, 72:10, 72:25, 73:19
**willing** [1] - 97:16
**willingness** [1] - 79:10

**wind** [1] - 80:19
**Winston** [1] - 50:5
**wish** [2] - 13:2, 77:10
**withheld** [1] - 60:11
**witness** [14] - 28:24, 30:3, 37:22, 37:24, 38:3, 41:15, 44:8, 44:16, 53:25, 88:5, 88:25, 89:3, 89:4
**witnesses** [7] - 38:5, 40:16, 45:13, 45:17, 47:1, 47:22, 55:6
**wonder** [1] - 55:1
**wondering** [1] - 11:23
**words** [1] - 85:5
**world** [2] - 41:1, 41:17
**worried** [1] - 74:11
**worth** [7] - 26:9, 38:12, 60:4, 60:5, 69:13, 71:19, 72:3
**worthy** [1] - 22:19
**write** [1] - 81:25
**writes** [1] - 46:3
**written** [3] - 58:24, 82:1, 96:25
**wrote** [2] - 43:17, 44:18

## Y

**year** [14] - 11:25, 16:5, 24:10, 25:16, 34:12, 44:19, 60:3, 62:12, 62:21, 76:21, 81:9, 90:2, 94:11
**years** [20] - 15:2, 15:25, 19:9, 34:7, 43:6, 53:9, 76:5, 81:14, 83:1, 83:24, 89:5, 89:25, 91:7, 91:23, 95:18, 96:2, 96:23, 98:18, 99:10
**YORK** [1] - 1:1
**York** [7] - 1:4, 1:15, 1:21, 54:20, 54:22, 81:19, 81:20